JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

15 CV 1539

Z.A. & R.A., individually and on behalf of D.A.,         :

                                    Plaintiffs,          :

            -against-                                    :          **COMPLAINT**

                                                         :          ECF Case

THE NEW YORK CITY DEPARTMENT OF                          :
EDUCATION,
                                    Defendant.
------------------------------------------------------------- X

        Plaintiffs Z.A. and R.A., individually and on behalf of their minor child,

D.A., by their attorneys, the Law Offices of Lauren A. Baum, P.C., as and for their

Complaint herein allege as follows:

## PRELIMINARY STATEMENT

        1.       Defendant, the New York City Department of Education ("DOE"),

is required to provide a free and appropriate public education ("FAPE") to every

New York City resident student with a disability. Defendant failed to provide a

FAPE to Plaintiff D.A. for the 2010-11 and 2011-12 school years ("SYs"). As a

result D.A.'s parents, Z.A. and R.A., were forced to secure a seat at an appropriate

private school, the Aaron School ("Aaron"), for D.A. to attend during the 2010-11

and 2011-12 SYs. Plaintiffs Z.A. and R.A. now bring this action seeking a

declaration that Defendant failed to provide D.A. with a FAPE for the 2010-11

and 2011-12 SYs; that Aaron appropriately addressed D.A.'s needs for the 2010-

11 and 2011-12 SYs; and that a weighing of the equities supports their claim for

1

reimbursement of the costs of D.A.'s attendance at Aaron during both SYs.

Plaintiffs seek a judgment reversing the Decisions of the State Review Officer

("SRO") denying their claims; upholding the Decisions of the Impartial Hearing

Officers ("IHOs"); and requiring Defendant to reimburse them for the costs of

D.A.'s attendance at Aaron during the 2010-11 and 2011-12 SYs.

## JURISDICTION

2.      This Court has jurisdiction to entertain this action pursuant to 28

U.S.C. § 1331 in that claims are asserted pursuant to the Constitution and laws of

the United States; pursuant to 20 U.S.C. § 1343(a) in that claims are asserted

pursuant to laws providing for the protection of civil rights; and pursuant to 20

U.S.C. § 1415(i)(2) & (3).

3.      If successful, Plaintiffs are entitled to their costs and attorney's

fees under 20 U.S.C. § 1415(i)(3) and 29 U.S.C. § 794(a).

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this district.

5.      Plaintiffs disagreed with the recommendations of Defendant's

Committee on Special Education ("CSE") for D.A. for the 2010-11 SY.  As a

result, as more fully set forth below, on or about July 13, 2011, Plaintiffs filed a

due process complaint ("DPC") commencing the first of the underlying impartial

hearings in this action.  An Amended DPC was filed on November 18, 2011.

6.     An impartial hearing occurred over five (5) days, commencing on January 23, 2012.

7.     The impartial hearing resulted in a findings of fact and decision, dated September 4, 2012, whereby the IHO determined that Defendant had failed to offer Plaintiff D.A. a FAPE for the 2010-11 SY; that Plaintiffs' unilateral placement of D.A. at Aaron was appropriate; and that equitable considerations supported Plaintiffs' claim, and granted Plaintiffs' request for tuition reimbursement for D.A.'s placement at Aaron for the 2010-11 SY. [Attached hereto as Exhibit "A" is a copy of the Findings of Fact and Decision of IHO Mindy Wolman, Esq., Case No. 134060, dated September 4, 2012].

8.     Defendant appealed the IHO's decision to the SRO, alleging that the IHO erred in finding that Defendant had failed to provide D.A. with a FAPE for the 2010-11 SY, as well as in finding that Aaron was appropriate for D.A. and that equitable considerations supported Plaintiffs' claim for tuition funding, and that the IHO had thus improperly granted Plaintiffs' request for tuition reimbursement.

9.     While in agreement with the IHO's final conclusions that Defendant failed to provide D.A. with a FAPE for the 2010-11 SY, that Aaron appropriately addressed D.A.'s needs, and that equitable considerations supported their claim for tuition reimbursement, Plaintiffs nevertheless cross-appealed the IHO's failure to address several of their claims in her decision to the SRO.

10.     The appeal to the SRO resulted in a decision dated October 29,

3

2014, whereby the SRO found that the IHO had incorrectly determined that Defendant failed to meet its burden to prove that it offered D.A. a FAPE for the 2010-11 SY and reversed the IHO's Decision. The SRO did not issue any findings regarding whether the IHO correctly found Plaintiffs had met their burden to show that Aaron appropriately addressed D.A.'s needs for the 2010-11 SY or whether the IHO had correctly determined that equitable considerations supported Plaintiffs' claim. [Attached hereto as Exhibit "B" is a copy of the Decision of the SRO, <u>Application of the New York City Department of Education</u>, No. 12-196, dated October 29, 2014].

11.    In contrast to the SRO's decision, the IHO's determination that Defendant failed to offer S.S. a FAPE for the 2010-11 SY was well-reasoned and supported by the record, and the SRO's decision improperly granted Defendant's appeal, dismissed Plaintiffs' cross-appeal, reversed the finding of the IHO that Defendant failed to offer D.A. FAPE for the 2010-11 SY, and denied Plaintiffs' claim for tuition reimbursement.

12.    Plaintiffs also disagreed with the recommendations of Defendant's CSE for D.A. for the 2011-12 SY. As a result, as more fully set forth below, on or about July 31, 2012, Plaintiffs filed a DPC commencing the second of the underlying impartial hearings in this matter.

13.    The impartial hearing took place over four (4) days, commencing on October 9, 2012.

14.    The impartial hearing resulted in a findings of fact and decision,

4

dated January 30, 2013, whereby the IHO determined that Defendant had failed to offer Plaintiff D.A. a FAPE for the 2011-12 SY; that Plaintiffs' unilateral placement of D.A. at Aaron was appropriate; and that equitable considerations supported Plaintiffs' claim, and whereby the IHO granted Plaintiffs' request for tuition reimbursement for D.A.'s placement at Aaron for the 2011-12 SY. [Attached hereto as Exhibit "C" is a copy of the Findings of Fact and Decision of IHO James McKeever, Esq., Case No. 140020, dated January 30, 2013].

      15.     Defendant appealed the IHO's decision to the SRO, alleging that the IHO erred in finding that Defendant had failed to provide D.A. with a FAPE for the 2011-12 SY, as well as in finding that Aaron was appropriate for D.A. and that equitable considerations supported Plaintiffs' claim for tuition reimbursement, and that the IHO had thus improperly granted Plaintiffs' request for tuition reimbursement.

      16.     While in agreement with the IHO's final conclusions that Defendant failed to provide D.A. with a FAPE for the 2011-12 SY, that Aaron appropriately addressed D.A.'s needs for the 2011-12 SY, and that equitable considerations supported their claim for tuition reimbursement, Plaintiffs nevertheless cross-appealed several aspects of the IHO's decision to the SRO.

      17.     The appeal to the SRO resulted in a cursory nine-page decision, of which only slightly over three pages were actually devoted to an assessment of the parties' arguments on appeal, dated October 29, 2014, whereby the SRO found that the IHO had erred in finding Defendant failed to meet its burden to prove that

it offered D.A. a FAPE for the 2011-12 SY and reversed the IHO's Decision. The SRO did not issue any findings regarding whether the IHO correctly found Plaintiffs had met their burden to show that Aaron appropriately addressed D.A.'s needs for the 2011-12 SY or whether the IHO had correctly determined that equitable considerations supported Plaintiffs' claim. [Attached hereto as Exhibit "D" is a copy of the Decision of the SRO, Application of the New York City Department of Education, No. 13-036, dated October 29, 2014].

18.    Plaintiffs bring the instant action seeking to overturn the decisions of the SRO finding that Defendant met its burden to prove that it offered D.A. a FAPE for the 2010-11 and 2011-12 SYs and denying Plaintiffs' claim for reimbursement for the costs of D.A.'s attendance at Aaron during the 2010-11 and 2011-12 SYs. Plaintiffs also seek their costs, attorney's fees, and related relief.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.    Plaintiffs pursued this matter through the impartial hearing process and IHOs rendered decisions in the cases Plaintiffs brought challenging Defendant's educational recommendations for D.A. for the 2010-11 and 2011-12 SYs. Defendant appealed both IHO decisions to the SRO, Plaintiffs cross-appealed the IHO's decisions to the SRO, and the SRO issued decisions in both cases. Plaintiffs have thus exhausted the administrative process precedent to the filing of this claim.

## PARTIES

20.    Initials are used throughout this Complaint to preserve the

6

confidentiality of the infant Plaintiff in conformity with the privacy provisions of the IDEA, codified at 20 U.S.C. § 1417(c), and with the Family Educational Right to Privacy Act ("FERPA"), codified at 20 U.S.C. § 1232(g).

21.    Plaintiffs Z.A. and R.A. are the parents of D.A., a student with a disability.  Plaintiffs all reside within the City of New York in New York County.

22.    D.A. was eleven years old at the start of the 2010-11 SY, the first SY that is the subject of this action, and was properly classified as a student with speech/language impairment during the 2010-11 and 2011-12 SYs.

23.    Defendant is a local educational agency as defined by the IDEA, pursuant to 20 U.S.C. § 1402(19), and, as such, is obligated to provide educational and related programs and services to the students in its jurisdiction in compliance with applicable federal and state statutes and regulations, as well as the United States Constitution, and is subject to the requirements of 20 U.S.C. § 1400, et. seq., 29 U.S.C. § 794, 42 U.S.C. § 12101, et. seq., and the regulations promulgated thereunder.

## OVERVIEW OF APPLICABLE FEDERAL LAW

24.    Congress enacted the IDEA to ensure that students with disabilities are provided with meaningful access to public education.  States who participate in the IDEA receive substantial federal funds in exchange for their agreement to provide a FAPE to all disabled children in the state and to comply with the IDEA's procedural and substantive mandates.

25.    New York has chosen to participate in the IDEA framework and

has established procedures for providing special educational services to children with disabilities. N.Y. Educ. Law § 4401, et. seq.

