# EXHIBIT B



# The University of the State of New York

### The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 12-196

**Application of the NEW YORK CITY DEPARTMENT OF EDUCATION for review of a determination of a hearing officer relating to the provision of educational services to a student with a disability**

**Appearances:**
Courtenaye Jackson-Chase, Special Assistant Corporation Counsel, attorneys for petitioner, Gail M. Eckstein, Esq., of counsel

Law Offices of Lauren A. Baum, PC, attorneys for respondents, Scott M. Cohen, Esq., of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the district) appeals from the decision of an impartial hearing officer (IHO) which found that it failed to offer an appropriate educational program to respondents' (the parents') son and ordered it to reimburse the parents for their son's tuition costs at the Aaron School for the 2010-11 school year. The parents cross-appeal from the IHO's failure to address issues raised in their due process complaint notice. The appeal must be sustained. The cross-appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due

process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[l]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

In this case, the student has received a diagnosis of an attention deficit hyperactivity disorder (ADHD) (Parent Ex. C at p. 3). The hearing record reflects that at the age of two and a half years old, the student experienced developmental and learning delays (Tr. pp. 325-26). The hearing record further reflects that the student received special education services through the Committee on Preschool Special Education (CPSE) including special education itinerant teacher (SEIT) services, which were provided in a general education preschool setting (Parent Ex. I at p. 2). The student subsequently attended kindergarten in a general education setting; however,

2

midway through the school year, the student experienced issues with impulsivity and was then placed in a special class with related services in a State-approved nonpublic school which the student attended from kindergarten through third grade (id.; see Tr. pp. 326-28). The student thereafter attended the Aaron School for the '2009-10 school year (Tr. p 327).

On April 19, 2010, the CSE convened to conduct the student's annual review and develop the student's IEP for the 2010-11 school year (Parent Ex. C). Finding the student eligible for special education and related services as a student with a speech or language impairment, the April 2010 CSE recommended a 12:1+1 special class placement in a community school with the following related services: two 30-minute sessions of individual occupational therapy (OT) per week, one 30-minute session of individual speech-language therapy per week, one 30-minute session per week of speech-language therapy in a group (5:1), one 30-minute session of individual counseling per week, and one 30-minute session per week of counseling in a group (3:1) (id. at pp. 1, 19). The CSE also recommended that the student participate in State and local assessments with testing accommodations of extended time, separate location, use of a calculator, and directions read and reread aloud (id. at p. 19).

By final notice of recommendation (FNR) dated August 6, 2010, the district summarized the special education services recommended in the April 2010 IEP and identified the particular public school site to which the district assigned the student to attend for the 2010-11 school year (Dist. Ex. 20). In a letter dated August 18, 2010, the parents informed the district that they were unable to visit the assigned public school site because it was closed for the summer and that until they were able to do so, they intended to maintain the student's placement at the Aaron School and seek public funding for his tuition costs (Parent Ex. D). The parents also requested that the district provide them with information about the assigned public school site, including a class profile and instructional methods that would be used by the classroom teacher (id.). On September 1, 2010, the parents executed an enrollment contract with the Aaron School for the student's attendance for the 2010-11 school year (Parent Ex. V).

In a letter dated October 27, 2010, the parents notified the district that they visited the assigned public school site identified in the FNR and were rejecting the school because it was not an appropriate school for the student (Parent Ex. E at p. 1). The parent identified several aspects of the school that rendered it inappropriate, including that (1) the school did not have a sensory gym; (2) the student would not have enough support in the classroom; (3) the environment was too noisy and distracting for the student; (4) the school was very large and overwhelming which would make it difficult for the student to navigate the school; (5) the student would not be appropriately grouped (id. at pp. 1-2). Based on these concerns, the parents advised the district of their intention to maintain the student's placement at the Aaron School at public expense for the 2010-11 school year (id. at p. 4).

### A. Due Process Complaint Notice

By amended due process complaint notice dated November 18, 2011, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2010-11 school year (Dist. Ex. 3 at pp. 3-4).[1] First, the parents asserted that the April 2010 CSE

---

[1] The parent initially filed a due process complaint notice dated July 13, 2011 (Parent Ex. A).

3

was invalidly composed (id. at p. 2). Next, the parents argued that the CSE failed to consider sufficient and appropriate evaluative information to justify its recommendations (id. at p. 1). The parents also argued that the CSE failed to allow the parents to meaningfully participate in the development of the student's IEP (id.).

With respect to the April 2010 IEP, the parents argued that the IEP did not accurately describe the student's present levels of performance (Dist. Ex. 3 at p. 2). More specifically, the parents asserted that the IEP failed to describe the student's cognitive, academic, and social/emotional issues, as well as the student's expressive and receptive language delays and functioning levels (id.). With respect to the annual goals, the parents argued that the IEP contained an insufficient number of appropriate goals to address the student's needs, and the goals did not provide measurable or separable benchmarks to measure the student's progress (id.). In addition, the parents asserted that the goals were compounded which would make it difficult to measure progress (id.). The parents also asserted that the IEP contained inappropriate promotion criteria which were inconsistent with the student's present levels of performance (id.).

Relative to the recommended placement, the parents alleged that the 12:1+1 special class placement was not appropriate because the student required a greater level of attention and support from trained educators in order to make progress and that the support was insufficient to address the student's issues, particularly with the student's difficulty with attention (District Ex. 3 at p. 3). With respect to the assigned public school site, the parents argued that the student's classroom did not have similarly functioning peers and lacked appropriate peer models, lacked a sensory gym and would not be able to provide the student with his mandated related services, and that the environment was too noisy, large, crowded, and loud (id.). The parents also alleged that the school had a number of administrative issues which would cause an inappropriate learning environment for the student (id.).