26.    The primary mechanism for ensuring implementation of the IDEA's mandate to provide students with a FAPE is the Individualized Education Program ("IEP"). An IEP is a written statement, prepared for every child with a disability, which describes the child's present levels of performance and provides a roadmap for the child's progress over the course of a school year. The IEP sets forth the special education and related services, supplementary aids and services, and program modifications or support for school personnel, that will be provided for the particular child in order to enable that child to achieve a comprehensive set of annual goals and short term objectives.

27.    The IDEA requires school districts to offer each who is classified under the Act as having a disability a FAPE, which is an education that is provided at public expense, meets the standards of the state education agency, and is provided in conformity with the IEP. 20 U.S.C. § 1401(9).

28.    When a district fails to offer a FAPE to a student and the parents unilaterally place the student at an appropriate private school, the school district may be required to reimburse the student's parents for the cost of the student's placement and attendance at the private educational placement. 20 U.S.C. § 1412(a)(10)(C)(ii); 20 U.S.C. § 1415(i)(2)(C)(iii); Burlington Sch. Comm. v. Massachusetts Dep't of Educ., 471 U.S. 359 (1986); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993).

8

## FACTUAL ALLEGATIONS

### Background

29.     D.A. was born on May 26, 1999.  At all relevant times during the 2010-11 and 2011-12 SYs, D.A. resided within Defendant's school district, was classified as a student with a disability under the IDEA, and had an IEP.

30.     D.A. has a history of academic and social deficits; pragmatic, expressive, and receptive language difficulties; delayed motor skills; anxiety, cognitive rigidity, and inflexibility; auditory processing issues; sensory integration and regulation difficulties; diminished frustration tolerance, particularly for over-stimulating tasks or those that he perceives as difficult; and problems with executive functioning, sustained attention, and impulsivity, all of which affected his functioning in school during the 2010-11 and 2011-12 SYs.

31.     In November and December 2008 and February 2009, D.A. was evaluated by Dr. David Salsberg.  Among other things, due to D.A.'s issues, Dr. Salsberg recommended placement for D.A. in a small, special education program "in a structured, therapeutic, and language-based setting . . . [that] specifically include[s] individualized focus on children with attentional, pragmatic language, and emotional needs."

32.     D.A.'s parents provided Dr. Salsberg's evaluation report to the CSE for consideration in developing educational recommendations for D.A.

33.     Consistent with Dr. Salsberg's recommendations and the input of the individuals involved in D.A.'s education, during the 2010-11 and 2011-12

9

SYs, D.A. required placement in a small, structured, supportive special education class in a small, structured educational environment, with appropriate levels of individual support from a teacher, supervision, and appropriate related services, including access to a sensory gym during his school day, as well as appropriate and similarly-functioning peers and appropriate peer models.

## Defendant Failed to Develop a Procedurally Valid and Substantively Appropriate IEP for D.A. for the 2010-11 SY

34.     A CSE review meeting was held on April 19, 2010 to develop an IEP for D.A. for the 2010-11 SY.

35.     Plaintiffs R.A. and Z.A. attended this meeting, and Kimberly Joyce, D.A.'s special education teacher at Aaron, participated by phone.  For the CSE, Feng Ye participated as the special education teacher and District Representative, Rose Fochetta participated as the school psychologist, and Victor Benavente participated as the general education teacher.

36.     The CSE classified D.A. as a student with speech or language impairment and recommended placement for him in a 12:1:1 special class in a community school along with related services of speech/language therapy ("SL"), occupational therapy ("OT"), and counseling ("CO") for the 2010-11 SY.

37.     As the IHO properly found, the record shows that the CSE failed to consider or discuss sufficient, current evaluative and documentary material at the April 2010 meeting in developing D.A.'s 2010-11 IEP. See 34 C.F.R. §§ 300.304(c), 300.305, 300.324, 300.4; 8 N.Y.C.R.R. § 200.4(f)(1).

38.     The CSE failed to discuss or review Dr. Salsberg's evaluation report, despite the fact that this evaluation was D.A.'s most current testing available at the time of the meeting and still well-within the required three-year range that determines whether an evaluation is still reliable under the IDEA. While Ms. Ye claimed to have reviewed this evaluation herself prior to the April 2010 meeting, she admitted that this evaluation was not used to develop D.A.'s IEP, calling into question the extent to which this evaluation actually informed the 2010-11 IEP.

39.     The CSE also failed to conduct or review a social history or medical assessment in developing D.A.'s IEP, and it failed to conduct or review any SL or OT evaluations to gather information about D.A.'s functioning in those areas. The CSE also failed to speak with D.A.'s then-current OT or SL therapists about his progress.

40.     Indeed, Ms. Ye admitted during the impartial hearing that the CSE only considered and discussed a classroom observation and Aaron school progress reports in developing D.A.'s IEP.

41.     Ms. Ye's testimony failed to establish that the CSE considered D.A.'s most-recent Aaron progress report from February 2010 in developing the IEP, even though the parents provided Ms. Ye with copies of this report three times prior to the April 2010 CSE meeting and even though this report would have provided the CSE with more current written information regarding D.A.'s functioning in his school environment.

42.     Ms. Ye also could not recall whether she had a copy of D.A.'s 2009-2010 IEP at the meeting or whether it was discussed during the meeting.

43.     As the IHO found, the record shows that the CSE also failed to provide the parents or D.A.'s teacher with a full and meaningful opportunity to participate in the April 2010 meeting or in the development of D.A.'s IEP.

44.     The CSE failed to provide any documents to the general education teacher who was on the telephone, nor did it provide a copy of the classroom observation to D.A.'s teacher.  Moreover, the CSE did not read the classroom observation or other documents aloud during the meeting for the benefit of those who did not have copies of the documents available to them.

45.     Ms. Ye and Ms. Fochetta prepared draft pages for D.A.'s IEP prior to the April 2010 CSE meeting, but they failed to share copies of these with D.A.'s parents or teacher so that they could meaningfully participate in the discussion or comment on whether these pages were accurate reflections of D.A.'s functioning and needs.

46.     Ms. Ye could not recall whether she reviewed the goals from D.A.'s prior IEP during the meeting with D.A.'s teacher to assess the progress he had made on those goals in developing new goals for him.

47.     The CSE copied related service goals into D.A.'s IEP for the 2010-11 SY directly from his Aaron progress report, without consulting with his then-current therapists regarding whether these goals would continue to be appropriate for him for the following SY.

12

48.    The record shows that the CSE also failed to meaningfully consider or to respond to the concerns of D.A.'s parents and teacher regarding the appropriateness of the proposed 12:1:1 special class in a community school recommendation for D.A., failing to even consider placing D.A. in a more supportive environment, despite being aware that D.A. was then-attending a co-taught class of 11 students and two teachers in a small school environment, rather than a class of 12 students with one teacher and one paraprofessional in a larger DOE community school, and despite lacking any basis to justify recommending a less supportive setting for D.A.

49.    While Ms. Ye and Ms. Fochetta took minutes during the meeting, they did not verify the contents of these minutes with D.A.'s parents or teacher at the conclusion of the meeting, and the record shows that these minutes indeed somewhat misrepresented what occurred during the meeting.

50.    The record shows that the procedural errors the CSE committed resulted in a substantively inappropriate IEP for D.A.  The CSE's failure to fully evaluate D.A. or to consider sufficient, current, appropriate evaluative and documentary material to justify its recommendations, as well as its failure to provide all meeting participants with a full and meaningful opportunity to participate in the meeting or to adequately consult the parent and the individuals most familiar with D.A.'s needs regarding the development of the IEP, resulted in an IEP that failed to appropriately reflect or address D.A.'s needs for the 2010-11 SY, and thus in a denial of FAPE.

13

51.    As the IHO concluded, the IEP failed to adequately describe or to address D.A.'s needs since it failed to appropriately reflect or address D.A.'s present levels of performance and educational needs and failed to fully or accurately reflect the extent and depth of D.A.'s academic, speech/language, and social/emotional issues.  For example, the IEP fails to include any indication of D.A.'s anxiety, auditory processing issues, cognitive rigidity, cognitive levels, disparities in his cognitive functioning, need for a sensory gym, or fine motor functioning, all issues that negatively affected D.A.'s functioning in school and that should have been included in his IEP.

52.    As the IHO correctly found, the 12:1:1 special class in a community school recommendation was not appropriate for D.A. since it would not have provided D.A. with the "level and type of support" that the CSE was aware that D.A. continued to need in order to make appropriate progress.  D.A. required a small class with two appropriately-trained teachers in the classroom in order provide him with the level of support he needed to make appropriate progress, and the DOE lacked any justification for providing D.A. with a lesser degree of support for the 2010-11 SY.

53.    The goals included in the IEP were also inappropriate for D.A. since they failed to address all of D.A.'s individual needs, including his frustration tolerance, cognitive rigidity, or anxiety; since many of the goals were not measurable as written, including the first writing goal; and since, as the IHO properly recognized, many of the IEP goals required D.A. to reach grade level by

14

the end of the 2010-11 SY, which was neither reasonable or appropriate since D.A. was functioning two or three years below grade level at the time of the IEP meeting.

54.    The promotion criteria included in the IEP were also inappropriate for D.A. since they were inconsistent with D.A.'s then-current levels of performance.

55.    The IEP also failed to include any transition supports that D.A. would have required to facilitate his transfer to a less supportive school environment.

56.    As a result of the foregoing, the record shows that the April 2010 IEP was not reasonably calculated to provide D.A. with meaningful educational and social/emotional benefit and to prevent regression.

**Defendant Failed to Recommend a Substantively Appropriate Placement to D.A. Capable of Appropriately Implementing His IEP for the 2010-11 SY**

57.    Nearly four months after the April 2010 IEP meeting, Plaintiffs received a Final Notice of Recommendation ("FNR"), dated August 6, 2010, offering D.A. a placement at P.S. 6 for the 2010-11 SY.  The FNR did not specify what class at P.S. 6 was specifically offered to D.A. for the SY.

58.    Because they received the FNR over the summer when the school was closed, Plaintiffs promptly sent a letter to the CSE advising that they would visit the program to consider its appropriateness when it reopened in the fall and advise the CSE of their decision at that time.