Lastly, the parents alleged that the student's unilateral placement at the Aaron School was appropriate because the program at the Aaron School was tailored to meet the student's needs, and that equitable considerations weighed in favor of the parents' request for relief (Dist. Ex. 3 at p. 4). As relief, the parents sought reimbursement for the student's tuition at the Aaron School for the 2010-11 school year, as well as the costs of related services and transportation (id. at p. 5). The parents invoked the student's right to a stay put (pendency) placement at the Aaron School (id.).[2]

### B. Impartial Hearing Officer Decision

On January 23, 2012, the parties met for a prehearing conference, and on February 21, 2012, the parties proceeded with the impartial hearing, which concluded on July 11, 2012 (see

---

[2] The parents also "reserve[d] the right" to raise other issues, specifically referencing the possibility that they would challenge (1) the composition or qualifications of the CSE; (2) qualifications of district personnel; and (3) the appropriateness of the district's recommended placement (Dist. Ex. 3 at p. 4). Such reservation clauses in complaints have generally been found ineffective (N.K. v New York City Dep't of Educ., 2013 WL 4436528, at *6 [S.D.N.Y. Aug. 13, 2013] [rejecting the claims in an amended due process complaint pursuant to a unilateral reservation of rights where permission of the school district or the IHO was absent]; B.P. v. New York City Dep't of Educ., 2012 WL 33984, at * 5 [E.D.N.Y. Jan 6, 2012] [rejecting the proposition that a general reservation of rights in a due process complaint notice preserves additional procedural arguments later in the proceeding]).

4

IHO Ex. I; Tr. pp. 1-485). In a decision dated September 4, 2012, the IHO concluded that the district failed to offer the student a FAPE for the 2010-11 school year, the Aaron School was an appropriate placement, and equitable considerations weighed in favor of the parents' request for relief (IHO Decision at pp. 9-10, 12).

Initially, the IHO found that the absence of an additional parent member from the April 2010 CSE meeting did not rise to a level of a denial of a FAPE (IHO Decision at p. 5).[3] Next, the IHO found that the April 2010 CSE did not consider sufficient and evaluative information, despite the CSE having evaluative information available to it during the CSE meeting (id.). The IHO further found that the district representative and district school psychologist failed to provide all of the CSE participants with copies of all of the evaluative information and furthermore, certain evaluative material was not discussed during the April 2010 CSE meeting, depriving the parents and the CSE participants the opportunity to meaningfully participate in the development of the IEP (id. at pp. 6-7).

With respect to the April 2010 IEP, the IHO found that it did not adequately address the student's academic, speech-language, and social/emotional needs (IHO Decision at p. 8). The IHO further found that the April 2010 IEP did not address the student's needs related to anxiety, auditory processing, and cognitive rigidity (id.). Relative to the annual goals, the IHO found that the goals did not address the student's needs and did not include appropriate and measurable benchmarks (id.).

Regarding the 12:1+1 special class placement recommended by the April 2010 CSE, the IHO found that that the district's recommendation was not appropriate because it would not have provided the student with the level and type of support that the student needed (IHO Decision at p. 7). The IHO further found that the student required a small class consisting of twelve students with two teachers in order to make meaningful progress (id.). With respect to the assigned public school site, the IHO found that the district could not establish that the school would have been able to implement the student's IEP or that the student would have been appropriately grouped (id. at pp. 8-9).

Turning to the unilateral placement, the IHO found that the Aaron School was appropriate and the student made progress (IHO Decision at p 10). The IHO further found that equitable considerations favored the parents because the parents fully cooperated with the CSE and provided the district with timely notice of their rejection of the CSE's recommendation (id. at pp. 11-12). Based on the foregoing, the IHO ordered the district to reimburse the parents for the costs of the student's tuition at the Aaron School for the 2010-11 school year (id. at pp. 12-13).

## IV. Appeal for State-Level Review

The district appeals, asserting that the IHO erred in finding that the district failed to offer the student a FAPE for the 2010-11 school year, that the Aaron School was an appropriate unilateral placement, and that equitable considerations weighed in favor of the parents' request

---

[3] Neither party appeals the IHO's determination that the absence of an additional parent member from the April 2010 CSE meeting did not rise to a level of a denial of a FAPE; thus, that determination is final and binding on the parties and will not be reviewed on appeal (34 CFR 300.514[a]; 8 NYCRR 200.5[j][v][5]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).

for relief. First the district asserts that the IHO erred in finding that the April 2010 CSE failed to consider appropriate and sufficient information in part because not all of the CSE participants had access to the documentation available to the CSE. The district further asserts that the IHO erred in finding that the district's failure to provide all participants with a draft copy of the IEP deprived the CSE participants with a meaningful opportunity to participate in the development of the student's April 2010 IEP. Additionally, the district argues that the although the 2009 psychoeducational evaluation was not discussed during the April 2010 CSE meeting, the CSE had sufficient evaluative information provided by the students' teacher and parent which accurately reflected the student's needs. Also, the district contends that the student's present levels of performance were consistent with the evaluative information available to the CSE and that the IHO erred in finding that the IEP failed to adequately describe the student's academic, speech-language, and social/emotional issues. With respect to the annual goals, the district argues that contrary to the IHO's finding, the goals addressed the student's needs, included appropriate and measurable benchmarks, and were designed to accurately measure the student's academic progress. The district also argues that the IHO erred in finding that a 12:1+1 special class placement was not appropriate for the student and that a 12:1+1 special class placement is the least restrictive environment for the student. With respect to the IHO's determinations relating to the district's inability to implement the student's IEP and functionally group the student appropriately at the assigned public school site, the district asserts that the parents' allegations were speculative in nature, as the student did not attend the school nor was the student enrolled in the school. In the alternative, the district asserts that the teacher at the assigned public school site testified that the student's IEP would have been properly implemented at the assigned public school site and the student would have been appropriately grouped because the students at the assigned classroom were sufficiently similar.