59.     In their letter, Plaintiffs asked the CSE to provide them with specific information regarding the placement and class recommended to D.A. in the interim that would help them in making a determination regarding whether the offered program and placement would be appropriate for D.A. Defendant failed to respond to Plaintiffs' letter in any way.

60.     When the school reopened in the fall, Plaintiffs arranged to visit P.S. 6 to consider its appropriateness for D.A. They met with Dr. Muldowney and observed the 5th grade 12:1:1 class that was recommended for D.A.

61.     The classroom environment was very loud, which would be disruptive to D.A. and would impede his ability to learn, and the children in the classroom did not appear to have attentional issues or to need the level of individual attention and support that D.A. would require in order to learn.

62.     The parents' observation of the class raised additional concerns that D.A. would not receive the level of individual attention and support he needed in this class since the teacher was sitting with one student, with most of the other students working independently, something that D.A. would not be capable of doing for as long a period of time. Two students appeared to not be doing the task at hand and no teacher or paraprofessional intervened to redirect them. D.A. not only requires substantial individual attention and support in the classroom and modification of the curriculum, but also requires frequent breaks in the classroom throughout the day in order to maintain his focus.

63.     The school environment was also very loud, with many parents and

children in the hallways, and the school was very large, with about 786 students. The parents also learned that students were admitted and dismissed at the same time during the day.  All of these factors raised concerns that the school environment would have been overwhelming for D.A.,which would have exacerbated his anxiety and negatively affected his ability to learn throughout the school day.

64.     The parents also learned that P.S. 6 lacked a sensory gym, which D.A. requires access to throughout the day due to his sensory issues and in order to sustain focus and attention and to be available to learn.

65.     The parents wanted to learn more about the class during their visit, but the classroom teacher was unable to speak with them during their visit.  The parents were told to check the school's website for additional information, but were unable to obtain any information from the website.  Following their visit, the parents called Dr. Muldowney multiple times and left messages asking that the classroom teacher call them to answer some questions about the class and school environment, but they never received a return call.

66.     Based upon their visit, Plaintiffs determined that the placement offered at P.S. 6 would not be appropriate for D.A. for the 2010-11 SY and wrote to the CSE detailing the specific reasons for their decision.

67.     In their letter, Plaintiffs also reiterated their belief that they had expressed at the April 2010 CSE meeting that the 12:1:1 class recommended would not be appropriate for D.A., and they indicated their continued willingness

17

to reconsider the offered placement if the CSE provided them with information responsive to their concerns, as well as their willingness to consider any alternative placement for their son for the 2010-11 SY.

68.     Defendant again failed to respond to Plaintiffs' letter in any way, either to respond to any of Plaintiffs' concerns regarding the offered program and placement or to offer an alternative placement to D.A. for the 2010-11 SY.

69.     As the IHO found, the record demonstrates that Defendant failed to meet its burden of proof with respect to the placement it offered to D.A. at P.S. 6 for the 2010-11 SY.

70.     Contrary to the SRO's decision, Defendant was required to show that P.S. 6 was reasonably calculated to provide meaningful educational benefit to D.A. and that it could have appropriately implemented his IEP for the 2010-11 SY, and it failed to meet this burden in this case. See Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 123 (3d Cir. 1998) (citing 8 N.Y.C.R.R. § 200.4(d)(2)(xii)); N.Y. Educ. L. § 4402(1)(b)(3)(b)(i); D.C. v. New York City Dep't of Educ., No. 12-Civ.-1894 (JGK), 2013 U.S. Dist. LEXIS 42764, at *39 (S.D.N.Y. Mar. 26 2013).

71.     Contrary to the SRO's finding, R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012), and its progeny do not relieve Defendant of its obligation to demonstrate that it could have appropriately implemented D.A.'s IEP in this case, nor do they invalidate D.A.'s challenges to the appropriateness of P.S. 6 as speculative.

72.     While Jennifer Radden, the teacher of the 12:1:1 class in which D.A. would have been placed at P.S. 6, testified that she would have been able to implement D.A.'s IEP, she based this testimony exclusively on D.A.'s contested 2010-11 IEP.

73.     The record also belies Ms. Radden's contention.  Among other things, Ms. Radden admitted that she had never had to support a student who required sensory tools and that she had never implemented the suggestions of an occupational therapist in order to do so, that she did not have any sensory corner or tools in her classroom during the 2010-11 SY; and that she could not say for certain that an occupational therapist would have been able to coordinate with her to meet D.A.'s need for sensory support in the classroom.  Moreover, it is undisputed that P.S. 6 lacked a sensory gym, which D.A. required access to throughout the school day.

74.     As the IHO properly found, Defendant also failed to show that the offered class would have provided D.A. with appropriate and similarly-functioning peers and peer models.

75.     In contrast to D.A., none of the students in Ms. Radden's class had sensory issues or required sensory tools or breaks throughout the day; only two of the other students received OT during the school year, but mostly for handwriting and organization, not sensory issues; none of the students had significant auditory processing issues; none were sensitive to loud noises, easily overwhelmed in groups, or had difficulty controlling themselves in the face of overwhelming input

of stimuli; and none of the students had anxiety issues, manifested cognitive rigidity, or had a motor tic like D.A. While one other student in the class had ADHD, he was mainstreamed for the majority of the school day, and none of the students in the classroom presented with attentional issues or hyperactivity. Being the only student with these issues would have negatively impacted D.A.'s self-esteem, among other things, and would have negatively affected his ability to progress academically, socially, and emotionally.

76.    As the IHO found, the D.A.'s social/emotional issues differed from the other students in the class, and the class required a level of independent work from its students that would not have been appropriate for D.A. since the students in the class did not need the high level of individual support that D.A. required.

77.    The record shows that the students in the class also would not have provided D.A. with an appropriate social peer group since they were socially immature and would get into conflicts a few times a week, including physical fights, and some would be aggressive with other students.

78.    Defendant also failed to establish that P.S. 6 would have appropriately provided D.A. with his related services, not only because the school did not have a sensory gym, but also because none of the students in the class received push-in related services during the 2010-11 SY.

79.    In addition, Defendant failed to establish that the school environment at P.S. 6 would be appropriate for D.A. since the record shows that P.S. 6 would not have provided D.A. with the small, safe, structured environment

with minimized distractions that he required due to his anxiety and impulsivity.

80.    The large settings for lunch and recess (110-120 students) would not have been appropriate for D.A., and P.S. 6 would not have provided D.A. with sufficient or appropriate support during these times to remain regulated and to negotiate conflicts with his peers.

81.    The arrival and dismissal settings at P.S. 6 would also have been overwhelming and inappropriate for D.A. since the size of these settings would have been overwhelming for D.A., and since P.S. 6 would not have provided D.A. with the level of support he required at these times.

82.    The record shows P.S. 6 would not have afforded D.A. with the level of support and supervision that he required throughout the school day to address his needs.

83.    While Defendant provided testimony responding to some of Plaintiffs' allegations regarding P.S. 6 and its appropriateness for D.A. for the 2010-11 SY during the impartial hearing, Defendant should not be permitted to rely upon this retrospective testimony contradicting Plaintiffs' understanding of the placement in meeting its burden of proof since the information was never communicated to them at any point prior to the impartial hearing. See D.C., 2013 U.S. Dist. LEXIS at * 51-52. Z.A. credibly testified regarding his and his wife's visit to the school and reasonably relied upon their observations and the information provided to them, as the IHO found, and advised the DOE of their understanding and concerns and of their willingness to reassess the program if

provided with additional information responsive to their concerns, but the CSE failed to ever respond at any point prior to the impartial hearing.

84.    Accordingly, the record shows that Defendant failed to establish that P.S. 6 was appropriate for D.A. for the 2010-11 SY or that it could have appropriately implemented D.A.'s IEP.

## Plaintiffs' Unilateral Placement of D.A. at Aaron Appropriately Addressed D.A.'s Needs for the 2010-11 SY

85.    As a result of Defendant's failure to offer D.A. a FAPE for the 2010-11 SY, Plaintiffs chose to unilaterally place D.A. at Aaron for the SY.

86.    As the IHO properly found, the hearing record demonstrates that Plaintiffs adequately met their burden of proving that Aaron appropriately addressed D.A.'s unique needs and enabled him to make measurable progress during the 2010-11 SY.

87.    Debra Schepard, the Founder and Head of School of Aaron at the time of the impartial hearing in this case; Lauren Klein, D.A.'s head classroom teacher during the 2010-11 SY; and the parent testified extensively regarding how Aaron tailored its program to meet D.A.'s individual needs and to provide the collaborative and integrated approach to learning that he required during the 2010-11 SY.

88.    Aaron is a school for children aged Kindergarten through sixth grade who are of average or higher cognitive ability, but who have challenges in language, language processing, auditory or sensory processing, attention,

focusing, and social cognition, and who would benefit from a small, structured, multi-sensory approach to leaning. One hundred and fifteen students attended the school during the 2010-11 SY. Faculty and staff received formal and informal training throughout the year.

89.    Every classroom has two teachers, a head teacher with at least a Master's in special education, and an assistant teacher with at least a B.A. and some experience in the field, although many of the assistant teachers at Aaron are enrolled in Masters programs in special education or related fields. Every classroom is also assigned a speech therapist, occupational therapist, and counselor, not only to provide related services to the students in that classroom, but also to establish a holistic, integrated, and collaborative team approach to the education of the students.

90.    D.A. was placed in Ms. Klein's classroom during the 2010-11 SY, which included ten other students, aged ten to twelve, with one student who turned thirteen later in the SY. D.A. was grouped with students who were an appropriate academic, functional and social for him since they had similar needs and were working on similar goals, something that was important not only for coordination of service and instruction, but also for D.A.'s self-esteem.

91.    Ms. Klein was assisted in the classroom by Laura Bry, her assistant teacher, who had a Bachelor's degree in psychology and experience working with children who needed behavior modification from working at a summer program at NYU for children with such needs prior to starting her work at Aaron.

23

92.     Ms. Klein and Ms. Bry taught their class as a workshop model, which involved short, mini-lessons, followed by small group work in groups of two to four students to practice the skills being taught, which was then often followed by independent activities.