Next, the district asserts that the IHO erred in her determination that the Aaron School was an appropriate unilateral placement for the student. Specifically, the district argues that the Aaron School was inappropriate because it failed to provide any mainstreaming opportunities for the student. With respect to equitable considerations, the district asserts that the parents had no intention of enrolling the student in a public school placement, as evidenced by the parents' multiple payments to the Aaron school, prior to the April 2010 CSE meeting, their visit to the assigned public school site, and their rejection of the assigned public school site. The district also asserts that the parents failed to give timely notice to the district of the alleged deficiencies in the April 2010 IEP, thus preventing the district from curing any deficiencies within the IEP in a timely manner. Consequently, the district seeks an order reversing the IHO's decision in its entirety.

In an answer and cross-appeal, the parents respond to the district's petition by denying the material allegations raised and asserting that the IHO correctly found that the district failed to offer the student a FAPE for the 2010-11 school year, that the Aaron School was an appropriate unilateral placement, and that equitable considerations weighed in favor of the parents' request for relief. The parents also interpose a cross-appeal, asserting that the IHO failed to fully address all of issues raised by the parents in their due process complaint notice. Specifically, the parents assert that the IHO should have considered their claim that the April 2010 IEP contained an insufficient number of goals to address the student's needs. The parents also argue that the IHO should have addressed the parents' claim that the promotion criteria in the IEP were inappropriate and inconsistent with the student's present levels of performance. With respect to the assigned public school site, the parents argue that the IHO should have also considered their

6

claims regarding the appropriateness of the assigned school and whether the student would have been grouped with an appropriate social peer group.

In response to the parents' answer and cross-appeal, the district maintains that the annual goals in the April 2010 IEP addressed the student's needs and included appropriate and measurable benchmarks. The district also argues that the promotion criteria in the April 2010 IEP were appropriate and were modified to address the student's needs. Additionally, the district maintains that the parents' claims regarding the assigned public school site are speculative.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245; A.H. v. Dep't of Educ., 394 Fed. App'x 718, 720 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008], aff'd, 361 Fed. App'x 156 [2d Cir. Oct. 16, 2009]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007], aff'd, 293 Fed. App'x 20 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C.

7

§ 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; G.B. v. Tuxedo Union Free Sch. Dist., 751 F. Supp. 2d 552, 573-80 [S.D.N.Y. 2010], aff'd, 486 Fed. App'x 954 [2d Cir. Oct. 18, 2012]; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. New York City Bd. of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [noting that a CSE must consider, among other things, the "results of the initial evaluation or most recent evaluation" of the student, as well as the "academic, developmental, and functional needs" of the student]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see also Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d

8

at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85; M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## VI. Discussion

### A. April 2010 CSE Meeting Process

#### 1. Consideration of Evaluative Information

With regard to the development of the April 2010 IEP, the IDEA requires a district to conduct an evaluation of students eligible to receive special education or related services at least once every three years unless the parents and the district agree otherwise (see 20 U.S.C. § 1414[a][2][B]). In developing an IEP, a CSE is directed to "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom based observations; and (iii) observations by teachers and related services providers" (id. § 1414[c][1][A]). Further, in developing the recommendations for a student's IEP, the CSE must consider the results of the "initial or most recent evaluation; the student's strengths; the concerns of the parents for enhancing the education of their child; the academic, developmental and functional needs of the student, including, as appropriate, the results of the student's performance on any general State or district-wide assessments; and any special considerations" in federal and State regulations (20 U.S.C. § 1414[d][3][A], [B]; 34 CFR 300.324[a]; 8 NYCRR 200.4[d][2]; see also T.G. v. New York City Dep't of Educ., 973 F. Supp. 2d 320, 340-41 [S.D.N.Y. 2013]; E.A.M. v. New York City Dep't of Educ., 2012 WL 4571794, at *9 [S.D.N.Y. Sept. 29, 2012]).

The CSE must also consider privately-obtained evaluations, provided that such evaluations meet the district's criteria, in any decision made with respect to the provision of a FAPE to a student (34 CFR 300.502[c]; 8 NYCRR 200.5[g][1][vi]). However, "consideration" does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight (T.S. v. Bd. of Educ., 10 F.3d 87, 89-90 [2d Cir. 1993]; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 947 [1st Cir. 1991]; see Michael P. v. Dep't of Educ., 656 F.3d 1057, 1066 n.9 [9th Cir. 2011]; K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 805-06 [8th Cir. 2011]; Evans v. Dist. No. 17, 841 F.2d 824, 830 [8th Cir.1988]; James D. v. Bd. of Educ., 642 F. Supp. 2d 804, 818 [N.D. Ill. 2009]). Moreover, the IDEA "does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP" (J.C.S. v. Blind Brook-Rye Union Free Sch. Dist., 2013 WL 3975942, at *11 [E.D.N.Y. Aug. 5, 2013]; see T.G., 973 F. Supp. 2d at 341).

9

In the instant case, the hearing record demonstrates that the April 2010 CSE considered and reviewed a December 2009 classroom observation, a November 2009 Aaron School progress report, and an October 2009 Aaron School speech-language therapy plan to develop the student's 2010-11 IEP (Tr. pp. 213-215, 217-18, 234-35, 331-32; Dist. Ex. 13; Parent Exs. J; K).