93.     The presence of two teachers in the classroom was necessary to provide the level of repetition, reinforcement, redirection, scaffolding and direct instruction from individuals trained in providing that kind of support that D.A. required to make appropriate progress.

94.     D.A. was grouped for math instruction with five other students in total, who were all functioning at the same levels and working at the same pace. He was also in a small, homogenous group for Literacy, with six students in total. He also received instruction in science and social studies. Instruction employed multisensory methods throughout the day, which was important for D.A.

95.     Ms. Klein and Ms. Schepard testified extensively regarding how Aaron appropriately addressed D.A.'s difficulties with comprehension and higher-order thinking, social cognition and cognitive rigidity issues, sensory integration difficulties, attentional issues, anxiety, auditory processing issues, and social skills deficits.  Aaron also addressed daily living skills, with instruction provided daily in a class co-taught by the speech and occupational therapists, which emphasized executive functioning development.

96.     Aaron appropriately provided D.A. with his related services and provided him with access to a sensory gym, which he required during the school

24

day. Ms. Klein collaborated extensively with D.A.'s related service providers and with the teachers for his specialty subjects informally on a daily basis and formally at weekly team meetings.

97.    D.A. ate lunch in a small setting with only up to twenty-four students and with three professionals present, which provided D.A. with the level of support he needed.

98.    Aaron assessed D.A.'s progress through standardized diagnostic assessments, teacher observation, informal assessments, team meetings, and discussions, and by monitoring D.A.'s achievement of goals via rubric-based progress reports, which were issued three times annually.

99.    As the IHO found, the record is replete with evidence of the academic, social, emotional, and behavioral progress that D.A. made at Aaron over the 2010-11 SY, and the individuals involved in D.A.'s education testified that Aaron appropriately addressed D.A.'s needs during the 2010-11 SY by providing him with the integrated, collaborative, and highly supportive program that he required.

**A Weighing of the Equities Supports An Award of Reimbursement for the Cost of D.A.'s Attendance at Aaron for the 2010-11 SY**

100.    As the IHO properly found, the record shows Plaintiffs fully cooperated with the CSE in this case and were willing to consider any appropriate public placement for D.A. for the 2010-11 SY.

101.    Plaintiffs provided the CSE with requested information prior to the

April 2010 CSE meeting, attended the April 2010 CSE meeting, and advised the CSE of concerns they had during the meeting.

102.    After receiving the FNR, the parents wrote to request information about the placement since they could not immediately visit due to the school being closed over the summer, subsequently visited the placement and considered it in good faith, even trying to obtain additional information from the school after their visit.  However, based upon their visit, the parents determined that P.S. 6 would not be appropriate for their son for the 2010-11 SY.

103.    Plaintiffs advised the CSE in writing that the offered placement was inappropriate for their son, including the specific reasons for their decision and advising that they would therefore be continuing to send D.A. to Aaron and would be seeking tuition reimbursement.

104.    Plaintiffs' letters indicated their continued willingness to reconsider P.S. 6 for their son if they were provided with information responsive to their concerns or to consider any alternative program or placement offered to their son for the 2010-11 SY.

105.    However, Defendant failed to respond to Plaintiffs' communications in any way either to respond to their concerns, advise them that they had misunderstood anything about the offered placement, or to provide an alternative offer of placement for D.A. for the 2010-11 SY.

106.    As the IHO properly acknowledged, Defendant's failure to respond to Plaintiffs' letters to correct their understanding of the offered program at any

point prior to the impartial hearing in this case should weigh equitably in favor of their claim for tuition reimbursement.

107.    The parents signed a contract with Aaron obligating them to pay $45,675.00 for D.A.'s attendance during the 2010-11 SY, which they have paid. Defendant should be belatedly forced to pay for the tuition expenses that it forced the parents to incur by failing to offer D.A. a FAPE.

**The IHO Correctly Found that Defendant Failed to Meet its Burden to Show that it Offered D.A. a FAPE for the 2010-11 SY; that Plaintiffs' Unilateral Placement of D.A. at Aaron Appropriately Addressed His Needs; and that Equitable Considerations Supported their Claim for Tuition Reimbursement**

108.    The IHO carefully weighed the testimony and evidence in the record and issued a well-reasoned decision granting Plaintiffs' request for tuition reimbursement for the cost of D.A.'s attendance at Aaron for the 2010-11 SY that warrants deference by this Court.

109.    The IHO properly found that Defendant failed to sustain its burden of demonstrating that it offered a FAPE for D.A. for the 2010-11 SY since it failed to develop a procedurally and substantively appropriate IEP and failed to offer D.A. an appropriate placement capable of appropriately implementing D.A.'s IEP. See Compl. Ex. A at 5-9.

110.    The IHO properly concluded that Feng Ye's testimony was less credible than that of the parent regarding what occurred at the April 2010 IEP meeting since Ms. Ye's testimony was "based more on her review of the documents than on any independent recall of the IEP meeting" and since Z.A. had

a better independent recollection of what occurred at the IEP meeting.

111.    The IHO properly found that the CSE failed to consider and discuss sufficient appropriate evaluative material to justify its recommendations in developing D.A.'s IEP, including D.A.'s 2009 psychoeducational evaluation, and that the CSE improperly based D.A.'s IEP on insufficient documentation. See Compl. Ex. A at 6.

112.    The IHO also properly found that Defendant failed to show that the CSE provided D.A.'s parents, special education teacher, and the DOE general education teacher who participated in the April 2010 IEP meeting with a full opportunity to participate in the IEP meeting and in the development of D.A.'s IEP since the CSE failed to provide all meeting participants with relevant material, including the draft IEP, so that they could meaningfully participate in the discussion. See Compl. Ex. A at 6-7.

113.    The IHO properly rejected Ms. Ye's claim that it was unnecessary to review D.A.'s 2009 psychoeducational evaluation at the meeting, concluding that since Ms. Ye deemed it important to review this evaluation and to incorporate part of the evaluation into D.A.'s IEP, then the CSE should have provided this evaluation to all meeting participants and discussed it during the CSE meeting. See Compl. Ex. A at 6-7.

114.    In reaching her conclusions, the IHO also properly acknowledged the significance of Ms. Ye's admission that the CSE did not review or discuss a social history, OT or SL evaluations, or a medical report at the meeting in

developing D.A.'s IEP. See id.

115.     The IHO correctly reasoned that these procedural errors resulted in a substantively inappropriate IEP.

116.     The IHO properly concluded that the CSE had no basis to recommend a 12:1:1 class or D.A. and that this recommendation was not appropriate for D.A. for the 2010-11 SY. See Compl. Ex. A at 7-8.  The IHO correctly observed that the evidence and testimony showed D.A. needed a small class with two teachers in order to make meaningful progress and found that Defendant failed to meet its burden to show that D.A.'s needs could have been met in a class with only one teacher and a paraprofessional.

117.     The IHO also correctly determined that the April 2010 IEP failed to adequately describe or address D.A.'s needs, including his then-current academic, speech/language, and social/emotional issues, and that the IEP also failed to address D.A.'s anxiety, auditory processing issues, or cognitive rigidity. All of these issues, as well as the discrepancy between D.A.'s verbal and non-verbal abilities, were significant enough to be important to include in D.A.'s IEP.

118.     The IHO correctly determined that the IEP goals were inappropriate for D.A. since they failed to address all of D.A.'s individual needs and failed to include appropriate, measurable benchmarks, and since several of the IEP goals inappropriately called for D.A. to make more than one year of progress since they called for D.A. to reach grade level, despite the fact that D.A. was functioning two to three years below grade level at the time of the IEP meeting.

119.    The IHO incorrectly failed to address Plaintiffs' claim that there was an insufficient quantity of appropriate, measurable, and separable goals to adequately address D.A.'s needs.

120.    The IHO also inappropriately failed to address Plaintiffs' claim that the promotion criteria in the IEP were inappropriate for D.A., as the promotion criteria in the IEP were inconsistent with D.A.'s then-current levels of performance.

121.    The IHO applied the correct legal standard to assessing Defendant's burden of proof with respect to the offered placement and correctly found that Defendant failed to sustain its burden of showing that the placement offered to D.A. at P.S. 6 could have appropriately addressed his needs or implemented his IEP.

122.    The IHO correctly concluded that the parents did not reject the IEP and offered placement until after receiving and meaningfully considering the CSE's August 6, 2010 placement offered by visiting the school.

123.    The IHO properly found that Defendant failed to show that P.S. 6 would have appropriately addressed D.A.'s sensory needs, anxiety, cognitive rigidity, and auditory processing issues, and that the record failed to show that the offered class would have provided D.A. with similarly-functioning or appropriate peers.

124.    While not essential to her decision, the IHO erred in failed to address Plaintiffs' claim that the offered class would not have provided D.A. with

30

an appropriate social grouping given the behavioral issues and social deficits presented by the other students.

125.    While not essential to her decision, the IHO improperly failed to address Plaintiffs' claims regarding the inappropriateness of the school and class environment for D.A., including the settings for lunch, recess, arrival and dismissal., and the level of support D.A. would have received throughout the school day.

126.    The IHO also correctly found that the record "overwhelmingly supports" that Aaron appropriately addressed D.A.'s needs for the 2010-11 SY since it provided him with a program of instruction, services, and support individually tailored to address his individual needs and provided him small, structured class and school environment, appropriate peers and peer models, and with the level of support he required throughout the school day.

127.    The IHO properly rejected Defendant's sole challenge to the appropriateness of Aaron, namely that it was too restrictive for D.A., correctly observing that parents are entitled to more flexibility in their choice of placement than the DOE, and that parents only need to establish that the program provided educational instruction that was specifically designed to meet a student's needs. See Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006).

128.    The IHO also properly found that a weighing of equitable considerations supported Plaintiffs' claim for tuition reimbursement since there was no evidence that the parents interfered with or hindered the CSE's program

development and placement process and since the record showed that Plaintiffs

fully cooperated with the DOE and were willing to consider and to accept an

appropriate public placement for D.A. for the 2010-11 SY had one been offered.