First, a careful review of the April 2010 IEP reveals that the CSE considered and incorporated aspects of the November 2009 Aaron School progress report. For example, according to the April 2010 IEP and consistent with the November 2009 Aaron School report, the student's self-regulation needs impacted his ability to attend during class and he needed teacher support in order to engage in a positive manner with peers, participate in large groups, and manage conflicts (compare Parent Ex. C at p. 4, with Parent Ex. K).

Second, the hearing record establishes that the April 2010 IEP included information obtained during the district special education teacher's observation of the student at the Aaron School (Dist. Ex. 13). For example, although the student was reportedly "tired" and initially unfocused during the observation, the classroom teacher asked follow up questions during their conversation and used redirection to keep the student on task (id. at pp. 1-3). Consistent with the December 2009 classroom observation, the April 2010 IEP states that the student had difficulty with attending to tasks but benefitted from follow up questions, teacher support, and redirection (Parent Ex. C at pp. 3-4).

Third, consistent with the student's October 2009 Aaron School speech-language therapy plan, the April 2010 IEP included goals to address the student's needs in speech and language (compare Parent Ex. C at pp. 14-16, with Parent Ex. J at pp. 1-2). Specifically, goals were developed to address the student's verbal reasoning and problem solving skills, oral and written narrative language needs, pragmatic and conversational skills, ability to execute spoken and written instructions and tasks, and knowledge and use of semantics (Parent Ex. C at pp. 14-16).

Lastly, with respect to the February 2009 psychoeducational evaluation, the district representative testified that although not discussed during the April 2010 CSE annual review meeting, the district representative reviewed the psychoeducational evaluation prior to the CSE meeting and "information from the [psychoeducational evaluation] was incorporated [into the IEP] in parts" (Tr. pp. 220-22, 226). Consistent with the February 2009 psychoeducational evaluation, the April 2010 IEP stated that the student displayed attention difficulties, fine motor delays, and impulsivity (compare Parent Ex. C at p. 3, with Parent Ex. I at pp. 4, 6, 8). Additionally, in congruence with the psychoeducational evaluation, the April 2010 IEP stated that the student enjoyed interacting with others, and benefitted from teacher support to build pragmatic skills (Parent Ex. C at p. 4, with Parent Ex. I at pp. 10, 12).

To the extent that certain evaluative documents might not have been expressly reviewed in detail during the CSE annual review meeting, I note that the IDEA "does not require that the [CSE] review every single item of data available, nor has case law interpreted it to mean such" (T.G., 973 F. Supp. 2d at 340, quoting F.B. v. New York City Dep't of Educ., 923 F. Supp. 2d 570, 581-82 [S.D.N.Y. 2013] [rejecting parents' claim that because an evaluation report "was not physically present at the CSE meeting, it was never consulted by any party to that meeting"]; see also J.C.S., 2013 WL 3975942, at *10 ). Based on the foregoing, I find that the evidence contained in the hearing record does not support the IHO's conclusion that the district denied the

student a FAPE because the April 2010 CSE did not adequately consider the documentary information that was available to the CSE.

### 2. Parental Participation

The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and State regulations governing parental participation require that school districts take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 CFR 300.322; 8 NYCRR 200.5[d]). Although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 [S.D.N.Y. 2008] ["A professional disagreement is not an IDEA violation"]; Sch. for Language and Commc'n Dev. v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] ["Meaningful participation does not require deferral to parent choice"]).

A review of the hearing record indicates that attendees at the April 2010 CSE meeting consisted of a district school psychologist, a district special education teacher (who also served as the district representative), both parents, a district general education teacher, and, by telephone, the student's special education teacher from the Aaron School (Parent Ex. C at p. 2).

With respect to the parents' access to the evaluative information, the student's father testified that the parents provided the district special education teacher with teacher reports and assessments prior to the April 2010 CSE meeting (Tr. p. 330).[4] The student's father further testified that the parents received the classroom observation from the district special education teacher prior to the CSE meeting and the CSE provided copies of the classroom observation to the CSE participants; however, the student's father was not aware if the student's special education teacher, participating via telephone, received a copy (Tr. pp. 330-32). With respect to the February 2009 psychoeducational evaluation, the district representative testified that the reason for not discussing the evaluation during the CSE meeting was because she thought it was more important to discuss the student's "current functioning" and "concentrate on the current school report[s]" (Tr. pp. 285-87).

In this instance, the hearing record indicates that while copies of the evaluative material may not have been disseminated to all of the CSE participants, discussion took place during the CSE meeting regarding the student and the student's needs, and changes were made to the student's IEP at the request of the parents' as well as the student's special education teacher at the Aaron School, thus affording the parents and the Aaron School teacher the opportunity to participate in the development of the student's program (Dist. Ex. 9). Thus, in this regard, the hearing record shows that the parents and Aaron school teacher participated, in part, by virtue of expressing their disagreement, and the fact that the CSE did not adopt all of their recommendations does not amount to a significant impediment to the parents' opportunity to

---

[4] The hearing record includes a letter to the district dated February 11, 2011, by which the parents provided the district with a copy of the student's progress reports and speech-language therapy plan (Parent Ex. I at p. 1).