**The SRO Erred in Granting Defendant's Appeal; Denying Plaintiffs' Cross-
Appeal; Reversing the IHO's Decision; Finding that Defendant Offered D.A.
a FAPE for the 2010-11 SY; and in Denying Plaintiffs' Claim for Tuition
Reimbursement**

129.   In a decision that was neither well-reasoned, nor careful, and that

incorrectly applied relevant legal precedent, the SRO erred in reversing the IHO's

Decision and in finding that Defendant offered D.A. a FAPE for the 2010-11 SY.

130.   The SRO applied an incorrect standard of review to evaluating the

findings of the IHO on appeal, inappropriately reviewing the claims it deemed

reachable *de novo* rather than applying the arbitrary and capricious standard

typically applied to appellate review of the decisions of administrative law judges

and specifically deemed applicable to review of such decisions judge under

Article 78 of the New York Civil Practice Law and Rules.

131.   The SRO erred in reversing the IHO's finding that the CSE failed

to consider and discuss sufficient, appropriate evaluative and documentary

material in developing D.A.'s IEP. See Compl. Ex. B at 9-10.  In reaching his

findings, the SRO improperly ignored Plaintiffs' claims regarding the sufficiency

of the evaluative material considered, including the CSE's failure to discuss or

consider a social history, SL or OT assessments, or a medical report in developing

D.A.'s IEP, as well as the evidence showing that the CSE failed to consider

D.A.'s most recent Aaron progress report.

132.   The SRO also erred in reversing the IHO's finding that the CSE failed to afford the parents, D.A.'s special education teacher, and the DOE general education teacher participants with a meaningful opportunity to participate in the IEP meeting and in the development of D.A.'s IEP. See Compl. Ex. B at 11-12.

133.   In reaching his conclusions, the SRO improperly made light of the effect that the CSE's failure to share all documentation considered with the individuals in question necessarily would have upon their participation in the meeting.  The SRO also improperly made light of the CSE's obligation to share documentation with all IEP participants in the first instance such that a true conference is possible by suggesting that D.A.'s special education teacher should have said something if she did not have all documentation.  In reaching his conclusions on this issue, the SRO also erred in failing to address the CSE's failure to share the draft IEP pages with all CSE meeting participants such that they could weigh in on the appropriateness of those pages, as well as the CSE's failure to consult with D.A.'s OT or SL therapists in developing related service recommendations for D.A. for the 2010-11 SY.

134.   The SRO further erred in concluding that the IEP adequately set forth D.A.'s present levels of performance and needs, inappropriately making light of the IEP's omissions of significant issues, by observing that an IEP need not exhaustively describe a student's issues and that IEP management needs made up for the omission of descriptions of all of D.A.'s issues. See Compl. Ex. B at

12-13. To the contrary, an IEP is required to set forth sufficient information to enable an educator to understand the student's issues and to address them appropriately, which the record shows the IEP failed to do. The SRO also inappropriately found that the IEP adequately reflected the results of the materials considered, ignoring the limited nature of materials considered by the CSE in developing D.A.'s IEP.

135. The SRO erred in reversing the IHO's finding that the goals included in D.A.'s IEP were inappropriate to address D.A.'s needs, ignoring, among other things, the evidence in the record attesting to the lack of measurability of the IEP goals and the fact that many of the IEP goals contemplated more than a year of progress given D.A.'s delays. See Compl. Ex. B at 13-15. The SRO also inappropriately concluded that there was a sufficient number of goals to address D.A.'s needs, ignoring the omission of goals to address significant areas of D.A.'s need, including D.A.'s frustration tolerance, cognitive rigidity and anxiety. See id.

136. The SRO erroneously concluded that the promotion criteria in the IEP were appropriate for D.A., inappropriately dismissing the inconsistency of the promotion criteria with D.A.'s functioning at the time of the IEP on the ground that the CSE is not required to include promotion criteria in an IEP and on the ground that nothing in the promotion criteria would alter the delivery of instruction to D.A. and that the hearing record failed to establish the significance of the promotion criteria to the delivery of FAPE to D.A. See Compl. Ex. B at 15-

16. To the contrary, the IEP promotion criteria would necessarily have affected D.A.'s education since they would have set D.A. up for failure given his delays.

137.   The SRO improperly reversed the IHO's finding that the 12:1:1 class recommended was not appropriate for D.A. See Compl. Ex. B at 16-17.  In reaching his conclusions, the SRO completely ignored the recommendations contained in Dr. Salsberg's 2009 psychoeducational evaluation regarding the kind of class environment D.A. required due to his issues, and found, without basis, that unspecified "supplementary school personnel" could have provided the kind of support that the individuals involved in D.A.'s education asserted that the second teacher in an appropriate classroom for D.A. would provide. See id. at 16. The IEP fails to specify any supplementary school personnel who would be present in the recommended class, and regardless, the individuals involved in D.A.'s educational all testified that due to the substantial individual attention and support D.A. required not only to maintain attention to task, but also for instructional purposes so that material would be appropriately modified for him throughout the day and so that he could process the material presented and start and complete tasks in the classroom, D.A. required the presence of a second teacher in the classroom.

138.   The SRO improperly reversed the IHO's finding that P.S. 6 would not have been appropriate for D.A., erroneously concluding that Plaintiffs' challenges to the offered placement were speculative and irrelevant since Plaintiffs rejected P.S. 6 and never sent D.A. to the school. See Compl. Ex. B at

35

17-18.

139.     In reaching his conclusions, the SRO inappropriately construed the law with respect to Defendant's burden of proof with respect to the appropriateness of the offered placement in this case, specifically R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012) and its progeny, and ignored the right of parents to participate meaningfully in the placement process and to consider the appropriateness of an offered placement before choosing whether to accept it. See Compl. Ex. B at 17-18.

140.     The SRO also erroneously observed that it was "undisputed" that Plaintiffs rejected P.S. 6 before the school became obligated to implement D.A.'s IEP. See Compl. Ex. B at 18.  To the contrary, Plaintiffs did not reject the offered placement for D.A. until October 27, 2010, well after the start of the 2010-11 SY when P.S. 6 became obligated to implement D.A.'s IEP.

141.     In reaching his conclusions, the SRO improperly suggested that there is a presumption that an offered placement will be able to implement a student's IEP for a given SY. See Compl. Ex. B at 17.  To the contrary, the application of any such "presumption" would improperly shift the burden of proof to the parents to *disprove* the appropriateness of an offered placement when the law clearly requires a school district to prove that the placement it recommends to a child is reasonably calculated to provide meaningful benefit and to enable the child to make measurable progress.

142.     The SRO also erred in failing to issue findings regarding whether

36

Aaron appropriately addressed D.A.'s needs and whether equitable considerations supported Plaintiffs' claim for tuition reimbursement.

### Defendant Failed to Develop a Procedurally Valid and Substantively Appropriate IEP for D.A. for the 2011-12 SY

143.    The CSE convened on June 1, 2011 to develop an IEP for D.A. for the 2011-12 SY.

144.    R.A. and Z.A. attended this meeting, and D.A.'s then-current special education teacher participated by telephone from Aaron.

145.    The CSE classified D.A. as a student with speech or language impairment and recommended placement in a 12:1:1 special class in a community school, along with related services of SL and OT for 45-minute sessions.

146.    Contrary to the SRO's finding, the record shows that the CSE failed to fully evaluate D.A. or to review sufficient, current, and appropriate evaluative and documentary material in developing his 2011-12 IEP.

147.    The CSE failed to conduct any evaluations in preparation for the June 2011 meeting, and admittedly failed to review or rely upon any psychoeducational testing of D.A., even though D.A.'s parents had previously provided the CSE with a copy of this private psychoeducational evaluation and even though the CSE had relied upon this evaluation in developing previous IEPs, and it thus lacked any data regarding D.A.'s cognitive functioning or needs. The CSE also failed to conduct or review a social history, OT evaluation, SL

evaluation, or medical report in developing D.A.'s IEP.

148.    While the CSE had SL and OT progress reports available from fall 2010 and used these to develop related service recommendations and goals, Dr. Steve Abramowitz, the school psychologist who testified for the DOE regarding the development of the IEP, acknowledged that D.A. could have achieved the goals set forth in the progress reports before the start of the 2011-12 SY and that the CSE failed to consult D.A.'s related service providers regarding whether the goals in those reports remained appropriate for D.A. for the 2011-12 SY before including them in D.A.'s IEP.

149.    Contrary to the SRO's finding, Defendant also failed to establish that the CSE afforded the parents or D.A.'s teacher with a full and meaningful opportunity to participate in the June 2011 CSE meeting or in the development of D.A.'s IEP such that a true conference was possible. See 8 N.Y.C.R.R. § 200.3, 200.4(f)(1); 34 C.F.R. § 300.324; Letter to Heldman, 19 IDELR 930 (1992) (citing W.G. v. Target Range Sch. Dist., 960 F.2d 1479 (9th Cir. 1992)).

150.    The record shows that the CSE drafted the entire IEP prior to the June 1, 1011 IEP meeting and brought this draft to the meeting, but failed to share it with the parents for input.  While Dr. Abramowitz testified that changes were made to this document based upon input provided by the parents and D.A.'s teacher during the meeting, the IEP that the parents received after the June 2011 IEP meeting did not have the modifications that were discussed during the meeting, demonstrating that the parents and D.A.'s teacher were deprived of the

opportunity to provide input into the actual IEP.

151.    The record also shows that the CSE failed to ensure that D.A.'s teacher had copies of the classroom observation, SL and OT reports, or March 2011 Aaron report relied upon by the CSE in developing D.A.'s IEP such that D.A.'s teacher could meaningfully participate in the meeting discussion.

152.    In addition, despite concerns expressed by the parents at the meeting regarding the CSE's proposed 12:1:1 special class in a community school recommendation since the parents did not believe this class would provide D.A. with the level of individual attention and support from a teacher that he required to make appropriate progress, as well as the CSE's awareness that D.A. was then attending a more supportive class and school program and that the individuals involved in his education strongly believed he continued to require an equivalent level of support, the CSE failed to discuss the possibility of recommending a more supportive program for D.A. for the 2011-12 SY.