11

participate in the development of the student's IEP (see 20 U.S.C. § 1415[b][1]; 34 CFR 300.322; 8 NYCRR 200.5[d]).[5]

### B. April 2010 IEP

#### 1. Present Levels of Performance

Among the elements of an IEP is a statement of a student's academic achievement and functional performance and how the student's disability affects his or her progress in relation to the general education curriculum (20 U.S.C. § 1414[d][1][A][i][I]; 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; see 8 NYCRR 200.1[ww][3][i]). In developing the recommendations for a student's IEP, the CSE must consider the results of the initial or most recent evaluation; the student's strengths; the concerns of the parents for enhancing the education of their child; the academic, developmental and functional needs of the student, including, as appropriate, the student's performance on any general State or district-wide assessments as well as any special factors as set forth in federal and State regulations (34 CFR 300.324[a]; 8 NYCRR 200.4[d][2]).[6] However, neither the IDEA nor State law requires a CSE to "consider all potentially relevant evaluations" of a student in the development of an IEP or to consider "every single item of data available" about the student in the development of an IEP (T.G. v. New York City Dep't of Educ., 2013 WL 5178300, at * 18-*19 [S.D.N.Y. Sept. 16, 2013], citing M.Z., 2013 WL 1314992, at *8; see F.B.', 923 F. Supp. 2d at 582). In addition, while the CSE is required to consider recent evaluative data in developing an IEP, so long as the IEP accurately reflects the student's needs the IDEA does not require the CSE to exhaustively describe the student's needs by incorporating into the IEP every detail of the evaluative information available to it (20 U.S.C. § 1414[d][3][A]; see M.Z., 2013 WL 1314992, at *9; D.B. v. New York City Dep't of Educ., 2011 WL 4916435, at *8 [S.D.N.Y. Oct. 12, 2011]).

Regarding the parents' assertion that the April 2010 IEP failed to accurately describe the student's academic, speech-language and social-emotional issues, the hearing record does not support the parents' position. The present levels of academic performance section of the April 2010 IEP reflect that the student's decoding and writing abilities were at mid-third grade level and the student's reading comprehension was at a beginning fourth grade level (Parent Ex. C at p. 3). The present levels of academic performance section of the IEP also reflected that the student's computation and problem solving abilities were at a mid-second grade level (id.). This section also noted that the student's strengths were in comprehension while the student had weaknesses in math (id.). These needs were consistent with those identified in the goals included in the November 2009 Aaron School progress report, which reflected that the student

---

[5] While it would be ideal to provide all CSE participants with individual copies of all materials in a student's file under all circumstances, it does not follow that any deviation from such an ideal automatically constitutes a denial of a FAPE. As a practical matter, it would be appropriate for a professional such as the student's Aaron School teacher to ask for copies of materials during a CSE meeting if copies were not provided at the outset and the teacher considered them to be important to her participation. If the district refused to provide these materials without a valid reason (such as a lack of parental consent), the likelihood of finding a significant impediment to the parents' opportunity to participate would increase.

[6] Although federal and State regulations require that an IEP report the student's present levels of academic achievement and functional performance, those regulations do not mandate or specify a particular source from which that information must come (see 34 CFR 300.324[a]; 8 NYCRR 200.4[d][2]).

functioned at fourth grade level in reading comprehension and at a second grade level in math (see Parent Ex. K at pp. 6-7). Additionally, consistent with the November 2009 Aaron School report and testimony provided by Aaron school staff, the IEP stated that the student needed redirection, verbal and visual reminders, teacher proximity, graphic organizers, sensory tools and breaks, structure, and having instructional materials broken down (compare Parent Ex. C at p. 3 with Parent Ex. K; Tr. pp. 308, 314, 387, 391). According to the April 2010 IEP, consistent with the November 2009 Aaron School report and testimony by the Aaron school staff, the student's self-regulation needs impacted his ability to attend during class, and he needed teacher support in order to engage in a positive manner with peers, participate in large groups, and manage conflicts (compare Parent Ex. C at p. 4, with Parent Ex. K, and Tr. pp. 389-90, 395, 432).

With the respect to the student's issues with anxiety, auditory processing issues or cognitive rigidity, the April 2010 IEP included management needs including redirection, verbal and visual reminders, teacher proximity, graphic organizers, access to sensory tools, breaks, teacher support to negotiate with others and resolve conflict, and use of calculator and manipulatives for math (Parent Ex. C at pp. 3, 4). I find that the hearing record demonstrates that the present levels of academic and social/emotional performance in the April 2010 IEP provided an accurate description of the student's present levels of performance upon which appropriate annual goals and special education services could be recommended. Furthermore, in light of the management needs and annual goals recommended by the April 2010 IEP, the absence of a detailed description of the student's anxiety, auditory processing issues, or cognitive rigidity needs from the present levels of functional performance section of the IEP does not result in a denial of a FAPE.

### 2. Annual Goals and Promotion Criteria

In their cross-appeal, the parents assert that the April 2010 IEP contained an insufficient quantity of appropriate, measurable, and separable goals to address the student's needs and measure progress. The parents further assert that the annual goals did not address the student's needs and failed to include appropriate and measurable benchmarks.[7]

An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability (see 20 U.S.C. § 1414[d][1][A][i][II]; 34 CFR 300.320[a][2][i]; 8 NYCRR 200.4[d][2][iii]). Each annual goal shall include the evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal during the period beginning with

---

[7] The parents' due process complaint notice alleged that the April 2010 IEP lacked a sufficient number of appropriate and separable goals to address the student's needs (see Dist. Ex. 1); however, they have not identified which goals they believe are inappropriate. Moreover, the parents did not indicate in their due process complaint notice what area(s) of need the goals failed to address, and a review of the student's needs and the April 2010 IEP annual goals and short-term objectives reflects that the CSE developed goals in the student's areas of deficit as identified in the information reviewed and considered by the CSE (compare Dist. Exs. 9-11, with Dist. Ex. 4 at pp. 6-14). Although the parents are correct that there are certain annual goals and short-term objectives that are compounded, I do not find that this defect renders them inappropriate such that the student was denied a FAPE.