153.    The record shows that the procedural errors the CSE committed resulted in a substantively inappropriate IEP for D.A. for the 2011-12 SY.  The CSE's failure to fully evaluate D.A. or to consider sufficient, current, appropriate evaluative and documentary material to justify its recommendations, as well as its failure to provide all meeting participants with a full and meaningful opportunity to participate in the meeting or to adequately consult the parent and the individuals most familiar with D.A.'s needs regarding the development of the IEP, resulted in an IEP that failed to appropriately reflect or address D.A.'s needs for

the 2011-12 SY and thus in a denial of FAPE.

154.    In particular, Defendant failed to prove that the 12:1:1 special class in a community school program recommendation was appropriate for D.A. for the 2011-12 SY. The record shows that D.A. required more individual support from a teacher than would have been provided in a class with just one teacher and a paraprofessional, and that the CSE lacked justification for recommending a lesser level of support than the individuals involved in D.A.'s education stressed that he continued to require at the time of the June 2011 IEP meeting.

155.    While Dr. Abramowitz argued that the Aaron progress report supported the CSE's recommendation of a 12:1:1 class, he claimed he was unaware of the nature of the program that D.A. attended at the time of the IEP meeting and whether it was equivalent to a DOE 12:1:1 class, which the record shows it was not. Moreover, Dr. Abramowitz claim that he was ignorant of the true nature of D.A.'s class at Aaron at the time of the meeting is belied by testimony of the parent that he stressed D.A.'s continued need for a classroom with two teachers during the IEP meeting.

156.    Defendant failed to show that the IEP contained sufficient or appropriate management needs to address D.A.'s needs during the 2011-12 SY. Specifically, the IEP failed to reflect D.A.'s management needs for extra time, wait time, frequent breaks, redirection, deep pressure, repetition and rephrasing of directions, clear expectations, and specific sensory tools such as balls, putty, a visual timer, and chewing sugar free gum, teacher support to problem solve

40

conflicts with peers, checklists, provision of a separate workspace for math computation, previewing information, additional time to organize his materials before transitions, teacher assistance to locate and correct his errors, and asking "wh" questions to help D.A. formulate his thoughts to complete tasks, all of which were either discussed at the CSE meeting as needs for D.A. or reflected in D.A.'s most-recent Aaron progress report.

157.    The IEP also failed to address D.A.'s needs for appropriate testing accommodations, including breaks, questions read aloud, refocusing, and access to putty and gum to remain focused.

158.    As a result of the foregoing, the record shows that the June 2011 IEP was not reasonably calculated to provide D.A. with meaningful educational and social/emotional benefit and to prevent regression.

**Defendant Failed to Develop a Substantively Appropriate Placement Capable of Conforming to D.A.'s IEP and of Appropriately Implementing His IEP**

159.    In July 2011, the parents received an FNR recommending a special class E31 at JHS 104 for D.A. for the 2011-12 SY.

160.    Since the school was then closed for the summer, Plaintiffs were unable to visit the placement at that time, so they wrote to the CSE to advise that they would visit the placement when school reopened in the fall and would inform the CSE of their decision about the program at that time. However, since the FNR expressly invited the parents to reach out to the CSE to discuss the placement offered, they also asked the CSE for information regarding the placement and the

class E31 offered to D.A., including the age range, functional ability, social skills, and disabilities of the students in the class, as well as information regarding the instructional methodologies that would be used that would assist them in assessing the placement's appropriateness for D.A.  Defendant failed to respond.

161.    When school reopened in the fall, Plaintiffs called the school several times and left messages asking to schedule an appointment to visit the offered program, but the school did not return their calls.

162.    Since they had not received any response from the school, R.A. eventually went to the school in person to ask to see the program, including the class offered to D.A. for the 2011-12 SY.  She presented the FNR she had received, but at first there was confusion over what class was recommended for D.A. since  the school representative was unable to determine from the FNR alone what class was recommended for D.A. and was unable to obtain clarification from the CSE on the issue over the phone.  However, since D.A.'s IEP recommended a 12:1:1 class and since D.A. was a sixth grade student, the school representative eventually advised the parent that the 6th grade 12:1:1 class was the class recommended to D.A. for the 2011-12 SY.

163.    The parent was advised that she had to schedule an appointment to view the program, including the offered class, and she took the first appointment provided to her to visit the placement on December 23, 2011.

164.    The parent was permitted to observe the offered 6th grade 12:1:1 class, but observed that there were a large number of students in the classroom

and more than the 12 students slated to be present in the classroom, raising concerns that the placement was unable to provide D.A. with a program in conformity with his full-time 12:1:1 IEP recommendation, as well as concerns that such a large classroom setting would be overwhelming for D.A. given his issues and that D.A. would not receive the level of individual attention and support from a teacher that he requires.

165.    The parent's visit also raised concerns that the school environment would be inappropriate for D.A. since the parent was informed that over 1,000 students attended the school and observed that the building was large and crowded, which would be overwhelming for D.A. socially and emotionally and which would negatively affect his ability to transition effectively to the classroom and to learn.

166.    Following her visit, the parent also obtained additional information about the school on the DOE's website and learned that a significant portion of the students who attended the school had reported bullying and harassment, fighting, and threatening behavior between the students on the Learning Environment Survey from the prior SY. An environment with such issues would not be appropriate for D.A. given his self-regulation, executive functioning, and social/emotional issues, and would also pose a safety concern.

167.    Based upon this visit and the information obtained on the DOE's website, Plaintiffs determined that JHS 104 would not be appropriate for D.A. and wrote to the CSE to explain their specific reasons for making this determination.

In their letter, the parents indicated their continued willingness to consider any appropriate program or placement the DOE offered to D.A. for the 2011-12 SY.

168.     Defendant failed to respond to their letter, either to correct their understanding of the offered program, to respond to their concerns, or to offer an alternative placement to D.A. for the 2011-12 SY.

169.     As the IHO found, the record shows that Defendant failed to meet its burden to show that it offered D.A. an appropriate placement capable of appropriately implementing D.A.'s IEP and providing him with a program in conformity with his IEP.

170.     Contrary to the SRO's decision, Defendant was required to show that JHS 104 was reasonably calculated to provide meaningful educational benefit to D.A. and that it could have appropriately implemented his IEP for the 2011-12 SY, and Defendant failed to meet this burden in this case. See Walczak, 142 F.3d at 123 (citation omitted); N.Y. Educ. L. § 4402(1)(b)(3)(b)(i); D.C., 2013 U.S. Dist. LEXIS 42764, at *39; R.E., 694 F.3d at 191-92 ("The Department may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP.").

171.     Contrary to the SRO's finding, R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012), and its progeny do not relieve Defendant of its obligation to demonstrate that it could have appropriately implemented D.A.'s IEP in this case, nor do they invalidate D.A.'s challenges to the appropriateness of JHS 104 as speculative.

172.    As the IHO recognized, Plaintiffs' challenges to the offered placement were inherently not speculative since they were based upon their observations and information provided to them regarding the offered placement and class and then only further bolstered by the testimony of Jenessa Polsinelli, the teacher of the class offered to D.A. at JHS 104, who testified that D.A. would have been placed in her classroom since her class was the only 12:1:1 class for a sixth grade student at the school during the 2011-12 SY. See V.S. v. New York City Dep't of Educ., No. 13-CV- 3476, 2014 U.S. Dist. LEXIS 79067, at *6-13 (E.D.N.Y. June 9, 2014) (recognizing that parents' procedural right to participate in the placement selection process includes the right to rely upon information obtained during a visit to the offered placement where that information shows the placement would be unable to implement the specific provisions of the student's IEP).

173.    As the IHO found, Defendant failed to prove that it could have provided D.A. with a program in conformity with his IEP and capable of appropriately implementing his IEP since Ms. Polsinelli testified that her class operated as a 12:1:1 class for only 25 periods during the school week, and that her students were mainstreamed for the remaining 10 class periods each week in classes with at least 20 students, or with more than 40 in the case of gym, and with teachers who were not certified in special education. Such a program would not have conformed to the full-time 12:1:1 recommendation in D.A.'s IEP.

174.    Dr. Abramowitz, the DOE's witness regarding the June 2011 IEP,

admitted that a subsequent amendment of D.A.'s IEP with the consent of D.A.'s

would have been necessary to make a program that deviated from D.A.'s IEP,

such as the program at JHS 104, valid.

175.    Moreover, given the June 2011 IEP's acknowledgment that

"[D.A.] has been diagnosed with attention deficit hyperactivity disorder" and

"presents with regulation concerns as well as fine motor deficits" and "social

concerns," and that those "issues warrant greater support than can be offered in a

general education class at this time," the CSE's failure to provide a placement that

would have provided D.A. with the recommended 12:1:1 class for all 35 periods

each week was more than a *de minimis* failure in the DOE's ability to

appropriately implement D.A.'s IEP. See D.D.-S. v. Southold Union Free Sch.

Dist., No. 09 Civ. 5026, 2011 U.S. Dist. LEXIS 100809, at *13 (E.D.N.Y. Sept. 2,

2011).

176.    Placement in mainstream classes for part of his school day would

not have been appropriate for D.A. since he would have been "extremely

uncomfortable" and "absolutely overwhelmed" in such settings given his issues,

and mainstream classes would not have provided him with the level of individual

attention and support that he required.  Moreover, D.A.'s IEP fails to recommend

any supports to assist D.A. in mainstream class settings.

177.    Defendant also failed to establish that JHS 104 would have been

capable of conforming to D.A.'s IEP related service mandates and appropriately

implementing those recommendations since the maximum length of therapy

mandated for the students in Ms. Polsinelli's class during the 2011-12 SY was 40

minutes, whereas D.A.'s IEP mandates 45-minute sessions.

178.    Defendant also failed to demonstrate that the placement and

offered class would have provided D.A. with appropriate and similarly-

functioning peers or with appropriate peer models, as is required by law. See

Walczak, 142 F.3d at 123 (quoting 8 N.Y.C.R.R. § 200.6(a)(3)(i)–(ii)). Ms.