13

placement and ending with the next scheduled review by the committee (8 NYCRR 200.4[d][2][iii][b]; see 20 U.S.C. § 1414[d][1][A][i][III]; 34 CFR 300.320[a][3]).

  A review of the hearing record reveals that the April 2010 IEP contained 20 annual goals that focused on the student's needs in the areas of reading, writing, math, socialization, self-regulation, daily living skills, motor skills, verbal reasoning, problem solving, and speech-language (Parent Ex. C at pp. 6-16). Specifically, to address the student's needs in the area of reading comprehension, the IEP contained goals for the student to develop inferential skills by identifying implied meaning and defining unfamiliar words using context cues; and to develop oral fluency by attending to punctuation while reading (id. at p. 6). In addition, the IEP addressed the student's fine motor needs with goals to develop his skills by writing complete sentences with correct capitalization and punctuation, descriptors, and conjunctions; and proper sizing and spacing of letters (id. at p. 7). The IEP also included occupational therapy two times per week to address the student's fine motor and attention needs, and included goals related to spacing of written work and cursive, awareness of his self-regulatory state and improved attention, organization, motor planning, postural control, and arm strength (id. at pp. 11-13). In the area of math, the IEP included goals for improving the student's automaticity in math computation and developing his problem solving skills by creating numerical operations from a word problem (id. at pp. 8-9). In order to address the student's social/emotional development, the April 2010 IEP included goals to improve his interaction with peers by initiating and maintaining a conversation, appropriately negotiating conflict, and improving his self-esteem (id. at pp. 10-11). Additionally, the April 2010 IEP included speech-language therapy twice per week to address the student's ability to answer questions, produce narrative, engage in conversation, follow multistep directions, and improve recall (id. at pp. 14-16).

  In developing the annual goals in the April 2010 IEP, the district representative testified that the academic goals were developed at the CSE meeting, and that the related services goals were derived from the Aaron school progress reports (Tr. pp. 240-41). Moreover, the April 2010 CSE meeting minutes reflect a collaborative effort between district personnel, the parent and the student's Aaron teacher to address the parents' concerns regarding the student's annual goals in the April 2010 IEP (see Dist. Ex. 9). Specifically, the April 2010 CSE meeting minutes reveal that the parent requested that the student's fine motor concerns be addressed and that a goal be added to the IEP addressing the student's ability to attend to punctuation while reading (Dist. Ex. 9). Correspondingly, the April 2010 IEP reflects that the April 2010 CSE included goals to address the student's fine motor concerns as well as goal that addressed the student's ability to attend to punctuation while reading (Parent Ex. C at pp. 6, 7, 11, 13). Thus, overall, the hearing record supports a finding that the annual goals in the April 2010 IEP targeted the student's identified areas of need.

  With regard to the measurability of the student's goals, State regulation requires that each annual goal include the evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward meeting the annual goal (8 NYCRR 200.4[d][2][iii][b]). The State Education Department's Office of Special Education issued a guidance document in December 2010 which specifies that evaluative criteria refers to "how well and over what period of time a student must perform a behavior in order to consider it met" ("Guide to Quality Individualized Education Program [IEP] Development and Implementation," Office of Special Educ. Mem. [Dec. 2010], at p. 32, available at http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf). A student's performance can be measured in terms of frequency,

14

duration, distance, or accuracy; and period of time can be measured in days, weeks, or occasions (id.). Evaluation procedures refers to the method that will be used to measure progress, such as structured observations, student self-monitoring, written tests, recordings, work samples, and behavior charting (id. at p. 33). Evaluation schedules refer to the date or intervals of time by which evaluation procedures will be used to measure the student's progress (id.).

In this case, the annual goals and short-term objectives in the April 2010 IEP provided criteria for measurement to determine if a goal had been achieved (i.e., 70 percent accuracy, 80 percent accuracy, 75 percent mastery, 80 percent mastery), the method of how progress would be measured (i.e., teacher, counselor and speech-language observations, performance assessment, checklists), and a schedule of when progress toward the goals would be measured (i.e., each week over the course of five weeks) (Dist. Ex. 1 at pp. 3-11). Additionally, the April 2010 IEP indicated that three reports of progress toward the annual goals would be prepared throughout the 2010-11 school year (id.). Thus, a review of the April 2010 IEP demonstrates that, contrary to the parents' assertions, the annual goals, combined with their corresponding short-term objectives, contained "sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress" (Tarlowe, 2008 WL 2736027, at *9 [internal quotations omitted]; see N.S. v. New York City Dep't of Educ., 2014 WL 2722967, at *9-*10 [S.D.N.Y. June 16, 2014]; B.K. v. New York City Dep't of Educ., 2014 WL 1330891, at *10-*12 [E.D.N.Y. Mar. 31, 2014]; R.B. v. New York City Dep't of Educ., 2013 WL 5438605, at *13-*14 [S.D.N.Y. Sept. 27, 2013]; D.A.B. v. New York City Dep't of Educ., 973 F. Supp. 2d 344, 359-61 [S.D.N.Y. 2013]; E.F. v. New York City Dep't of Educ., 2013 WL 4495676, at *17-*19 [E.D.N.Y. Aug. 19, 2013]; D.B., 966 F. Supp. 2d at 334-35; see also M.Z., 2013 WL 1314992, at *6; A.D. v. New York City Dep't of Educ., 2013 WL 1155570, at *11 [S.D.N.Y. Mar. 19, 2013]; J.L. v. City Sch. Dist. of New York, 2013 WL 625064, at *13 [S.D.N.Y. Feb. 20, 2013]; C.D. v. Bedford Cent. Sch. Dist., 2011 WL 4914722, at *8 [S.D.N.Y. Sept. 22, 2011]; P.K. v. New York City Dep't of Educ., 819 F.Supp.2d 90, 109 [E.D.N.Y. 2011], aff'd 526 Fed. App'x 135 [2d Cir. May 21, 2013] [noting reluctance to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress]). Lastly, with respect to the parents' argument that the April 2010 IEP failed to include appropriate and measurable benchmarks, as noted above both State and federal regulations only require a CSE to develop measurable benchmarks for students who participate in alternate assessments (8 NYCRR 200.4[d][2][iv]; see 20 U.S.C. §1414[d][1][A][i][I][cc]; 34 CFR 300.320[a][2][ii]). As the IEP indicates that the student would participate in State and local assessments (Parent Ex. C at p. 19), the parents' argument is without merit.