Polsinelli testified that D.A. would have been one of the highest functioning

students academically in her class and that the range of decoding and reading

comprehension ability in the class spanned five grade levels during the 2011-12

SY and spanned three grade levels for math. Moreover, only two or three of the

students were classified as being speech or language impaired like D.A., and none

of the students in the class had similar sensory needs to D.A., including having

issues with self-regulation and needing specific sensory tools and sensory breaks

throughout the day. Z.A. testified that being the only student with these issues

would not only have prevented D.A. from receiving the level of individual

attention and support he needed, but also would have negatively affected D.A.'s

self-esteem since he would have felt different from the other students in the class.

179.    Defendant also failed to establish that the offered class would have

provided D.A. with the level of individual attention and support that he required

to make measurable academic, social, and emotional progress considering the

evidence regarding the minimal teaching experience of the classroom teacher and

minimal experience and qualifications of the classroom paraprofessional, as well

as the evidence attesting to the insufficient individual attention that D.A. would have received from Ms. Polsinelli given his functioning levels in this classroom and the level of independent work Ms. Polsinelli required of her students during the 2011-12 SY.

180.    Defendant also failed to establish that JHS 104 would have provided D.A. with the safe, structured environment with appropriate peers and peer models that he required to make measurable progress and avoid regression. There were approximately 1,100 students at JHS 104 during the 2011-12 SY, and the entire sixth grade (365 students) ate lunch together supervised by less than 10 teachers and administrators. The school and lunch settings, as well as the settings for arrival and dismissal at the school, would have been overwhelming for D.A. and would have negatively affected his ability to be available for learning.

181.    Additionally, Ms. Polsinelli confirmed the parents' concerns for D.A.'s safety and social/emotional security in the offered placement and regarding the appropriateness of the peer group in the school and offered class for D.A.'s academic progress, as well as his socialization and behavior since she confirmed that physical fighting, harassment, and bullying took place among the students during the 2011-12 SY. Placement in a classroom and school environment with students who have behavioral issues would not have been appropriate for D.A. given his self-regulation, executive functioning, and social/emotional issues, and would have posed a safety concern.

**Plaintiffs' Unilateral Placement of D.A. at Aaron Appropriately Addressed D.A.'s Needs for the 2011-12 SY**

182.    As a result of the DOE's failure to provide D.A. with a FAPE for the 2011-12 SY, Plaintiffs chose to unilaterally place D.A. at Aaron for the SY.

183.    As the IHO found, the record shows that Aaron provided D.A. with an individually tailored and supportive program of educational instruction, social/emotional support, and related services that appropriately addressed his needs for the 2011-12 SY.

184.    Deborah Blenman, the educational supervisor at Aaron for grades four through seven, described Aaron as a program for students with profiles like D.A.'s that took a holistic approach to addressing student needs during the 2011-12 SY by providing an integrated program of academic and therapeutic services.

185.    D.A. worked with a team of faculty during the 2011-12 SY, which included Ms. Blenman, who was D.A.'s science teacher during the SY, as ell as a head teacher, assistant teacher, social worker, occupational therapist, speech therapist, other specialty subject teachers, and a psychologist.

186.    D.A's main class consisted of thirteen other students, aged eleven to thirteen, all of whom were appropriate, similarly-functioning peers for him. D.A.'s head teacher was Alexis Williams, and his assistant teacher was Ms. Lzovick; both teachers were New York State certified special education teachers. With Masters degrees in special education.

187.    For ELA and math, D.A. was instructed in small, skill-based groups with six or seven students from his homeroom class who were functioning

at similar levels as he was.  For social studies and science, D.A. was instructed in a small group for two of the three weekly lessons, with the other supported by two teachers to monitor students and facilitate their understanding.  D.A. also received additional writing instruction during his school week.

188.    Ms. Blenman testified extensively regarding how Aaron appropriately supported D.A.'s specific learning needs in the classroom and throughout the school day, and the interventions she described were also confirmed by the Aaron progress reports in evidence.

189.    Aaron also appropriately provided D.A. with his related services by licensed therapists through an integrated approach.

190.    During the 2011-12 SY, Aaron measured student progress through formal and informal assessments, project-based learning, observations, and assessments of whether students can apply and generalize information taught in the classroom, and progress was tracked through the issuance of three progress reports annually.

191.    The record is replete with evidence of the academic, social, and emotional progress that D.A. achieved at Aaron during the 2011-12 SY, and the individuals involved in D.A.'s education testified that Aaron was an appropriate placement for D.A. during the 2011-12 SY.

**Equitable Considerations Support Plaintiffs' Claim for Tuition Reimbursement**

192.    As the IHO found, equitable considerations support Plaintiffs'

claim for tuition reimbursement since the record shows that D.A.'s parents cooperated fully with the CSE and demonstrated by their actions that they were willing to consider an appropriate public placement for D.A. for the 2011-12 SY.

193.    Plaintiffs attended and participated in the CSE meeting, provided the CSE with requested information prior to the meeting, advised the CSE of their concerns, requested information regarding the offered placement when they received the FNR, and visited the placement to consider it in good faith for D.A., and then advised the CSE that it was not appropriate for D.A.

194.    At no point did Defendant respond to any of Plaintiffs' communications regarding the offered placement, and Plaintiffs thus reasonably relied upon their observations and understanding of the program. Defendant's failure to respond to Plaintiffs' letters to correct their understanding of the offered placement or to offer an alternative placement to D.A. for the 2011-12 SY should weigh equitably in favor of Plaintiffs' claim for reimbursement.

**The IHO Correctly Found that Defendant Failed to Meet its Burden to Show that it Offered D.A. a FAPE for the 2011-12 SY; that Plaintiffs' Unilateral Placement of D.A. at Aaron Appropriately Addressed His Needs; and that Equitable Considerations Supported their Claim for Tuition Reimbursement**

195.    The IHO properly weighed the testimony and evidence in the record and issued a well-reasoned decision granting Plaintiffs' request for tuition reimbursement for the cost of D.A.'s attendance at Aaron for the 2011-12 SY.

196.    The IHO properly found that Defendant failed to sustain its burden of demonstrating that it offered a FAPE for D.A. for the 2011-12 SY since it

51

failed to show that the placement offered to D.A. would have appropriately implemented D.A.'s IEP or provided him with a program in conformity with his IEP.

197.    The IHO applied the appropriate legal standard to assessing Defendant's burden of proof with respect to the placement offered to D.A. for the 2011-12 SY and correctly reasoned that Defendant bore the burden of demonstrating that it was capable of implementing D.A.'s IEP for the SY in the first instance.

198.    The IHO properly concluded that Defendant had failed to meet its burden to show that JHS 104 could have implemented D.A.'s IEP as written, since the testimony of the teacher of the class recommended to D.A. confirmed the parents' understanding that the class did not operate as a 12:1:1 class for the entire school day, as was recommended on D.A.'s IEP.  The IHO correctly reasoned that the evidence showing Defendant had failed to offer D.A. a placement that conformed to his IEP resulted in a deprivation of FAPE since "not providing [D.A.] with approximately 10 periods per week of instruction in the 12:1:1 was more than a de minimis failure in the DOE's ability to implement [D.A.'s] IEP." See Compl. Ex. C at 7.

199.    The IHO further properly reasoned that R.E. v. New York City Dep't of Educ. and its progeny did not support a finding that Plaintiffs' claims regarding the placement offered to D.A. were speculative and therefore irrelevant since the evidence presented at hearing confirmed the parents' understanding that

the class would not have operated as a 12:1:1 class throughout D.A.'s school day. See Compl. Ex. C at 7. Parents' observations gleaned from a visit to an offered placement and reasonably relied upon are inherently not speculative.

200.    The IHO erred in concluding that Plaintiffs' DPC did not specifically allege that D.A. was denied a FAPE on the ground that the assigned class did not conform to D.A.'s IEP since the DPC sufficiently included this claim.

201.    The IHO nonetheless correctly reasoned that the issue of the ability of JHS 104 to provide D.A. a program in conformity with his IEP was properly before him since the claims set forth in the DPC provided adequate notice of the issue that the parents were concerned that the offered class would not provide D.A. with the level of individual attention and support or the small class environment that he required. See Compl. Ex. C at 7-8. In addition, the DPC objected to the CSE's failure to discuss the level of support D.A. would require to participate in mainstream activities or provide any support for participation in such activities, as well as challenged the qualifications of the teachers who would have worked with D.A. in the offered placement, as well as the placement's ability to maintain an appropriate staffing ratio throughout the school day. The Second Circuit has held that "the waiver rule is not to be mechanically applied" and that the key is whether the district had fair notice of the claim at issue, and the allegations detailed above clearly encompass a challenge regarding the placement's ability to provide a program in conformity with D.A.'s IEP such that

53

Defendant was clearly on notice of the issue. See C.F. v. New York City Dep't of Educ., 746 F.3d 68, 78 (2d Cir. 2014).

202.    Furthermore, Defendant has the fundamental burden to demonstrate that it recommended a placement to the student capable of providing a program in conformity with his IEP in order to establish that it offered a FAPE, meaning that no notice of a parent's specific allegation regarding this issue was even necessary since Defendant bore the burden of demonstrating that the placement it offered could conform to D.A.'s IEP in the first instance. See D.C., 2013 U.S. Dist. LEXIS, at *39 (stating that the DOE's failure to offer placement in a school that can conform to an IEP's requirements is, by definition, a failure to provide FAPE).

203.    The IHO also appropriately reasoned that Defendant should not be permitted to benefit from a strict "four corners" of the IEP rule which would render all subsequent testimony and evidence regarding the placement offered irrelevant where Defendant never "provide[d] the parent with an accurate description of the assigned class and failed to respond to the parents's request for same." See Compl. Ex. C at 8.

204.    While not essential to his decision, the IHO erred in concluding that the offered class at JHS 104 would have afforded D.A. with appropriate peers and peer models. See Compl. Ex. C at 8.  In reaching this conclusion, the IHO ignored the evidence attesting to the fact that the students in the offered class did not have similar needs to D.A., the evidence that the functioning levels for

54

decoding and reading comprehension in the offered class spanned five grade levels, beyond the statutory range permitted, and the evidence that some of the students in the offered class bullied, fought with, and harassed other students.