Turning next to the parents' contentions regarding the inappropriateness of the promotion criteria in the April 2010 IEP, neither federal nor State regulations require that an IEP contain promotion criteria (see 8 NYCRR 200.4[d][2]; see also 34 CFR 300.320). State guidance from the Office of Special Education indicates that "[i]f the [CSE] determines that the criteria for the student to advance from grade to grade needs to be modified, the IEP would indicate this as a program modification. This information would most appropriately be indicated in the IEP in the 'Supplementary Aids and Services/Program Modifications/Accommodations' section of the IEP" ("Questions and Answers on Individualized Education Program [IEP] Development, the State's Model IEP Form and Related Documents," at p. 51, Office of Special Educ. [Apr. 2011], available at http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf). In the instant case, the district representative testified that the April 2010 CSE discussed the issue of

15

modifying the student's promotion criteria and the district determined that during the 2010-11 school year, in order to be promoted, the student would be required to meet 70 percent of the fifth grade ELA and math standards as evidenced by teacher observation and assessments (Tr. p. 209; Parent Ex. C at p. 19). Nothing in the IEP's description of the promotional criteria alters how instruction should be delivered to the student and nothing in the hearing record indicates that these promotion criteria would impede the student's ability to receive educational benefits.

### 3. 12:1+1 Special Class Placement

State regulations provide that a 12:1+1 special class placement is designed for students "whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students" (8 NYCRR 200.6[h][4][i]).

In reaching the decision to recommend a 12:1+1 special class placement, the April 2010 CSE determined that the student was unable to function in a general education setting with supports due to his need for the structure of a small classroom setting (Tr. pp. 207-08; Parent Ex. C at p. 18). The district representative indicated that a 12:1 special class was also considered and rejected as insufficiently supportive and that the student required an additional staff person within the classroom due to his difficulty with attention and social relationships (Parent Ex. C at p. 18). Additionally, the district representative stated that due to the student's attention issues, a 12:1+1 special class placement would meet the student's needs for a smaller class environment, with the additional staff to help with redirection (Tr. p. 208).

With respect to the IHO's finding that the student's needs could not have been met with one teacher and one paraprofessional, during the impartial hearing, the head of the Aaron School testified that the student needed the support of two teachers to help the students in the classroom "in terms of scaffolding, in terms of an explanation, in terms of redirection, [and] in terms of social skills between students" (Tr. p. 315). Additionally, the student's parent testified that the student's Aaron School special education teacher who attended the April 2010 CSE meeting stated that the student required a classroom with 12 students and 2 teachers, which would enable the teachers to provide the frequent individualized support, calming and breaks that the student needs (Tr. p. 342). I note that these descriptions of the student's need for two teachers in the classroom align with the types of support that are permissibly provided by supplementary school personnel, and do not indicate a need for an additional adult in the classroom capable of providing independent instruction. Therefore, the hearing record indicates that the support the student required could have been provided by one teacher and one supplementary school personnel (see F.L. v. New York City Dep't of Educ., 553 Fed. App'x 2, 8-9 [2d Cir. Jan. 8, 2014]; K.L. v. New York City Dep't of Educ., 530 Fed. App'x 81, 85-86 [2d Cir. July 24, 2013]; B.K., 2014 WL 1330891, at *18-*20; M.L. v. New York City Dep't of Educ., 2014 WL 1301957, at *10-*11 [S.D.N.Y. Mar. 31, 2014]).

Contrary to the parents' arguments, the hearing record does not contain evidence that the student required a smaller student-to-teacher ratio or two teachers due to his need for redirection and difficulty regulating his body. Rather, the evidence in the hearing record establishes that the structure and support offered in the 12:1+1 special class placement, together with the annual goals and management needs in the April 2010 IEP, was appropriate to meet the student's needs.