205.    While not essential to his decision given his appropriate conclusion that Defendant had failed to make a *prima facie* case since it had failed to show that it offered a placement capable of providing D.A. with a program in conformity with his IEP recommendation, the IHO improperly failed to reach Plaintiffs' claims regarding whether the June 2011 CSE impeded Plaintiffs' ability to meaningfully participate in the IEP meeting and in the development of D.A.'s IEP; whether the CSE had sufficient evaluative material to develop D.A.'s IEP; whether the 12:1:1 program recommended was reasonably calculated to provide D.A. with the level of individual attention and support from a teacher that he required to make measurable progress and avoid regression; whether the IEP included adequate and appropriate management needs and testing accommodations; whether JHS 104 would have been able to appropriately implement the related service mandates on D.A.'s IEP; whether the offered class at JHS 104 would have provided D.A. with the level of individual attention and support and appropriate instruction that he required; whether JHS 104 would have provided D.A. with an appropriate peer group for socialization and behavior; whether the school environment at JHS 104 would have been appropriate for D.A; and whether JHS 104 would have provided D.A. with a sufficient and appropriate level of support throughout his school day.

206.    The IHO properly concluded that Aaron appropriately addressed D.A.'s needs for the 2011-12 SY since it provided D.A. with "direct and specialized educational instruction that was specifically designed to meet the unique educational needs of the student." See Compl. Ex. C at 11.

207.    The IHO also correctly concluded that equitable considerations supported Plaintiffs' claim for tuition reimbursement since "nothing in the record suggests that the parents failed to cooperate with the CSE and the evidence demonstrates that the CSE provided the DOE with the requisite notice of the student's removal from public school prior to the student's placement" at Aaron. See Compl. Ex. C at 11.  In so finding, the IHO correctly found thatt "the parent testified, credibly, that ha[d] the DOE offered an appropriate placement, the student would have attended a public school." See Compl. Ex. C at 12.

**The SRO Erred in Granting Defendant's Appeal; Denying Plaintiffs' Cross-Appeal; Reversing the IHO's Decision; Finding that Defendant Offered D.A. a FAPE for the 2011-12 SY; and in Denying Plaintiffs' Claim for Tuition Reimbursement**

208.    In a decision that was neither well-reasoned, nor careful, and that incorrectly applied relevant legal precedent, the SRO erred in reversing the IHO's Decision and in finding that Defendant offered D.A. a FAPE for the 2011-12 SY.

209.    The SRO applied an incorrect standard of review to evaluating the findings of the IHO on appeal, inappropriately reviewing Plaintiffs' claims *de novo* rather than applying the arbitrary and capricious standard typically applied to appellate review of the decisions of administrative law judges and specifically

deemed applicable to review of such decisions judge under Article 78 of the New York Civil Practice Law and Rules.

210.     Despite the voluminous pleadings submitted by both parties on appeal, the SRO issued a cursory eight-and-a-half page decision that failed to address all of the parties' claims and failed to correctly apply legal precedent. The SRO's Decision was neither thorough nor careful and thus does not warrant deference by the Court.

211.     The SRO erroneously concluded that the CSE afforded the parent a meaningful opportunity to participate in the IEP meeting and in the development of D.A.'s IEP, ignoring the significance of the CSE's failure to provide all documents considered, including the draft IEP, to all meeting participants, see supra ¶¶ 150-51, and making light of the fact that "very little" changed in the draft IEP before it was finalized and sent to the parents by incorrectly observing that Plaintiffs "do not dispute the substantive adequacy of the IEP they received." See Compl. Ex. D at 6. While Plaintiffs did not challenge the IHO's findings that the IEP goals and present levels of performance were appropriate, the IHO failed to reach any of Plaintiffs' other claims regarding the substantive adequacy of the IEP, preserving them for appeal. Moreover, the SRO also ignored the evidence in the record demonstrating that the CSE failed to meaningfully respond to the parents' concerns regarding the proposed 12:1:1 program for D.A. See supra ¶¶ 152, 154-55.

212.     The SRO also erred in finding that the CSE reviewed sufficient

evaluative material in developing D.A.'s IEP. The SRO's conclusions on this issue were neither well-reasoned nor careful since the SRO merely listed the documents the CSE considered and concluded summarily that they contained adequate information regarding D.A.'s needs. See Compl. Ex. D at 7-8. This decision was neither well-reasoned nor careful and does not warrant deference.

213.    The SRO erred in failing to address any of Plaintiffs' claims regarding the substantive inappropriateness of the resulting IEP, in particular Plaintiffs' claim regarding the appropriateness of the 12:1:1 special class in a community school recommendation for D.A. given their allegation that the IEP recommendation failed to provide D.A. with the level of individual attention and support that he required.

214.    The SRO applied an erroneous construction of relevant legal precedent and improperly reversed the IHO's finding that Defendant had failed to meet its burden of proof since it had failed to show that it could have implemented D.A.'s IEP as written. See Compl. Ex. D at 8-9.

215.    In reaching this conclusion, the SRO erroneously construed Second Circuit legal precedent and incorrectly reasoned that Plaintiffs' challenges to the offered placement were impermissibly speculative under R.E. v. New York City Dep't of Educ, and its progeny since D.A. did not attend the offered placement for the 2011-12 SY. See Compl. Ex. D at 8-9. However, to the contrary, as the IHO properly reasoned, Plaintiffs' claims were based upon their observations from their visit to the offered placement, making them inherently not speculative.

Moreover, Plaintiffs did not reject the offered placement until after the start of the 2011-12 SY, meaning that Defendant was obligated to implement D.A.'s IEP as written as of the first day of the 2011-12 SY, and the evidence presented demonstrated that Defendant would not have been able to do so.

216.    The SRO erred in finding that the IHO had improperly relied upon retrospective testimony of Ms. Polsinelli to determine whether the DOE provided D.A. with a FAPE. See Compl. Ex. D at 9.  To the contrary, since Defendant bore the burden to demonstrate that it could implement D.A.'s IEP as of the first day of the 2011-12 SY, it was more than appropriate for the IHO to assess this testimony and to concluded that this testimony confirmed the validity of the parents' concerns after their visit that JHS 104 would not be able to appropriately implement D.A.'s IEP and provide him with a program in conformity with his IEP for the 2011-12 SY.

217.    The SRO thus erroneously failed to address Plaintiffs' other substantive claims regarding the appropriateness of the placement offered to D.A. at JHS 104, including whether JHS 104 would have been able to appropriately implement the related service recommendations on D.A.'s IEP; whether the offered class would have provided D.A. with the level of individual attention and support and appropriate instruction that D.A. required; whether JHS 104 would have provided D.A. with sufficient and appropriate support throughout his school day; whether the school would have provided D.A. with an appropriate peer group for socialization and behavior; and whether the school environment would have

been appropriate for D.A.

218.    The SRO also erred in failing to issue findings as to whether the IHO had appropriately concluded that Aaron appropriately addressed D.A.'s needs and as to whether the IHO had properly found that equitable considerations supported Plaintiffs' clam for tuition reimbursement.

## CAUSES OF ACTION

219.    Plaintiffs repeat, re-allege, and reassert each and every response and allegation set forth in paragraphs 1 through 218 above, as if more fully set forth herein.

220.    Defendant's failure to offer D.A. an appropriate educational program and placement for the 2010-11 and 2011-12 SYs, and the SRO's reversal of the IHO's decisions granting Plaintiffs' claims for reimbursement for the costs of D.A.'s attendance at Aaron for the 2010-11 and 2011-12 SYs, deprived Plaintiff D.A. of a FAPE pursuant to the IDEA, 20 U.S.C. §§ 1400, et. seq., and the regulations promulgated thereunder for the 2010-11 and 2011-12 SYs.

221.    Defendant's failure to offer D.A. an appropriate educational program and placement for the 2010-11 and 2011-12 SYs, and the SRO's reversal of the IHO's decisions granting Plaintiffs' claims for reimbursement for the costs of D.A.'s attendance at Aaron for the 2010-11 and 2011-12 SYs, deprived Plaintiff D.A. of a FAPE pursuant to the IDEA, 20 U.S.C. §§ 1400, et. seq., and the regulations promulgated thereunder, and thus deprived Plaintiffs of rights secured by federal law in violation of 42 U.S.C. § 1983.

222.    Defendant's failure to offer D.A. an appropriate educational program and placement for the 2010-11 and 2011-12 SYs, and the SRO's reversal of the IHO's decisions granting Plaintiffs' claims for reimbursement for the costs of D.A.'s attendance at Aaron for the 2010-11 and 2011-12 SYs, deprived Plaintiff S.S. of a FAPE pursuant to Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794.

223.    Defendant's failure to offer D.A. an appropriate educational program and placement for the 2010-11 and 2011-12 SYs, and the SRO's reversal of the IHO's decisions granting Plaintiffs' claims for reimbursement for the costs of D.A.'s attendance at Aaron for the 2010-11 and 2011-12 SYs, violated Plaintiffs' rights under Article 89 of the New York Education Law, specifically N.Y. Educ. Law §§ 4401, 4404, & 4410, and pursuant to the regulations of the New York State Commissioner of Education, codified at 8 N.Y.C.R.R. § 200, et. seq.

## REQUESTED RELIEF

a.    Issue a Judgment requiring Defendant to reimburse Plaintiffs for the costs associated with Plaintiff D.A.'s attendance at Aaron for the 2010-11 and 2011-12 SYs;

b.    Issue a judgment that Defendant's failure to provide a FAPE violated Plaintiffs' rights under the IDEA, Section 504 of the Rehabilitation Act of 1973, Section 1983 of the Civil Rights Act, and the New York Education Law;

c.      Award to Plaintiffs their costs and attorney's fees; and

d.      Grant such other and further relief as may be deemed appropriate.

Dated: March 2, 2015
New York, New York

Respectfully Submitted,

KIRA I. EPSTEIN (KE2009)
Law Offices of Lauren A. Baum, P.C.
61 Broadway, Suite 1060
New York, New York 10006
Telephone: (212) 644-4414
Facsimile: (212)644-8470
Kepstein@nyspecialedlaw.com
*Counsel for Plaintiffs*