16

### C. Assigned Public School Site

With regard to the parties' arguments pertaining to the assigned public school site, such challenges are generally relevant to whether the district properly implemented a student's IEP, which is speculative when the student never attended the recommended placement. Generally, the sufficiency of the district's offered program must be determined on the basis of the IEP itself (R.E., 694 F.3d at 186-88). The Second Circuit has explained that the parents' "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement" (R.E., 694 F.3d at 195; see F.L., 553 Fed. App'x at 9; see also K.L., 530 Fed. App'x at 87; R.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 273 [S.D.N.Y. 2012] [explaining that "[g]iven the Second Circuit's recent pronouncement that a school district may not rely on evidence that a child would have had a specific teacher or specific aide to support an otherwise deficient IEP, it would be inconsistent to require evidence of the actual classroom a student would be placed in where the parent rejected an IEP before the student's classroom arrangements were even made"]). The Second Circuit has also clarified that, under factual circumstances similar to those in this case, in which the parents have rejected and unilaterally placed the student prior to IEP implementation, "[p]arents are entitled to rely on the IEP for a description of the services that will be provided to their child" (P.K. v. New York City Dep't of Educ., 526 Fed. App'x 135, 141 [2d Cir. 2013]) and, even more clearly, that "[t]he appropriate inquiry is into the nature of the program actually offered in the written plan, not a retrospective assessment of how that plan would have been executed" (K.L., 530 Fed. App'x at 87, quoting R.E., 694 F.3d at 187; see C.F. v. New York City Dep't of Educ., 746 F.3d 68, 79 [2d Cir. 2014]'; see also Grim, 346 F.3d at 381-82 [holding that the district was not liable for a denial of a FAPE where the challenged IEP was determined to be appropriate, but the parents chose not to avail themselves of the public school program]).[8] When the Second Circuit spoke recently with regard to the topic of assessing the district's offer of an IEP versus later acquired school site information obtained and rejected by the parent as inappropriate, the Court disallowed a challenge to a recommended public school site, reasoning that "the appropriate forum for such a claim is 'a later proceeding' to show that the child was denied a free and appropriate public education 'because necessary services included in the IEP were not provided in practice" (F.L., 553 Fed. App'x at 9, quoting R.E., 694 F.3d at 187 n.3).

---

[8] While the IDEA and State regulations provide parents with the opportunity to offer input in the development of a student's IEP, the assignment of a particular school is an administrative decision that must be made in conformance with the CSE's educational placement recommendation (T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 420 [2d Cir. 2009]; see K.L.A. v. Windham Southeast Supervisory Union, 371 Fed. App'x 151, 154 [2d Cir. Mar. 30, 2010]). A school district "may have two or more equally appropriate locations that meet the child's special education and related services needs and school administrators should have the flexibility to assign the child to a particular school or classroom, provided that determination is consistent with the decision of the group determining placement" (Placements, 71 Fed. Reg. 46588 [Aug. 14, 2006]). Once a parent consents to a district's provision of special education services, such services must be provided by the district in conformity with the student's IEP (20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see 20 U.S.C. § 1414[d]; 34 CFR 300.320). The Second Circuit recently reiterated that while parents are entitled to participate in the determination of the type of placement their child will attend, the IDEA confers no rights on parents with regard to school site selection (C.F., 746 F.3d at 79). However, the Second Circuit has also made clear that just because a district is not required to place implementation details such as the particular public school site or classroom location on a student's IEP, the district is not permitted to choose any school and provide services that deviate from the provisions set forth in the IEP (see R.E., 694 F.3d at 191-92; T.Y., 584 F.3d at 420 [the district does not have carte blanche to provide services to a child at a school that cannot satisfy the IEP's requirements]). The district has no option but to implement the written IEP and parents are well within their rights to compel a non-compliant district to adhere to the terms of the written plan.

17

In view of the foregoing, the parents cannot prevail on their claims regarding implementation of the April 2010 IEP because a retrospective analysis of how the district would have implemented the student's April 2010 IEP at the assigned public school site is not an appropriate inquiry under the circumstances of this case (K.L., 530 Fed. App'x at 87; R.E., 694 F.3d at 186; R.C., 906 F. Supp. 2d at 273). Here, it is undisputed that the parents rejected the assigned public school site that the student would have attended and instead chose to enroll the student in a nonpublic school of their choosing (see Parent Exs. E; V). Therefore, the district is correct that the issues raised and the arguments asserted by the parents with respect to the assigned public school site are speculative. Furthermore, in a case in which a student has been unilaterally placed prior to the implementation of an IEP, it would be inequitable to allow the parents to acquire and rely on information that post-dates the relevant CSE meeting and IEP and then use such information against a district in an impartial hearing while at the same time confining a school district's case to describing a snapshot of the special education services set forth in an IEP (C.L.K. v. Arlington Sch. Dist., 2013 WL 6818376, at *13 [S.D.N.Y. Dec. 23, 2013] [stating that in addition to districts not being permitted to rehabilitate a defective IEP through retrospective testimony, "[t]he converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE"]). Based on the foregoing, the district was not obligated to present retrospective evidence at the impartial hearing regarding the execution of the student's program or to refute the parents' claims (K.L., 530 Fed. App'x at 87; R.E., 694 F.3d at 186; R.C., 906 F. Supp. 2d at 273). Accordingly, the parents cannot prevail on their claims that the assigned public school site would not have properly implemented the April 2010 IEP.

## VII. Conclusion

Having determined that the evidence in the hearing record establishes that the district offered the student a FAPE, the necessary inquiry is at an end and there is no need to reach the issues as to whether the Rebecca School was an appropriate unilateral placement for the student or whether equitable considerations support the parents' request for relief (Burlington, 471 U.S. at 370; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134).

I have considered the parties' remaining contentions and find it unnecessary to address them in light of my determinations herein.

**IT IS ORDERED** that the IHO's decision dated September 4, 2012, is modified by reversing those portions which found that the district failed to offer the student a FAPE for the 2010-11 school year and ordered the district to reimburse the parents for the costs of the student's tuition at the Aaron School for the 2010-11 school year.

Dated:   Albany, New York
         October 29, 2014

JUSTYN P. BATES
STATE REVIEW OFFICER