UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

Z.A. & R.A., *individually and on behalf of*
D.A.,

                         Plaintiffs,

                    v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                         Defendant.

------------------------------------------------------ X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: September 13, 2016 |

15 Civ. 1539 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Z.A. and R.A., individually and on behalf of their special needs

child, D.A. (collectively, "Plaintiffs"), filed suit against Defendant New York City

Department of Education ("Defendant" or the "DOE"), advancing claims under

the Individuals with Disabilities Education Improvement Act ("IDEA," formerly

known as the Individuals with Disabilities Act), 20 U.S.C. §§ 1400-1409, 1411-

1419, 1431-1444; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

§ 794; Article 89 of the New York Education Law, N.Y. Educ. Law §§ 4401-

4410, and Part 200 of the regulations of the New York State Commissioner of

Education, codified at 8 N.Y. Comp. Codes R. & Regs. tit. 8, Parts 200-201.[1]

---

[1]    The Court does not expressly name the child or the parents because "in an action
commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA,
the plaintiffs should be permitted to proceed, as a matter of course, using initials in
place of full names in public filings with the Court." *P.M.* v. *Evans-Brant Cent. Sch. Dist.,*
No. 08 Civ. 168A (RJA), 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008); *see also*
Fed. R. Civ. P. 5.2(a); 20 U.S.C. § 1417(c).

Plaintiffs bring this action seeking (i) review of two October 29, 2014 decisions of the State Review Officer ("SRO"), and (ii) reimbursement for the costs of D.A.'s attendance at the Aaron School during the 2010-2011 and 2011-2012 school years.

Plaintiffs have now moved for summary judgment.  For the reasons set forth in the remainder of the Opinion, Plaintiffs' motion is denied.

**BACKGROUND**[2]

**A.      The Legal Framework**

The IDEA "requires States to provide disabled children with a 'free appropriate public education'" (referred to in this setting as a "FAPE").  *Florence County Sch. Dist. Four* v. *Carter*, 510 U.S. 7, 9 (1993) (citation omitted); *see also R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2005).  In accordance with this mandate, school districts are required to create an individualized education program (or "IEP") for each qualifying child in order to ensure that the child receives a FAPE.  *See R.E.*, 694 F.3d at 175.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational

---

[2]     The facts set forth herein are drawn from the administrative record of the proceedings below, including the two decisions of the Impartial Hearing Officers ("IHO Op.") and the two decisions of the State Review Officer ("SRO Op."); the exhibits introduced during the hearings by Plaintiffs ("Pl. Ex.") and Defendant ("Def. Ex."); and the transcripts ("Tr.") of the IHO hearings.  For documents pertaining to the 2010-2011 school year, the Court includes "Y1" in each citation, and for documents pertaining to the 2011-2012 school year, the Court includes "Y2" in the citation.  For convenience, Plaintiffs' opening brief is referred to as "Pl. Br." (Dkt. #18), Defendant's opposition brief as "Def. Opp." (Dkt. #23), and Plaintiffs' reply brief as "Pl. Reply" (Dkt. #25), all referenced according to their ECF pagination.  The Court waived the requirement that the parties submit Local Rule 56.1 Statements, at the request of the parties.  (*See* Dkt. #16).

performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A).  The cornerstone of the IDEA is the requirement that the IEP be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

In New York State, each school district has a Committee on Special Education ("CSE") that is responsible for developing IEPs for qualifying students within that district. *Gagliardo*, 489 F.3d at 107.  A CSE is "comprised of members appointed by the local school district's board of education; it must include, among others, the student's parent(s), a regular or special education teacher, a school board representative, [and] a parent representative," and it may include others. *R.E.*, 694 F.3d at 175; *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).[3]  The CSE is responsible for examining each student's level of

---

[3]     A "parent representative," also referred to as a "parent member," is a parent of another special needs student.  This parent attends the CSE meeting to provide information and support to the parent of the student for whom the CSE meeting is being held.  *See* N.Y. Educ. Law § 4402(1)(b)(1)(a)(viii).

achievement and specific needs in order to formulate an appropriate educational program.  *R.E.*, 694 F.3d at 175.

If a parent believes that his or her child's IEP fails to comply with the IDEA, the parent may seek relief by filing a due process complaint with the appropriate state agency.  20 U.S.C. § 1415(b)(6).  Federal law mandates that, upon the filing of a due process complaint, the parent be provided with an impartial due process hearing before an Impartial Hearing Officer ("IHO").  *Id.* § 1415(f).  New York law, in turn, requires a parent to pursue his or her claim first before an IHO; once the IHO renders a decision, either party may appeal the decision to the SRO.  N.Y. Educ. Law § 4404(1), (2).  After the SRO completes his or her review of the IHO's decision, either party may file an action in state or federal court seeking review of the SRO's decision.  20 U.S.C. § 1415(i)(2)(A).

Judicial review under the IDEA is a "two-part inquiry":

> First, the court asks whether the State complied with the procedures set forth in the Act.  Second, the court asks whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits.  If an IEP is deficient — either procedurally or substantively — the court then asks whether the private schooling obtained by the parents for the child is appropriate to the child's needs.

*M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012) (internal citations and alterations omitted).  In assessing this last question, "equitable

considerations relating to the reasonableness of the action taken by the parents are relevant." *Id.* (internal citation omitted).[4]

## B.    Factual Background

As noted, Plaintiffs challenge the formulation, substance, and implementation of IEPs for two successive school years.  Because several of Plaintiffs' claims are interrelated, the Court will set forth the factual and procedural history of both IEPs, before proceeding to consider Plaintiffs' legal challenges as to each.

### 1.    D.A.'s Disability Classification and Placement Prior to 2010

Plaintiffs Z.A. and R.A. are the parents of Plaintiff D.A., a child with "low average range of intellectual functioning" and "a history of motor skills deficits, persistent and severe pragmatic expressive and receptive language difficulties, and primary problems with sustained attention and impulsivity."  (Y1 Tr. 12). In his infancy, D.A. generally achieved his developmental milestones on time, though he experienced certain deficits.  (Y1 Pl. Ex. I at 1).  Specifically, D.A. was able to walk without assistance at 11 months, but he "barely crawled" and had difficulty learning how to throw and catch.  (*Id.*).  D.A. also struggled to speak in full sentences, though with speech therapy, he was able to do so shortly after his third birthday.  (*Id.*).

---

[4]    This three-prong analysis is called the *Burlington/Carter* test, from the Supreme Court cases in which it was articulated.  *C.F. ex rel. R.F.* v. *N.Y.C. Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014); *see generally Florence County Sch. Dist. Four* v. *Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Town of Burlington, Mass.* v. *Dep't of Educ. of Mass.*, 471 U.S. 359 (1985).

D.A. attended preschool in a mainstream class, but received assistance from a Special Education Itinerant Teacher ("SEIT"), who "help[ed] [him] navigate activities within the classroom." (Y1 Pl. Ex. I at 2). Subsequently, D.A. was placed in a mainstream kindergarten class at the Dwight School, where he did not receive assistance from a SEIT. (*Id.*). D.A. ultimately displayed impulsivity problems, and this learning environment was "deemed not a good fit for him." (*Id.*). D.A. was then transferred into a special education class at the Gateway School ("Gateway"), which had an 8:1:1 classroom ratio,[5] and he received services such as group speech and language therapy, occupational therapy, and counseling. (*Id.*). D.A. spent the next three years at Gateway, until the school advised Plaintiffs that they should seek an alternative school that could provide more support to D.A. (Y1 Tr. 328-29). D.A. attended the Aaron School for the 2009-2010 school year. (*Id.* at 327).

### 2. The 2010-2011 School Year

#### a. The CSE Meeting

On April 19, 2010, the CSE convened to develop D.A.'s IEP for the 2010-2011 school year, during which D.A. would be in fifth grade. (Y1 Pl. Ex. C ("Y1 IEP")). Plaintiffs Z.A. and R.A. were both in attendance at the meeting. (*Id.* at 2). Feng Ye participated in her dual capacities as district representative and DOE special education teacher. (*Id.*). Victor H. Benavente participated as a general education teacher, and Rose Fochetta participated as a school

---

[5]     A classroom ratio of this type refers, in turn, to the numbers of students, teachers, and classroom paraprofessionals.

psychologist.  (*Id.*).  Kimberly Joyce, a special education teacher at the Aaron

School, attended the meeting via telephone.  (*Id.*).

### b. D.A.'s 2010-2011 IEP

Regarding D.A.'s academic performance and learning characteristics, the

2010-2011 IEP stated that D.A. "ha[d] a diagnosis of ADHD" and "present[ed]

with regulation and attentional difficulties as well as fine motor delays."  (Y1

IEP at 3).  It also noted that D.A.'s "impulsivity and demanding an immediate

answer at times c[ould] be disruptive."  (*Id.*).  According to the IEP, "visual

reminders and access to sensory tools and breaks" were helpful to D.A., as well

as "redirection[,]" "structure[,] and having instructional materials chunked into

small increments."  (*Id.*).  At the time of the CSE meeting, D.A. functioned at a

mid-third-grade level in decoding and writing, an early-fourth-grade level in

reading comprehension, and a mid-second-grade level in math.  (*Id.*).  In terms

of D.A.'s academic management needs, the IEP listed "[r]edirection; verbal [and]

visual reminder[s]; teacher proximity; [a] graphic organizer; sensory tools [and]

breaks; [and] use of calculator and manipulative[s] for math."  (*Id.*).

In the Social and Emotional Performance narrative, the IEP stated that

D.A.'s difficulties in school stemmed from his "self-regulation needs, executive

functioning[,] and higher order cognition."  (Y1 IEP at 4).  The IEP described

D.A.'s "tendency to dwell on the negative" and his struggles to both converse

and engage with others.  (*Id.*).  To accommodate D.A.'s social and emotional

management needs, the IEP recommended that he be afforded access to

sensory materials, water breaks and body breaks, teacher support in managing

interactions with others, and verbal and non-verbal reminders.  (*Id.*).  As to
D.A.'s health and physical development, the IEP once again noted D.A.'s ADHD
diagnosis, and indicated that D.A. took medication for his attentional
difficulties and hyperactivity.  (*Id.* at 5).  The IEP stated that "occupational
therapy continue[d] to be warranted."  (*Id.*).

The IEP also set out numerous annual goals for D.A.  (Y1 IEP at 6).
These included reaching grade level in reading, writing, and handwriting, in
addition to developing oral fluency, encoding skills, automaticity in math
computation, and problem-solving skills.  (*Id.* at 6-9).  The IEP projected that
D.A. would improve (i) social relationships and his ability to negotiate conflicts;
(ii) self-esteem; (iii) graphomotor skills; (iv) awareness of his self-regulatory
state; (v) daily living school-based skills; (vi) motor planning and body
awareness; (vii) postural control, trunk strength, and functional shoulder, arm,
and hand control; (viii) verbal reasoning and problem-solving skills; (ix) oral
and written narrative language skills; (x) pragmatic language and
conversational skills; (xi) his ability to execute spoken and written language
instructions; and (xii) his knowledge and use of semantics.  (*Id.* at 6-16).

In the portion of the IEP detailing programs and services that were
considered and rejected, the narrative stated that D.A. was unable to
participate in a general education setting, and still required the structure and
support of a small classroom environment.  (Y1 IEP at 18).  The IEP also
commented that a 12:1 student-to-teacher ratio was considered and rejected
because D.A. "require[d] additional adult support" in the classroom.  (*Id.*).

Ultimately, a classroom setting of 12:1:1 was deemed appropriate in all areas of instruction because D.A.'s specific needs "warrant[ed] greater support th[a]n [could] be found in a general education in a general education setting." (*Id.* at 17).

The IEP established that D.A. was able to participate fully in lunch, assemblies, trips, and other school activities with non-disabled students. (Y1 IEP at 19). In addition, the IEP directed that in order to be promoted, D.A. would be required to meet "70% of the passing criteria of the 5th grade ELA [English and Language Arts] and math determined by teacher observation and assessment." (*Id.*). Handwritten notes on the IEP indicated that D.A.'s group speech therapy and group counseling was to be modified, at the request of D.A.'s parents, to "push-in." (*Id.*; *see also id.* at 2). Further, a notation on the IEP signaled that the document was sent to Plaintiffs Z.A. and R.A. on April 20, 2010. (*Id.* at 2).

### c. The DOE's Recommended Placement at P.S. 6

In August 2010, Plaintiffs received a letter informing them that the DOE had recommended a placement at P.S. 6. (Y1 Pl. Ex. A at 2). Following receipt of this placement, on August 18, 2010, Plaintiffs sent a letter to Nancy Funke at the CSE indicating that they wished to visit P.S. 6; however, they were unable to do so because the school was closed for the summer. (Y1 Pl. Ex. D at 1). Plaintiffs expressed their intent to visit the school when it re-opened in September, but requested that, in the interim, the CSE provide them with information regarding P.S. 6, including the expected size of D.A.'s class and the

range of abilities of his expected classmates.  (*Id.*).  D.A.'s parents stated that they would be sending D.A. to the Aaron School until they could determine whether P.S. 6 was an appropriate placement and would seek reimbursement for the tuition.  (*Id.*).  Plaintiffs state that they did not receive a response to this letter.  (Y1 Pl. Ex. A at 2-3; Y1 Tr. 344-45).

Z.A. and R.A. sent a follow-up letter to Nancy Funke of the CSE on or about October 27, 2010, stating that they had received a tour of the fifth grade 12:1:1 class at P.S. 6 from a Dr. Muldowney a few weeks prior.  (Y1 Pl. Ex. E at 1).  D.A.'s parents set forth numerous reasons why they believed P.S. 6 was an inappropriate placement for D.A., including that (i) the school did not have a sensory gym, which D.A. required; (ii) the classroom had only one teacher and a paraprofessional, while D.A. needed support from "trained educators" to assist with his attentional issues; (iii) the hallways and the classroom's air conditioning unit were very noisy, which would be distracting for D.A.; (iv) the school's student population was too large; (v) the students in the class did not exhibit hyperactivity or attention issues like D.A.; and (vi) the school had not been responsive to Plaintiffs' requests for information.  (*Id.* at 1-2).  At the conclusion of their letter, Plaintiffs reiterated the inappropriateness of P.S. 6 for D.A., and expressed their intent to continue sending him to the Aaron School. (*Id.* at 2).  Plaintiffs indicated that they would be willing to reconsider their position if the DOE addressed their concerns regarding the appropriateness of the placement or provided D.A. with an alternate placement.  (*Id.*).  Plaintiffs

Z.A. and R.A. paid tuition totaling $45,675 for D.A.'s enrollment in the Aaron School for the 2010-2011 school year.  (Ex. V-1).

### d.    The Due Process Complaint

On July 13, 2011, Plaintiffs filed a Due Process Complaint indicating that (i) the CSE had not been properly constituted; (ii) the IEP was not "reasonably calculated to provide meaningful educational benefit and avoid regression," as it did not reflect D.A.'s present levels of performance and needs; (iii) the IEP did not contain goals calculated to allow D.A. to make "reasonable academic, social, and emotional progress and avoid regression"; (iv) the placement would not provide the level of support necessary for D.A.; (v) the Aaron School, in contrast, constituted an appropriate placement for D.A.; and (vi) the equities supported reimbursement.  (*See* Y1 Pl. Ex. A).

### e.    The IHO Hearing

IHO Mindy G. Wolman conducted hearings on February 21, May 1, June 5, and July 11, 2012.  (*See generally* Y1 Tr.).  Jennifer Radden, the 12:1:1 teacher at P.S. 6, and Feng Ye, a DOE special education teacher, testified on behalf of Defendant.  (*Id.*).  Z.A., D.A.'s father; Debra Schepard, Head of the Aaron School; and Lauren Kelin, a special education teacher at the Aaron School, testified on behalf of Plaintiffs.  (*Id.*).

### f.    The IHO Decision

On September 4, 2012, the IHO issued a decision ordering tuition reimbursement for the cost of D.A.'s 2010-2011 placement at the Aaron School.  (Y1 IHO Op. 13).  The IHO began by recounting the background of the

11

case (*id.* at 2-4), before setting forth the appropriate legal standards and the *Burlington/Carter* test (*id.* at 4-5).  Preliminarily, the IHO concluded that although an additional parent member was required at the April 2010 CSE meeting, this parent member's absence "did not impede the Student's right to a [FAPE], did not significantly impede the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, and did not cause a deprivation of educational benefits."  (*Id.* at 3-5).  The IHO noted that she gave more weight to the testimony of Z.A. than the testimony of Ye because Z.A. displayed a "better and more detailed recollection" of the CSE meeting than Ye did; Ye, in contrast, relied heavily on her review of the CSE-related documents than on her recollection of the meeting.  (*Id.* at 5-6).  In point of fact, however, the IHO did not identify specific instances where Ye's testimony diverged from Z.A.'s.  (*Id.*).

The IHO then turned to analyze whether the CSE considered sufficient evaluative material in developing D.A.'s IEP.  (Y1 IHO Op. 6).  The IHO indicated that D.A.'s "psychological, psychoeducational, speech and language, and occupational therapy evaluations, classroom observation, teacher reports, provider reports, social history, medical reports, etc." may have been reviewed and considered by district representatives in developing the IEP; however, Ye did not provide copies of all of these documents to D.A.'s parents during the meeting.  (*Id.*).  Further, the IHO noted that not all of these materials had been discussed at the CSE meeting.  (*Id.*).  Additionally, because draft copies of the IEP had not been provided to all meeting participants, the IHO reasoned that

D.A.'s parents, the special education teacher, and the DOE general education teacher had not been able to participate meaningfully in the development of the IEP.  (*Id.*).

The IHO expressed disapproval at Ye's failure to provide CSE meeting participants with copies of the 2009 psycho-educational evaluation that she had reviewed in developing the IEP, as well as her failure to discuss the document at the meeting.  (Y1 IHO Op. 6-7).  The IHO also faulted the CSE for not reviewing and discussing D.A.'s 2009 IEP in developing his 2010-2011 IEP. (*Id.* at 7).

Based on her review of the hearing testimony and the documentary evidence, the IHO concluded that the CSE did not make appropriate recommendations for D.A.  (Y1 IHO Op. 7).  First, the IHO determined that a 12:1:1 classroom setting would not have allowed D.A. to make meaningful progress given evidence presented by D.A.'s parents, and stated that the DOE failed to establish that D.A.'s needs could be met by a teacher and a paraprofessional.  (*Id.* at 7-8).  Next, the IHO found that D.A.'s IEP "did not adequately describe or address [his] academic, speech and language, and social-emotional issues."  (*Id.* at 8).  Additionally, the IHO found that the IEP was unreasonable and inappropriate because it required D.A. to make two to three years of academic progress within one academic year.  (*Id.*).

The IHO then turned to the issue of whether the P.S. 6 placement was appropriate for D.A.  (Y1 IHO Op. 8).  Stating that the burden rested with the DOE to prove that the CSE's proposed placement would have been appropriate

for D.A., the IHO concluded that the DOE failed to establish that P.S. 6 would have been able to implement D.A.'s IEP adequately.  (*Id.*).  In making this finding, the IHO relied on the testimony of Radden, the 12:1:1 special education teacher at P.S. 6.  (*Id.*).  Radden's testimony did not give the IHO confidence that, at P.S. 6, D.A.'s anxiety, cognitive rigidity, auditory processing issues, and social-emotional issues would be addressed; that D.A. would have been able to handle the level of independent work; and that D.A. would have received the necessary redirection, refocusing, and prompting that he required.  (*Id.* at 9).  Further, the IHO noted that none of the other students in D.A.'s anticipated class had language difficulties similar to D.A.  (*Id.*).

With regard to the second criterion of the *Burlington*/*Carter* test, the IHO stated that in order to prevail, D.A.'s parents had the burden of demonstrating that the Aaron School "provided instruction specially designed to meet [D.A.'s] unique special education needs." (Y1 IHO Op. 9).  Based on the hearing testimony and documentary evidence, the IHO concluded that Plaintiffs made this showing.  (*Id.* at 10).  The IHO described the various features of the Aaron School that suited D.A.'s needs, including the school's ability to accommodate "children who have average or above average cognitive ability [but] have difficulty functioning in mainstream programs" and its "small, structured, multisensory approach to learning."  (*Id.*).  According to the IHO, the Aaron School was not "overly restrictive," and D.A. had been able to make meaningful progress there.  (*Id.*).

Finally, the IHO turned to the third prong of the *Burlington/Carter* analysis, whether equitable considerations militated in favor of reimbursement. (Y1 IHO Op. 11).  Determining that D.A.'s parents "fully cooperated with the CSE" and did nothing to "interfere[] with or hinder[] the CSE in any way," the IHO concluded that equitable factors supported Plaintiffs' claim for tuition reimbursement.  (*Id.* at 11-12).  The IHO noted that D.A.'s parents expressed disagreement with the 12:1:1 classroom setting with one teacher and one paraprofessional proposed at the April 2010 CSE meeting.  (*Id.* at 11).  The IHO also detailed D.A.'s parents' initial inability to visit the placement school and the DOE's failure to be responsive to their concerns, citing these facts as "tip[ping] the equitable scale even further in the Parents' favor."  (*Id.* at 11-12).  Lastly, the IHO found that nothing in the record supported Defendant's argument that D.A.'s parents never intended to send him to a public school. (*Id.* at 12).

### g.    The SRO Decision

The DOE appealed the IHO's adverse determination, and on October 29, 2014, SRO Justyn P. Bates found that Defendant had in fact provided D.A. with a FAPE for the 2010-2011 school year.  In his decision, the SRO first discussed whether the April 2010 CSE sufficiently considered evaluative material in developing D.A.'s IEP.  (Y1 SRO Op. 9-11).  The SRO determined that the CSE "considered and reviewed a December 2009 classroom observation, a November 2009 Aaron School progress report, and an October 2009 Aaron School speech-language therapy plan to develop the student's

2010-11 IEP." (*Id.* at 10).  The SRO therefore concluded that the IHO erred in finding that the DOE denied D.A. a FAPE to the extent that finding was predicated on the CSE's purported failure to consider the evaluative material available.  (*Id.* at 10-11).

The SRO then addressed whether D.A.'s parents had the opportunity to participate meaningfully in the development of their child's IEP in light of the CSE's claimed failure to distribute the relevant materials.  (Y1 SRO Op. 11-12).  Again disagreeing with the IHO's conclusion, the SRO determined that D.A.'s parents and the special education teacher at Aaron School did in fact have an opportunity to participate in the development of D.A.'s IEP.  (*Id.* at 11).

While acknowledging that the relevant evaluative materials may not have been provided to all CSE participants, the SRO determined that the hearing record indicated that the content of these materials was sufficiently discussed during the CSE meeting and that revisions to the IEP were made at the request of D.A.'s parents and the Aaron School teacher.  (Y1 SRO Op. 11-12).  He then reviewed the attendees at the CSE meeting and the nature and extent of each attendee's participation.  First, the SRO noted that the April 2010 CSE was attended by a district school psychologist; a district special education teacher, who also served as the district representative; both of D.A.'s parents; a district general education teacher; and, telephonically, D.A.'s special education teacher at Aaron.  (*Id.* at 11).  The SRO then cited testimony of Z.A., D.A.'s father, stating that he and D.A.'s mother had provided the DOE special education teacher with teacher reports and assessments prior to the CSE meeting.  (*Id.*).

Further, the SRO noted, Z.A. testified that all of the participants in the CSE received a copy of the classroom observation; however, Z.A. was unsure whether the student's special education teacher, who participated by telephone, received a copy. (*Id.*). Additionally, the district representative testified that the February 2009 psycho-educational evaluation was not discussed during the CSE meeting because she "thought it was more important to discuss the student's 'current functioning' and 'concentrate on the current school report[s].'" (*Id.*). Accordingly, the SRO concluded that "the fact that the CSE did not adopt all of [D.A.'s parents' and the Aaron School teacher's] recommendations does not amount to a significant impediment to the parents' opportunity to participate in the development of the student's IEP[.]" (*Id.* at 11-12).

Next, the SRO addressed the substance of D.A.'s April 2010 IEP, and whether the program had been adequately developed. (Y1 SRO Op. 12-13). With respect to this issue, the SRO found that the hearing record did *not* demonstrate that the IEP had "failed to accurately describe the student's academic, speech-language and social-emotional issues." (*Id.* at 12). After comparing the IEP to the Aaron School progress report and testimony from Plaintiffs and Aaron School staff, the SRO determined that the record "demonstrate[d] that the present levels of academic and social/emotional performance … provided an accurate description of [D.A.'s] present levels of performance upon which appropriate annual goals and special education services could be recommended." (*Id.* at 13).

With regard to the goals and promotion criteria, the SRO listed the legal requirements under the IDEA and New York State regulations, and he then provided a detailed account of the academic, social-emotional, motor skills, and related services areas addressed by the IEP's goals.  (Y1 SRO Op. 13-14).  The SRO recounted the "collaborative effort" by CSE participants, including Plaintiffs, in developing those goals, and he explained the manner in which the goals complied with the measurability requirements of New York State regulations.  (*Id.* at 14).  In connection with the promotional criteria listed in the IEP, the SRO determined that such information was not mandated, but in any event, noted that nothing in the record "indicate[d] that the[] promotion criteria would impede [D.A.'s] ability to receive educational benefits."  (*Id.* at 15-16).

With respect to the recommendation of a 12:1:1 placement, the SRO related the CSE's rejection of other potential placements as insufficiently supportive, along with the DOE's reasoning for finding a 12:1:1 setting appropriate.  (Y1 SRO Op. 16).  The SRO then detailed how, in contrast to Plaintiffs' contention that D.A. required a second teacher, a classroom paraprofessional would be capable of providing the additional support necessary for D.A.  (*Id.*).

Last, the SRO addressed Plaintiffs' contentions about the assigned public school site.  The SRO first described, in detail, how the law disallows "speculative" challenges to a placement when a parent has not enrolled the child in the recommended school.  (Y1 SRO Op. 17-18).  As he then explained,

Plaintiffs could not "prevail on their claims regarding implementation of the April 2010 IEP because a retrospective analysis of how the district would have implemented the student's April 2010 IEP at the assigned public school site is not an appropriate inquiry under the circumstances of this case." (*Id.* at 18). Moreover, he noted, Plaintiffs could not be permitted to rely on information post-dating the CSE meeting and the IEP in rejecting a placement, and thus, Plaintiffs' claims about the 12:1:1 placement were unavailing. (*Id.*).

### 3.   The 2011-2012 School Year

#### a.   The CSE Meeting

Both Z.A. and R.A. attended the June 1, 2011 CSE meeting to develop an IEP for the 2011-2012 school year. (Y2 Def. Ex. 8 ("Y2 IEP") at 2). Other participants included Joan Cantore, as DOE special education teacher and district representative; Lauren Miller, a special education teacher from the Aaron School; Dr. Steven Abramowitz, a DOE school psychologist; Teresa Goudie, a DOE social worker; and Jeanette Betty, as the parent member. (*Id.*).

#### b.   D.A.'s 2011-2012 IEP

The 2010-2011 IEP indicated that D.A. "struggle[d] with self[-]regulation and social/emotional flexibility," and noted his impulsivity. (Y2 IEP at 3). The "Academic Management Needs" section of the IEP specified that D.A. needed a multisensory approach to learning that comprised check-ins, repetition, and teacher proximity; basic lines of questioning and chunking of information; visual and verbal cues and reminders; positive reinforcement; consistent schedules; and sensory tools and sensory breaks. (*Id.* at 4). Handwritten

notes on this section of the draft IEP mentioned additional recommendations, including extra time, wait time, frequent breaks, and various sensory tools. (*Id.*).  D.A.'s social/emotional management needs included water breaks, sensory breaks, and body breaks; sensory tools, including a bumpy cushion; checklists, praise, teacher reminders and leading questions, repetition of directions, visual and verbal prompts, predictable and consistent schedules and routines, visual sequencing charts, and consistency between teacher and related service providers with regard to the approach to teaching.  (*Id.* at 5-6). Handwritten notes in this area also mentioned "repetition and rephrasing of directions" and "clear expectations."  (*Id.*).

The IEP ultimately recommended a 12:1:1 classroom environment for 35 periods per week.  (Y2 IEP at 16).  The IEP noted that a 12:1 class size had been considered and rejected because D.A. "[r]equire[d] a higher level of support to maximize his potential of lea[r]ning and meeting his IEP goals."  (*Id.* at 17).

### c.  The DOE's Recommended Placement at J.H.S. 104

In July 2011, Plaintiffs received a recommended placement for D.A. at J.H.S. 104.  (Y2 Pl. Ex. A at 3).  Following receipt of this placement, in an undated letter, R.A. expressed concern about the recommended school.  (Y2 Pl. Ex. E at 1).  She reported that the school was non-responsive to her prior telephone calls seeking an appointment to visit the school; as a result, R.A. visited the school without an appointment and requested in person to visit D.A.'s assigned classroom.  (*Id.*).  As it happened, on the day of R.A.'s visit, the

12:1:1 sixth-grade class was watching a movie with several other sixth-grade classes, and many more students than usual were thus present in the classroom.  (*Id.*).  In consequence, R.A. listed numerous concerns about J.H.S. 104's appropriateness for D.A. as a result of her visit: (i) D.A. required "more individual attention and support from trained teachers than would be available in the offered class"; (ii) the school was too large for D.A.; (iii) too many students were present in the classroom at the time of R.A.'s visit; and (iv) statistics on the DOE's website indicated that bullying and fighting were prevalent at the school.  (*Id.*).  R.A. concluded by noting that she was willing to consider an alternative appropriate placement for D.A., but would continue to send D.A. to the Aaron School until one was offered, and would seek tuition reimbursement.  (*Id.* at 2).

### d.    The Due Process Complaint

On July 31, 2012, Plaintiffs filed a second Due Process Complaint that echoed many of their grievances concerning the 2010-2011 IEP; they contended that (i) the CSE for the 2011-2012 IEP had been improperly constituted and had failed to provide all relevant documentation to all participants; (ii) the IEP was not "reasonably calculated to provide meaningful educational benefit and avoid regression"; (iii) the IEP did not contain "sufficiently appropriate, measurable, and separable goals to adequately address D.A.'s needs"; (iv) the recommended placement did not provide the necessary level of attention and support required by D.A., and the school as a whole was too large and overwhelming; (v) the Aaron School provided education

21

and services tailored to meet D.A.'s needs; and (vi) the equities supported

reimbursement of Plaintiffs for the Aaron School tuition.  (Y2 Pl. Ex. A).

### e.   The IHO Hearing

On October 12, 2012, Jenessa Polsinelli, a special education teacher for

the sole 12:1:1 sixth-grade class at J.H.S. 104, testified on behalf of Defendant.

(Y2 Tr. 62-63).  Polsinelli testified, in relevant part, that her students remained

in the 12:1:1 setting for English, math, science, and social studies, but were

mainstreamed for electives and lunch.  (*Id.* at 64).  Polsinelli estimated that

there were at least 20 students in the mainstream classes.  (*Id.* at 78-79).

Significantly, when asked whether J.H.S. 104 would have been able to meet

D.A.'s goals and objectives as set forth in the IEP, Polsinelli answered in the

affirmative.  (*Id.* at 66).  The other witness for Defendant at the IHO hearing

was DOE psychologist Dr. Steven Abramowitz.  Both Z.A. and Deborah

Blenman, an educational supervisor at the Aaron School, testified on behalf of

Plaintiffs.  (*See generally* Y2 Tr.).

### f.   The IHO Decision

On January 30, 2013, the IHO issued a decision finding that the DOE

failed to provide D.A. with a FAPE for the 2011-2012 school year, and was

required to reimburse Plaintiffs for the cost of tuition at the Aaron School for

that year.  (Y2 IHO Op. 12).  Though Plaintiffs raised numerous procedural and

substantive challenges to the IEP underlying their claim that D.A. had been

denied a FAPE for the 2011-2012 school year, the IHO accepted only one of

them:  The IHO found that D.A. had been denied a FAPE because "the DOE

22

failed to offer [him] a program that conformed to [his] IEP generated on June 1, 2011." (*Id.* at 7).  Relying solely on the testimony of Polsinelli, the IHO concluded that D.A. would have been placed in her 12:1:1 class and thus would have attended general education classes for almost one-third of the school day, which contravened the IEP and suggested that it could not have been implemented at the J.H.S. 104 placement.  (*Id.*).

Next, the IHO turned to Z.A.'s and R.A.'s placement of D.A. at the Aaron School for the 2011-2012 school year.  (Y2 IHO Op. 9).  After stating the relevant legal standard, the IHO concluded that Plaintiffs had acted appropriately in placing D.A. at the Aaron School.  (*Id.* at 11).  The IHO found that the Aaron School "provided direct and specialized educational instruction that was specifically designed to meet the unique educational needs of the Student." (*Id.*).  The IHO described D.A.'s classroom environment at Aaron, composed of 14 students with two certified special education teachers.  (*Id.*).  According to the IHO, D.A.'s sensory and social issues were adequately addressed there, and D.A. was "demonstrating progress 'across the board.'" (*Id.*).  Finding no evidence that Plaintiffs failed to cooperate with the CSE or to provide notice of D.A.'s removal from J.H.S. 104, the IHO determined that Plaintiffs were entitled to tuition reimbursement for the 2011-2012 school year. (*Id.* at 11-12).

### g.    The SRO Decision

Again, the DOE appealed the IHO's determination that D.A. was denied a FAPE, and on October 29, 2014 (the same day as the decision for the 2010-

2011 school year), SRO Bates issued his decision as to the 2011-2012 school year. The SRO began his analysis by discussing Plaintiffs' allegation that they had not had a meaningful opportunity to participate in the development of D.A.'s June 2011 IEP. (Y2 SRO Op. 6-7). The SRO noted that the IHO "failed to specifically address the issue of parental participation"; however, he delved into this issue because it arose in the parents' due process complaint notice and petition. (*Id.* at 6). The SRO recounted the testimony of the DOE school psychologist, who stated that a draft IEP was prepared prior to the June 2011 CSE meeting using evaluative documentation provided by D.A.'s parents and teachers. (*Id.*). According to the district psychologist, the IEP was then read verbatim to D.A.'s parents and Aaron School teacher during the CSE meeting. (*Id.*). The district psychologist also testified that several handwritten notes were incorporated into the final IEP, including "needs extra break time," "frequent breaks," "clear expectations," "repetition and rephrasing of directions," and "questions read aloud." (*Id.* (citing Y2 Tr. 208-10; Y2 IEP at 4, 6, 12, 18)). The SRO emphasized that D.A.'s parents did not appear to contest the substantive adequacy of the June 2011 IEP, though they alleged their participation in the CSE process was hindered because they did not receive the IEP with the handwritten notes incorporated. (Y2 SRO Op. 6).

As to whether D.A.'s parents were entitled to receive a copy of the IEP with the handwritten notes incorporated, the SRO concluded that the DOE had no obligation to include the handwritten notes in the finalized IEP, "as these were merely a recordation of the suggestions provided by the parents and the

24

Aaron school teacher." (Y2 SRO Op. 6-7). The SRO found the handwritten notes "were not substantive or material modifications to the student's needs," but merely elaborated on certain needs that were already addressed in the IEP. (*Id.* at 7).

Based on his review of the hearing record, the SRO determined that D.A.'s parents did have the opportunity to participate meaningfully and actively in the development of D.A.'s June 2011 IEP. (Y2 SRO Op. 7). As the SRO observed, D.A.'s parents attended the CSE meeting in person and the Aaron School teacher attended telephonically, and Z.A. in fact testified that during the CSE meeting, "where [Plaintiffs] felt that [they] could shed some light on [D.A.], the person, the student, [they] did." (*Id.* (citing Y2 Tr. 310)). The SRO also noted that the CSE meeting minutes indicated "substantial input" by Z.A. and the Aaron School teacher. (*Id.* at 7).

The SRO next concluded that the CSE had sufficient evaluative information in developing D.A.'s June 2011 IEP. (Y2 SRO Op. 7-8). The SRO's review of the hearing record revealed that to develop the IEP, the CSE considered a December 2010 Classroom Observation report written by the district social worker who participated in the June 2011 CSE meeting, a February 2011 progress report from the Aaron School, an October 2010 Aaron School speech-language report, and an October 2010 Aaron School occupational therapy report. (*Id.* at 8). According to the SRO, taken as a whole, these documents allowed for D.A.'s functional, developmental, and academic deficits to be incorporated adequately into the IEP. (*Id.*). The SRO

25

went on to note Z.A.'s testimony that a private psychoeducational evaluation had been conducted within two to three years prior to the June 2011 CSE meeting.  (*Id.* (citing Y2 Tr. 288-89)).  The SRO recognized that the failure of the CSE to consider the 2009 psychoeducational evaluation might constitute a procedural violation; however, he ultimately found that D.A.'s parents had not alleged a procedural deficiency in the IEP that sufficed to constitute a denial of a FAPE.  (Y2 SRO Op. 8).  The SRO likewise determined that the absence of the psychoeducational evaluation did not result in an IEP developed with insufficient evaluative information.  (*Id.*).

Last, the SRO turned to the issues involving the placement at J.H.S. 104.  (Y2 SRO Op. 8-9).  He concluded that since D.A. never attended the assigned public school, the parents' claims as to how the IEP would have been implemented were impermissibly speculative.  (*Id.* at 8).  The SRO further determined that the IHO, in contravention of Second Circuit law, had relied on retrospective testimony of the public school's teacher in determining whether D.A. received a FAPE.  (*Id.* at 9).  As a result of this conclusion, the SRO did not address the propriety of D.A.'s unilateral placement at the Aaron School, or whether equitable considerations were appropriate.  (*Id.*).

## C.    The Instant Litigation

On March 2, 2015, having exhausted their administrative remedies as required, Plaintiffs filed the Complaint in this action.  (Dkt. #1).  On September 16, 2015, Plaintiffs filed a motion for summary judgment.  (Dkt. #18).  Defendant filed its opposition on November 4, 2015.  (Dkt. #23).  Plaintiffs

concluded the briefing with the filing of its reply on December 4, 2015.  (Dkt. #25).

## DISCUSSION

### A.    The Standard of Review

In IDEA cases, motions for summary judgment "serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled."  *T.Y.*, 584 F.3d at 418.  For this reason, a motion for summary judgment in an IDEA case is "an appeal from an administrative determination" that typically "triggers more than an inquiry into possible disputed issues of fact."  *Lillbask*, 397 F.3d at 83 n.3 (internal citations omitted).

The federal court's role in reviewing these state administrative decisions is, however, "circumscribed."  *R.E.*, 694 F.3d at 189; *see also T.Y.*, 584 F.3d at 417.  A federal court must give "due weight to the state proceedings, mindful that [the court] lack[s] the specialized knowledge and experience necessary to resolve questions of educational policy."  *R.E.*, 694 F.3d at 189 (internal citation, quotation marks, and alteration omitted).  "Keeping in mind this circumscribed role, the district court engages in an independent review of the administrative record and makes a determination based on a preponderance of the evidence."  *M.B. ex rel. L.C.* v. *Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77-78 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).  Although a court's review of state administrative decisions "requires a more critical appraisal of the agency determination than clear-error review, [it]

nevertheless falls well short of complete *de novo* review." *M.H.*, 685 F.3d at 244 (internal citation omitted).  District courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *T.Y.*, 584 F.3d at 417 (internal quotation marks and alterations omitted).

As relevant here, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *M.H.*, 685 F.3d at 241 (citing *A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)).  Where the IHO and SRO reach competing determinations, courts "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.

The deference owed to an SRO's decision depends on the quality of that opinion. *R.E.*, 694 F.3d at 189.  "Deference is particularly appropriate when the state hearing officer's review has been thorough and careful." *Id.* at 184 (citing *Walczak*, 142 F.3d at 129).  In reviewing the administrative decision, a district court is directed to assess "the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* at 189 (citation and quotation marks omitted).

28

**B.     Analysis**

    **1.     The 2010-2011 CSE and IEP**

For the 2010-2011 school year, Plaintiffs have raised numerous challenges in three general areas: the procedural adequacy of the CSE process, the substantive sufficiency of the IEP, and the appropriateness of the recommended placement.  The Court addresses each of these challenges in turn.

        **a.     Plaintiffs' Procedural Challenges Fail**

            **i.     Applicable Law**

An IEP may deemed procedurally deficient such that a FAPE is denied "only if the procedural inadequacies [i] impeded the child's right to a [FAPE]; [ii] significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or [iii] caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii); *see also J.G. ex rel. N.G.* v. *Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 638 (S.D.N.Y. 2011) ("[A] procedural flaw necessitates a finding that a child was denied his or her right to a [FAPE] only if it results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in formulating an IEP.").

In developing a student's IEP, the CSE must "review existing evaluation data on the child including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments,

29

and classroom-based observations; and (iii) observations by teachers and related services providers[.]"  20 U.S.C. § 1414(c)(1)(A).

Further, federal and New York State regulations require that "the results of the initial or most recent evaluation of the student and any independent evaluations obtained at public expense be considered in connection with the development of the IEP."  *M.Z.* v. *N.Y.C. Dep't of Educ.*, No. 12 Civ. 4111 (KBF), 2013 WL 1314992, at *5 (S.D.N.Y. Mar. 21, 2013) (citing 34 C.F.R. § 300.324; 8 N.Y.C.R.R. §§ 200.4(f)(1), 200.5(g)(1)(vi)).  However, the IDEA "does not require that the team review every single item of data available, nor has case law interpreted it to mean such."  *F.B.* v. *N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 582 (S.D.N.Y. 2013).

### ii.       The CSE Considered Sufficient Evaluative Material

Plaintiffs first contend that the 2010 CSE was not procedurally adequate because the CSE failed to consider sufficient evaluative material.  (Pl. Br. 20).  As Plaintiffs state, the evidence fails to show that the CSE considered a social history, medical assessment, speech-language evaluation, or occupational therapy evaluation.  (*Id.* at 21-22).  In particular, Plaintiffs allege, based on Ye's testimony, that the CSE "only considered a classroom observation and Aaron school progress reports," without considering the most recent Aaron School report from February 2010.  (*Id.* at 20).

Plaintiffs also stress the CSE's purported failure to consult a 2009 psycho-educational evaluation — while acknowledging that Ye testified to having reviewed it prior to the CSE meeting — and claim that "this evaluation

was D.A.'s most current testing available at the time of the meeting." (Pl. Br. 21). Specifically, Plaintiffs adopt the finding of the IHO "that it was necessary for the CSE to discuss [the 2009 evaluation] in developing D.A.'s IEP since it was the most recent testing available and provided critical information regarding the kind of program D.A. required." (*Id.*).

In opposition, the DOE asserts that the CSE considered sufficient evaluative information irrespective of the 2009 evaluation and complied with its obligations under the IDEA and New York State regulations. (Def. Opp. 21-22). The DOE notes that the CSE reviewed D.A.'s recent evaluations, including the December 2009 DOE classroom observation, the November 2009 Aaron School progress report, and the October 2009 Aaron School Speech-Language Therapy Plan, all of which "provided significant first-hand observation of [D.A.] by both DOE and Aaron personnel during the time period immediately preceding the CSE Meeting." (*Id.* at 22).

And as for the 2009 psycho-educational evaluation, the DOE argues that this document memorialized testing from late 2008 and February 2009, and, as such, "significantly pre-dat[ed] the materials relied upon by the CSE." (Def. Opp. 23). Moreover, Ye did review this document in advance of the CSE and testified that it would have been of "limited utility," particularly compared to the more recent documentation actually considered by the CSE. (*Id.*). Defendant urges deference to the SRO's opinion on this point, arguing that the SRO relied on and cited the relevant law and administrative record in finding that the consulted materials were adequate. (*Id.* at 23-24). In any event,

31

Defendant argues that Plaintiffs have not demonstrated that these procedural violations, alone or in combination, resulted in an insufficient IEP or denied D.A. a FAPE.  (*Id.* at 21).

Ultimately, the Court upholds the analysis of the SRO.  Here, as the SRO explained, the CSE "considered and incorporated" information relevant to D.A.'s psycho-educational challenges and needs, including from (i) the November 2009 Aaron School progress report, pertaining to D.A.'s self-regulation needs and requirement of teacher support for engagement with peers; (ii) the December 2009 DOE classroom observation conducted by Ye, as it related to D.A.'s need for follow-up questions and redirection; and (iii) the October 2009 Aaron School speech-language therapy plan, including goals to address D.A.'s speech-language needs.  (Y1 SRO Op. 10).  With respect to the 2009 psycho-educational evaluation, the SRO cited Ye's testimony that she had reviewed the document prior to the CSE meeting, though it was not ultimately discussed.  (*Id.* at 10-11).  The Court, as did the SRO, also accepts Ye's explanation that "a psychological educational [evaluation] tells a child's cognitive functioning," and "[t]hat piece didn't change at [D.A.'s] age."  (Y1 Tr. 221).  Ye explained that it was "more important for [the CSE team] to know whether [D.A.] [was] actually functioning at that time in the classroom setting," and it was "more important to discuss [his] current level an[d] [his] needs at the meeting with the classroom teacher and parent."  (*Id.*).  In any event, as the SRO explained, the ultimate IEP incorporated information from the psycho-

educational evaluation, including details of D.A.'s attentional difficulties, fine motor delays, and impulsivity.  (Y1 SRO Op. 10).

Moreover, the SRO noted, while the CSE must consider initial or recent evaluations, parental concerns, the student's needs, and the results of the student's assessments, this "'consideration' does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight."  (Y1 SRO Op. 9 (citing *T.S.* v. *Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89-90 (2d Cir. 1993) (finding that consideration of a document does not require each member of the group to read it))).  Further, the IDEA "does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP."  (*Id.* (citing *J.C.S.* v. *Blind Brook-Rye Union Free Sch. Dist.*, No. 12 Civ. 2896 (CS), 2013 WL 3975942, at *11 (S.D.N.Y. Aug. 5, 2013))).  *See also E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has recommended different programming does nothing to change the … deference to the district and its trained educators." (internal quotation marks and alterations omitted)), *aff'd*, 487 F. App'x 619 (2d Cir. 2012) (summary order).

In light of the CSE's consideration of multiple, more recent evaluative documents, Ye's review of the 2009 evaluation and the IEP's incorporation of relevant information from it, and the settled law that a CSE need not "review every single item of data available," *F.B.*, 923 F. Supp. 2d at 582, the Court

concurs with the SRO's determination that the CSE considered sufficient evaluative material to comply with the IDEA and New York State regulations.

Even if the CSE's failure to consider certain evaluative materials were deemed a procedural violation, however, the administrative record contains no evidence to suggest that it amounted to a denial of a FAPE.  *See D.B.* v. *N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 331 (S.D.N.Y. 2013) ("[T]he extensive documentation and verbal input that the CSE Members used to formulate the Student's IEP provided the DOE with more than enough current information to assess accurately the Student's skill levels."); *T.F.* v. *N.Y.C. Dep't of Educ.*, No. 14 Civ. 3401 (WHP), 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015) ("An updated psychoeducational evaluation is required only if [i] the school district determines that one is warranted, [ii] the parents or teachers request one, or [iii] the evaluation in question is three years [old] or older.").  As Plaintiffs have presented no compelling argument that D.A. was denied a FAPE by virtue of the CSE's failure to consider the 2009 psycho-educational evaluation, the Court adheres to the SRO's determination that the CSE was procedurally adequate in this regard.

### iii.      Plaintiffs Meaningfully Participated in the Development of D.A.'s 2010-2011 IEP

Plaintiffs next argue that the CSE did not adequately or meaningfully consult D.A.'s parents or the Aaron School participants.  (Pl. Br. 22-23).  Again, Plaintiffs point to the fact that Ye did not review the 2009 psycho-educational evaluation with the CSE participants, which the IHO found to be error.  (*Id.* at 23).  They also concur with the IHO's correlative finding that "[i]f the

34

psychological evaluation was important for Ms. Ye to review prior to the meeting and contained material that was being incorporated into the IEP, it was then important to provide the other meeting participants with a copy of the evaluation and to discuss the evaluation at the meeting." (Y1 IHO Op. 7).

As additional procedural deficiencies, Plaintiffs state that (i) the CSE failed to provide evaluative documents to the DOE general education teacher participating in the CSE; (ii) the CSE failed to provide the DOE classroom observation to D.A.'s teacher from the Aaron School; (iii) Fochetta and Ye prepared draft IEP pages prior to the meeting but failed to distribute copies of these; and (iv) Fochetta and Ye failed to review the goals from D.A.'s prior IEP. (Pl. Br. 23). More broadly, Plaintiffs contend that the SRO "improperly dismissed the significance of the CSE's failure to share documents with all meeting participants or to adequately discuss the content of the IEP with them," and as a result, erroneously determined that the CSE was procedurally sound. (*Id.* at 23-24).

The DOE unsurprisingly agrees with the SRO, and asserts in opposition that Plaintiffs' allegations do not amount to procedural violations under the IDEA, and that Plaintiffs "present no legal support for the proposition that the dissemination of all evaluative materials and draft IEPs to all CSE members is required to ensure parental participation under the law." (Def. Opp. 25). Rather, Defendant contends, where parents attend the CSE meeting and "advocate[] as to what program the[y] [feel] would best serve their child," they are offered the opportunity to participate meaningfully under the IDEA. (*Id.* at

35

26 (citing *R.K. ex rel. R.K.* v. *N.Y.C. Dep't of Educ.*, No. 09 Civ. 4478 (KAM)

(RLM), 2011 WL 1131492, at *14 (E.D.N.Y. Jan. 21, 2011), *report and*

*recommendation adopted*, 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd*

*sub nom. R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012))).

Defendant notes that both of D.A.'s parents, in addition to an Aaron

School special education teacher, participated in the CSE meeting.  (Def.

Opp. 26).  And D.A.'s parents clearly provided input, including by

recommending a change in D.A.'s speech therapy that was incorporated into

the IEP, approving D.A.'s listed annual goals, and participating in development

of D.A.'s Academic Management Needs.  (*Id.* at 26-27).  Similarly, Defendant

indicates that D.A.'s related services goals were adopted from the Aaron School

reports, and the teacher from that school contributed to development of D.A.'s

goals and Academic Management Needs.  (*Id.*).

Preliminarily, and as discussed above, the Court upholds the decision

of the SRO that the CSE's failure to review the 2009 psycho-educational

evaluation did not result in deprivation of a FAPE, in light of Ye's review and

incorporation of its information, in conjunction with the CSE's review of more

recent documents that provided adequate detail about D.A.'s functioning and

challenges.  With regard to the alleged failure of the CSE to distribute each

document to all participants, the Court concurs in the SRO's determination

that consideration of documents "does not require ... that every member of the

CSE read the document," particularly where the substance of the documents is

reviewed by the CSE.  (Y1 SRO Op. 9).  Moreover, Plaintiffs' assertion regarding

36

preparation of draft IEP pages is legally untenable; such advance preparation of draft IEPs is permissible under the IDEA, "[s]o long as they do not deprive parents of the opportunity to meaningfully participate in the IEP development process." *M.M.* v. *N.Y.C. Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008).  No such showing can be made here.

 With regard to participation-related claims, as noted above, a procedural deficiency amounts to denial of a FAPE *only* where the child's right to a FAPE is impeded, the parents' opportunity to participate in the decisionmaking process is "significantly impeded," or the child is deprived of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).  Here, Z.A. testified that the CSE reviewed Aaron School progress reports and the DOE classroom observation during the CSE meeting.  (Y1 Tr. 331-32).  Further, Z.A. stated that he and his wife were given an opportunity to participate and provide input during the CSE meeting, and that the Aaron School teacher was asked a number of questions about D.A.'s challenges, the Aaron School program D.A. attended, and the goals (including evaluative criteria) incorporated into the IEP. (*Id.* at 360-61).  Z.A. also testified that he and his wife "tried to give the [CSE] participants a description of [D.A.]," noting that he was bright but had difficulties processing and hearing properly.  (*Id.* at 334).  Z.A. recalled discussing D.A.'s fine motor skill difficulties, sensory issues, and attentional

issues with the CSE, and he also remembered objecting to the 12:1:1
classroom recommendation.  (*Id.* at 336-38, 340-41).[6]

        In light of all of the record evidence discussed above, the Court
determines that Plaintiffs meaningfully participated in development of the IEP,
even if certain documents were not distributed to each participant.  *See P.F.* v.
*Bd. of Educ. of the Bedford Cent. Sch. Dist.*, No. 15 Civ. 507 (KBF), 2016 WL
1181712, at *7 (S.D.N.Y. Mar. 25, 2016) (finding that parents were afforded
meaningful participation where they actively participated in the CSE process,
provided input, and voiced their concerns); *cf. A.M.* v. *N.Y.C. Dep't of Educ.*, 964
F. Supp. 2d 270, 280 (S.D.N.Y. 2013) (indicating that while a parent must have
an opportunity to participate, the parent need not have the "final word" as to
an IEP's recommendations).

        Z.A.'s testimony evinced Plaintiffs' provision of relevant reports to the
CSE, receipt of the classroom observation from the DOE, and participation in
discussion regarding D.A. and his needs; on the latter score, "changes were
made to the student's IEP at the request of the parents[] as well as the
student's special education teacher at the Aaron School, thus affording the
parents and the Aaron School teacher the opportunity to participate in the
development of the student's program."  (Y1 SRO Op. 11).  Given that the Court
has examined the record and observed the same, the Court finds that Plaintiffs'

---

[6]        In this regard, as discussed above, the IHO credited Z.A.'s testimony to a greater extent
        than Ye's testimony, though the IHO did not specify any specific areas where the two
        diverged; this Court similarly has not identified any material differences in Z.A.'s and
        Ye's recollections of the CSE meeting.

allegations regarding the failure to distribute all documents, even if assumed to be a procedural violation, did not amount to denial of a FAPE.

### b.    Plaintiffs' Substantive Challenges Fail

#### i.    Applicable Law

"An IEP is substantively adequate if it provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *DiRocco ex rel. M.D.* v. *Bd. of Educ. of Beacon City Sch. Dist.*, No. 11 Civ. 3897 (ER), 2013 WL 25959, at \*21 (S.D.N.Y. Jan. 2, 2013) (internal citation omitted); *see also Rowley*, 458 U.S. at 207 (finding an IEP substantively adequate where it is "reasonably calculated to enable the child to receive educational benefits"). Further, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and that affords the student with an opportunity for greater than mere trivial advancement." *S.W.* v. *N.Y.C. Dep't of Educ.*, 92 F. Supp. 3d 143, 160 (S.D.N.Y. 2015) (citing *T.P. ex rel. S.P.* v. *Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009)). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra* v. *Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005).

#### ii.    D.A.'s 2010-2011 IEP Was Substantively Adequate

In challenging the substantive adequacy of the 2010-2011 IEP, Plaintiffs first claim that the document failed to reflect D.A.'s "then-current levels of

39

performance and needs," and further that it "failed to provide special education
and related services tailored to meet his unique needs." (Pl. Br. 24).
Specifically, Plaintiffs state that the IEP failed to describe a host of issues,
including D.A.'s "anxiety, auditory processing issues, cognitive rigidity,
cognitive levels, disparities in his cognitive functioning, need for a sensory gym,
or fine motor functioning." (*Id.* at 24-25).[7]  Plaintiffs attribute these
shortcomings in part to the earlier-alleged procedural failings of the CSE,
asserting that while the SRO found that the IEP reflected the given evaluative
materials, this "finding erroneously ignored the inadequacy of the materials
actually considered by the CSE." (*Id.* at 26).

Defendant claims, in opposition, that the IEP was substantively
appropriate, and urges the Court to defer to the SRO's assessment. (Def.
Opp. 28-29).  With respect to the IEP's description of D.A.'s needs, Defendant
cites the IDEA's dual requirements of "[i] a statement of a student's academic
achievement and functional performance and [ii] how the student's disability
affects his or her progress in relation[] to the general education curriculum."
(*Id.* at 29 (citing Y1 SRO Op. 12)).  Defendant argues that the IEP sufficiently
(i) described D.A.'s ADHD diagnosis, regulation and attentional difficulties, and
fine motor delays; (ii) detailed D.A.'s "impulsivity and demanding immediate
answers," along with strategies for dealing with D.A.'s challenges; and
(iii) acknowledged and described D.A.'s "struggles with self-regulation needs,

---

[7]     During the IHO hearing, Z.A. testified that D.A.'s anxiety "wasn't as significant [at the
time of the CSE meeting] as perhaps it [was]" by the time of the IHO hearing.  (Y1
Tr. 335).

executive functioning and higher order cognition," in addition to providing methods for addressing those difficulties.  (Def. Opp. 29).  And, in response to the enumerated conditions Plaintiffs allege were omitted from the IEP, Defendant asserts that the IEP nonetheless addressed the substance of those conditions; for instance, Plaintiffs' assertion about the need for a sensory gym was reflected in the requirement of "sensory tools and breaks."  (*Id.* at 30).

The record supports Defendant's position.  In examining the IEP, the SRO first detailed the documents and information a CSE must consider under the IDEA and state regulations.  As the SRO noted, "while the CSE is required to consider recent evaluative data in developing an IEP, so long as the IEP accurately reflects the student's needs[,] the IDEA does not require the CSE to exhaustively describe the student's needs by incorporating into the IEP every detail of the evaluative information available."  (Y1 SRO Op. 12).  Even so, the SRO explained, in detail, how the IEP accurately described D.A.'s academic, speech-language, and social-emotional issues, in stark contrast to Plaintiffs' claim that this information was absent; specifically, the SRO detailed the manner in which the IEP's present levels of academic performance, goals, and management and self-regulation needs reflected the goals and provisions included in the November 2009 Aaron School progress report and testified to by Aaron School staff.  (*Id.* at 12-13).  The SRO also stated that D.A.'s anxiety, auditory processing issues, and cognitive rigidity were addressed by the recommendations of redirection, verbal and visual reminders, teacher

proximity, graphic organizers, access to sensory tools, breaks, teacher support, and use of a calculator and manipulatives for math. (*Id.* at 13).

In sum, the SRO properly determined that the record "demonstrate[d] that the present levels of academic and social/emotional performance … provided an accurate description of the student's present levels of performance upon which appropriate annual goals and special education services could be recommended." (Y1 SRO Op. 13). Further, the SRO found that "in light of the management needs and annual goals [in the IEP], the absence of a detailed description of the student's anxiety, auditory processing issues, or cognitive rigidity needs from the present levels of functional performance section of the IEP does not result in a denial of a FAPE." (*Id.*). Given the SRO's detailed engagement with the record and thorough recounting of the manner in which D.A.'s challenges and needs were addressed, the Court defers to the SRO's expertise in determining that the IEP was substantively adequate. *See Grim* v. *Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

Plaintiffs next contend that the IEP's goals were not appropriate or sufficiently measurable, as required by the IDEA. (Pl. Br. 25). In this vein, Plaintiffs argue that many of the goals "contemplated more than a year of progress given D.A.'s delays," and that the IEP omitted goals in significant areas of need. (*Id.* at 25-26). Defendant claims, in opposition, that the SRO correctly determined the 20 goals were measurable and designed to meet D.A.'s

42

needs, as required by the IDEA.  (Def. Opp. 30).  As Defendant states, these goals addressed "a broad array of [D.A.'s] functional and academic needs, such as reading, writing, math, socialization, self-regulation, daily living skills, motor skills, verbal reasoning, problem solving, and speech language."  (*Id.* at 31). Further, they "contained detailed descriptions, and criteria for measurement of [D.A.'s] progress."  (*Id.*).  Defendant also notes that the goals were formulated and revised with input from D.A.'s parents and his teacher at Aaron School, and the IEP reflected information from the Aaron School progress report.  (*Id.* at 31).

Under the IDEA and relevant state regulations, an IEP must contain "measurable annual goals," both academic and functional, along with "the method used to measure the student's progress toward those goals," including how and how often such progress will be measured.  *M.H.*, 685 F.3d at 245 (citing 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. § 200.4(d)(2)).  Upon review of the IEP, the Court observes that it contained 20 annual goals targeting (i) academic skills, including reading, "oral fluency," writing, handwriting, encoding, math computation, and math problem-solving; (ii) social-emotional skills, including social engagement with peers, negotiating conflicts with peers, and self-esteem; (iii) motor skills, including graphomotor skills, "awareness of [ ] self-regulatory state," daily living school-based skills, motor planning and body awareness, and postural control and strength; and (iv) speech-language skills, including verbal reasoning and problem-solving, oral and written narrative language,

pragmatic and conversational language, ability to execute spoken and written instruction, and knowledge and use of semantics.  (Y1 IEP at 6-16).

With regard to evaluations of success, the IEP required three progress reports for each goal annually, and also specified how frequently within the year D.A.'s progress should be evaluated.  (Y1 IEP at 6-16).  Further, almost every goal within the IEP provided a target percentage of accuracy or mastery upon measurement; in addition, each goal specified which individual, whether a teacher, counselor, or related service provider, would evaluate D.A.'s progress on the relevant objective.  (*Id.*).  As the SRO determined, in light of the enumerated criteria, methods, and timelines for measurement, the IEP's goals contained "sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress."  (Y1 SRO Op. 15 (citing *Tarlowe* v. *N.Y.C. Bd. of Educ.*, No. 07 Civ. 7936 (GEL), 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008) (internal quotation marks omitted))).

The SRO found further support for his decision in Ye's testimony that the CSE members developed the academic goals during the meeting, and the related services goals were drawn from the Aaron School reports.  (Y1 SRO Op. 14 (citing Y1 Tr. 240-41)).  The Court notes that Z.A. also testified, during the IHO hearing, that the CSE asked D.A.'s Aaron School teacher about the goals; Z.A. recalled "a discussion [with the teacher] about … what would constitute success in the different areas that they were targeting, those percentages we spoke to earlier."  (Y1 Tr. 361).  As Z.A. further stated, "[t]here

44

was some back and forth about this.  I don't know the amount of time that they

spent, but it seemed like a full conversation in that they asked her, and she

answered all their questions." (*Id.*).  The SRO appropriately deemed this "a

collaborative effort between district personnel, the parent and the student's

Aaron teacher to address the parents' concerns regarding the student's annual

goals," which supported "a finding that the annual goals in the April 2010 IEP

targeted the student's identified areas of need."  (Y1 SRO Op. 14).

Again, the Court concurs with the SRO's detailed and reasoned judgment

that the goals included in the IEP were substantively appropriate and

adequate.  Given that (i) the IEP's goals were specific and measurable as

required by the IDEA; (ii) the record demonstrates that Plaintiffs and D.A.'s

teacher from the Aaron School were afforded the opportunity to contribute to

formulation of the goals; and (iii) the SRO deemed the goals substantively

appropriate and targeted to D.A.'s needs, the Court finds that the IEP's goals

were calculated to enable D.A. to make progress, and accordingly, D.A. was not

denied a FAPE.

With respect to Plaintiffs' assertion that the IEP's goals were

inappropriate due to their contemplation of more than one year's progress, the

Court notes that neither Plaintiffs nor the IHO offers support for the contention

that anticipation of more than one year of progress necessarily results in denial

of a FAPE.  In contrast, as the SRO observed, the IEP designated that D.A.

would take part in standard State and local assessments, presumably

correlating to his grade level, and "State and federal regulations only require a

45

CSE to develop measurable benchmarks for students who participate in *alternate* assessments." (Y2 SRO Op. 15 (emphasis added)). Relatedly, while the promotion criteria similarly contemplated D.A.'s performance at grade level for a certain percentage of the time, the SRO noted that "[n]othing in the IEP's description of the promotional criteria alters how instruction should be delivered to [D.A.] and nothing in the hearing record indicates that these promotion criteria would impede [D.A.'s] ability to receive educational benefits." (*Id.* at 15-16). Given that the SRO determined that the 2011-2012 IEP contained goals that targeted D.A.'s areas of need and "reflect[ed] a collaborative effort" among the CSE participants (*id.* at 14), in conjunction with his related finding that the promotion criteria would not impact D.A.'s receipt of a FAPE, the Court finds that D.A. was not denied a FAPE solely because of the ambitiousness of the IEP's goals.

Plaintiffs' final challenges to the substantive adequacy of the IEP are personnel-based. First, Plaintiffs argue that the 12:1:1 recommendation was inappropriate, as it would not provide sufficient support for D.A. to make progress; they argue that D.A. requires two trained teachers, as evidenced by the 2009 psycho-educational evaluation, whereas the SRO inexplicably concluded that the required support could be provided by "supplementary school personnel." (Pl. Br. 26 (citing Y1 SRO Op. 16)). Second, Plaintiffs state, the IEP failed to provide transitional supports to aid D.A. in his move from a smaller school and classroom to the recommended placement. (Pl. Br. 27).

46

In response, Defendant again urges deference to the SRO's expertise and his determination that such placement was appropriate. (Def. Opp. 32). While Plaintiffs press the import of the 2009 psycho-educational report's endorsement of two teachers for D.A., Defendant notes that the second teacher's functions — described in the record as providing "explanation and redirection" and "individualized support," in addition to "facilitating social skills between students" — could be fulfilled by a classroom paraprofessional. (*Id.* at 32-33). The SRO proffered similar explanations, and the Court is ill-equipped to second-guess that decision.

New York law provides that a 12:1:1 class placement is appropriate for students "whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students." 8 N.Y.C.R.R. § 200.6(h)(4)(i). As the SRO explained, the CSE determined that D.A. required "the structure of a small classroom setting" rather than a general education setting, and a 12:1 special class was also rejected as insufficiently supportive. (Y1 SRO Op. 16).

With regard to their claim that D.A. required two teachers, Plaintiffs rely in large part on the 2009 psycho-educational evaluation, the sole document that explicitly recommended two teachers. As noted above, however, the CSE is not required to adhere to every recommendation from an expert in formulating a student's IEP. *See J.C.S.*, 2013 WL 3975942, at *11. Z.A. testified at the IHO hearing that D.A. required a second teacher to "provide the frequent individualized support that [he] needed, the calming him down, the

managing the break process if he need[ed] it." (Y1 Tr. 342). Similarly, Debra

Schepard, head of the Aaron School, testified that D.A. needed "a lot of

reinforcement and scaffolding and repetition," including "explanation, …

redirection, … [and] social skills between students." (*Id.* at 315). The SRO

noted that, according to Ye's testimony, the classroom paraprofessional in the

12:1:1 recommendation would serve to assist D.A. with "redirection" and could

work on his "difficulty with attention and social relationships." (Y1 SRO Op. 16

(citing Y1 Tr. 207-08)). After considering all of this testimony, the SRO deemed

the 12:1:1 placement appropriate, finding that the "descriptions of the

student's need for two teachers in the classroom align with the types of support

that are permissibly provided by supplementary school personnel, and do not

indicate a need for an additional adult in the classroom capable of providing

independent instruction." (Y1 SRO Op. 16). The Court defers to the SRO's

reasoned conclusion, based on the record and the applicable New York

regulation, that the 12:1:1 recommendation was appropriate. *See L.R.* v. *N.Y.C.*

*Dep't of Educ.*, No. 15 Civ. 1542 (FB) (RML), 2016 WL 3390413, at *3 (E.D.N.Y.

June 20, 2016) ("To be sure, considerations of appropriate class size are

matters of educational policy on which courts should afford greater deference

to administrative findings."); *see also F.O.* v. *N.Y.C. Dep't of Educ.*, 976 F. Supp.

2d 499, 511 (S.D.N.Y. 2013) ("[C]lass size and instructional programming are

matters of educational policy concerning which courts defer to a state

administrative officer.").

### c.    Plaintiffs' Challenges to the Placement Fail

Plaintiffs' final set of challenges for the 2010-2011 school year concern the placement at P.S. 6.  They contend first that the Court should adhere to the IHO's determination that "to show that it offered D.A. a FAPE, Defendant had to show not only that it provided an appropriate placement offer, but also that the placement was capable of appropriately implementing the student's IEP." (Pl. Br. 27).  The SRO, in contrast, had concluded that Plaintiffs' challenges to the placement were speculative and irrelevant, since Plaintiffs had rejected the placement at P.S. 6 prior to sending D.A. there.  (*Id.* at 28).  While acknowledging that speculation about a placement is inadequate to find denial of a FAPE, Plaintiffs seek to ground their claim in precedent holding that "information gleaned as a result of conversations with school personnel or visits to a recommended school placement suggesting that the placement would be unable to appropriately implement a student's IEP program or appropriately address the student's needs is not speculative."  (*Id.* at 28-29 (collecting cases)).  Plaintiffs further argue that "the SRO improperly suggested that there is a presumption that an offered placement will be able to implement a student's IEP," which Plaintiffs contend improperly shifts the burden of proof to the parents.  (*Id.* at 29-30).

In response, Defendant presses the SRO's finding that Plaintiffs' challenges to the placement were speculative and were "impermissible substantive attacks on the IEPs couched as challenges to the adequacy of the placements." (Def. Br. 35).  Defendant relies on *M.O.* v. *N.Y.C. Dep't of Educ.*,

793 F.3d 236, 245 (2d Cir. 2015), to argue that challenges to aspects like the size of a school, student-teacher ratios, or academic programming amount to "cloaked attacks on the substantive recommendations of an IEP." (Def. Br. 36). As Defendant notes, such challenges "[do] not trigger a duty on the part of the school district to provide evidence regarding [the placement's] adequacy." (*Id.* (quoting *M.O.*, 793 F.3d at 245)).

Generally speaking, a court's "evaluation must focus on the written plan offered to the parents," and "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195. However, the law provides that "[i]n addition to challenging the IEP, parents may also prospectively challenge a proposed placement school's *capacity* to implement a child's IEP." *M.T.* v. *N.Y.C. Dep't of Educ.*, No. 14 Civ. 10124 (GHW), 2016 WL 1267794, at *6 (S.D.N.Y. Mar. 29, 2016) (emphasis added). Even then, arguments about a proposed placement relating to its size, curriculum, or environment — which do not implicate the capacity of the placement to perform the IEP's designated services — may be deemed "impermissibly speculative arguments" amounting to "substantive attacks on [the] IEP that [are] couched as challenges to [its] adequacy." *Y.F.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 6322 (LGS), 2015 WL 4622500, at *7 (S.D.N.Y. July 31, 2015) (internal citation omitted), *aff'd sub nom. Y.F., individually and on behalf of K.H., a minor* v. *N.Y.C. Dep't of Educ.*, — F. App'x —, 2016 WL 4470948 (2d Cir. Aug. 24, 2016) (summary order). Accordingly, the validity of Plaintiffs' challenges to the proposed placement

depend on whether they properly implicate the placement's capacity to implement D.A.'s IEP; for this reason, the Court has examined, in detail, Plaintiffs' challenges in this regard.

In substance, Plaintiffs argue that Defendant failed to prove it could implement D.A.'s IEP.  (Pl. Br. 30-31).  Plaintiffs note that Jennifer Radden, the teacher of the 12:1:1 class at P.S. 6, testified that she had not previously taught a student who required sensory tools, had not "implemented the suggestions of an occupational therapist in her classroom to support a student with sensory needs," and did not have a sensory corner or tools in her classroom.  (*Id.* at 30-31).  Plaintiffs also note that P.S. 6 lacked a sensory gym, which D.A. required to stay regulated.  (*Id.* at 31).

Separately, Plaintiffs contend that the placement would not provide D.A. with "appropriate and similarly-functioning peers and peer models," as (i) the other students did not have sensory issues; (ii) only two received occupational therapy, for issues dissimilar to D.A.'s; (iii) D.A. would be the only student with "significant auditory processing issues" and anxiety issues; and (iv) only one other student, who was largely mainstreamed, had ADHD.  (Pl. Br. 31).  Also, Plaintiffs note, the record demonstrated that the students were "socially immature" and "would get into conflicts."  (*Id.* at 32).  As Plaintiffs argue, "[t]he IHO properly recognized that being the only student with his issues would have negatively impacted D.A.'s self-esteem, among other things, and would have negatively affected his ability to progress academically, socially, and emotionally.  (*Id.* at 31-32).

Finally, Plaintiffs argue more generally that the environment at P.S. 6 was not sufficiently small and structured for D.A., and that he would not have had sufficient support during the large settings at lunch, recess, and arrival/dismissal to "remain regulated and to negotiate conflicts with his peers." (Pl. Br. 32). Plaintiffs contend that they "reasonably relied upon their observations and the information provided to them during their visit and advised the DOE of their understanding and concerns," but the DOE did not respond to these issues. (*Id.* at 32-33).

While maintaining that Plaintiffs' attacks on the capacity of P.S. 6 to implement D.A.'s IEP are impermissibly speculative and are, in reality, substantive attacks on the IEP, Defendant also argues that such allegations are nonetheless unfounded. (Def. Br. 37). With regard to the recommended 12:1:1 class, Defendant cites Radden's testimony that she would have implemented all of the IEP's goals and management needs, and that D.A. would not have presented a particular challenge, as many students in the class required the "redirection" provided by the classroom paraprofessional. (*Id.* at 37-38). Further, Defendant notes, based on Radden's testimony, D.A. "would have fit squarely into [ ] Radden's 2010-2011 classroom," as his grade levels fit within the range of her other students and a number of other students received occupational therapy, counseling, and speech-language therapy. (*Id.* at 38).

The Court finds, as an initial matter, that Plaintiffs' contentions about the size and environment of P.S. 6 cannot suffice to demonstrate that the placement was inappropriate; the IEP did not dictate a particular school size

(*see generally* Y1 IEP), and such challenges have been deemed impermissible substantive attacks on an IEP, *see Y.F.*, 2015 WL 4622500, at *7.  Accordingly, these challenges are unavailing.

Plaintiffs' remaining challenges to the placement amount to impermissibly speculative claims that the DOE would not adhere to the IEP, couched attacks on the substance of the IEP, or claims based on later-learned information that did not play a role in D.A.'s parents' decision to reject the placement.  Specifically, Plaintiffs' claims about the 12:1:1 classroom and Radden's ability to implement the IEP are impermissibly speculative, as Radden testified that she *could* fulfill the terms of the IEP, and Plaintiffs fail to present evidence that the placement lacked the ability to implement the program.  In any event, Plaintiffs cannot base such a challenge on information they learned from Radden during the course of the IHO hearing.  *See M.T.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 5226 (RJS), 2016 WL 1072491, at *9 (S.D.N.Y. Feb. 26, 2016) ("This test of a school's capacity of implement a student's IEP, however, is limited to facts uncovered by a parent *prior to* rejecting the placement option.  It does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO hearing." (emphasis in original)); *cf. C.L.K.* v. *Arlington Sch. Dist.*, No. 12 Civ. 7834 (NSR), 2013 WL 6818376, at *13 (S.D.N.Y. Dec. 23, 2013) ("[A] substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE.").

Finally, Plaintiffs' claim about P.S. 6 lacking a sensory gym amounts to a substantive attack on the IEP, as the plan did not mandate a sensory gym for D.A.; rather, it required only "sensory tools and breaks," which Plaintiffs did not demonstrate the placement would not provide.  Given that Plaintiffs did not present capacity-based challenges grounded in information learned prior to the IHO hearing and Due Process Complaint, but rather only speculated that the placement would not adhere to the IEP's provisions, the SRO did not erroneously shift the burden in stating that "a retrospective analysis of how the district would have implemented [D.A.'s] April 2010 IEP at the assigned public school site [was] not an appropriate inquiry under the circumstances of this case." (Y1 SRO Op. 18).  Accordingly, Plaintiffs' challenges to the placement for the 2010-2011 school year fall short as well.

## 2.  The 2011-2012 CSE and IEP

### a.  Plaintiffs' Procedural Challenges Fail

Plaintiffs challenge the procedural adequacy of the 2011 CSE on similar grounds to the 2010 CSE, and the Court can dispose of certain of the interrelated challenges in short order.  First, Plaintiffs allege that the 2011 CSE failed to consider sufficient evaluative material, as it neither referenced nor considered the 2009 psycho-educational evaluation.  (Pl. Br. 33-34).  Moreover, Plaintiffs allege, the CSE failed to consult D.A.'s related service providers regarding D.A.'s progress and the appropriateness of the goals for that year. (*Id.* at 34).  As Plaintiffs claim, the SRO concluded only summarily that the

documents considered were adequate, and accordingly, his conclusion does not merit deference.  (*Id.*).

In opposition, Defendant argues that the CSE appropriately considered "numerous documents which had been developed significantly closer in time [to] the 2011 CSE Meeting" than the 2009 report, including the Aaron School reports from February and May 2011, an Aaron School speech-language therapy plan and an occupational therapy plan both dated October 2010, and a DOE classroom observation from December 1, 2010.  (Def. Br. 24).  Further, as Defendant again argues, Plaintiffs fail to allege how this omission, even if a procedural error, amounted to denial of a FAPE.  (*Id.* at 25).

The Court concurs with Defendant.  For the same reasons set forth in the context of the 2010-2011 CSE and IEP, the failure to consider the 2009 psycho-educational evaluation simply did not result in deprivation of a FAPE, as the CSE considered substantial, recent documentary evidence and testimony from D.A.'s parents and Aaron School staff.  Again in this context, such an omission, even if considered a procedural error, did not "result[] in the loss of an educational opportunity" for D.A. or "seriously infringe[] [his] parent[s'] opportunity to participate in formulating an IEP."  *See Matrejek* v. *Brewer Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) (summary order).

Plaintiffs further allege that the CSE again failed to consult Plaintiffs or the Aaron School participants meaningfully, as "[t]he record shows that the CSE drafted the entire IEP prior to the June [2011] IEP meeting and brought

this draft to the meeting, but failed to share it with the parents for input." (Pl. Br. 34). And while modifications were made to this document, Plaintiffs contend that the final IEP did not reflect the changes discussed, "demonstrating that the parents and D.A.'s teacher were deprived of the opportunity to provide critical input into the actual IEP." (*Id.*). Moreover, Plaintiffs claim that the CSE failed to distribute copies to D.A.'s teacher of the relevant documents, including the DOE classroom observation, the speech-language and occupational therapy reports, or the March 2011 Aaron School report. (*Id.* at 35). Finally, Plaintiffs claim procedural error in the fact that, despite their expressed concerns about the 12:1:1 program, and the CSE's awareness that D.A.'s Aaron School classroom was more supportive, the CSE nonetheless recommended a 12:1:1 class structure. (*Id.*).

As noted above in the context of the 2010-2011 school year, draft IEPs are permissible under the IDEA "[s]o long as they do not deprive parents of the opportunity to meaningfully participate in the IEP development process." *M.M.*, 583 F. Supp. 2d at 506. Moreover, in contrast to Plaintiffs' contention, Dr. Abramowitz testified, without refutation, that the draft IEP was read aloud verbatim and reviewed in its totality during the CSE meeting. (Y2 Tr. 211-12). With regard to parental participation, as Z.A. testified, the CSE "elicited most of the information about [D.A.] from the conversation with the Aaron teacher, as far as academics [were] concerned and what have you" (*id.* at 287); that said, Z.A. and R.A. participated by (i) "highlighting how important it was to have [D.A.] get those types of sensory aids, to help him through the day"; (ii) raising

56

objections to the 12:1:1 classroom recommendation; and (iii) "where [they] felt that [they] could shed some light on [D.A.], the person, the student, [they] did" (*id.* at 290-91, 310).  In light of Z.A.'s testimony, the Court concurs with the SRO's determination that "the hearing record reflects meaningful and active parental participation in the development of the student's June 2011 IEP" (Y2 SRO Op. 7), as substantiated by the meeting minutes reflecting Plaintiffs' and the Aaron participants' input (Y2 Def. Ex. 4).

Further, with regard to the handwritten modifications that were not incorporated into the final IEP, the SRO determined that "these were merely a recordation of the suggestions provided by the parents and the Aaron School teacher," and the DOE was not obligated to include these on the finalized version.  (Y2 SRO Op. 6-7).  Thus, the SRO determined this did not impede Plaintiffs' participation in the CSE.  (*Id.*).  Finally, as discussed above, *see supra* at 38-39, in spite of Plaintiffs' protestations of the 12:1:1 classroom structure, the CSE was not obligated to adhere to all of their wishes, and as such, its rejection of a smaller classroom atmosphere did not constitute a denial of Plaintiffs' meaningful participation in the CSE.  Thus, Plaintiffs have failed to allege procedural violations amounting to denial of a FAPE, as D.A.'s parents and Aaron School staff actively participated and contributed to development of the IEP.

### b.    Plaintiffs' Substantive Challenges Fail

With regard to the substantive adequacy of the IEP, Plaintiffs first contend that the procedural errors they ascribe to the CSE resulted in a

substantively inappropriate IEP that failed to reflect D.A.'s need for more individualized support.  (Pl. Br. 35-36).  Plaintiffs claim that while Dr. Abramowitz testified that a 12:1:1 class was appropriate based on the Aaron School progress report, he was in fact aware that D.A.'s program at Aaron was more supportive than a 12:1:1 class.  (*Id.* at 36).

In response to Plaintiffs' arguments, Defendant states that the 12:1:1 recommendation was appropriate for the same reasons as in the 2010-2011 IEP, in large part because Plaintiffs "allege[d] no change in [D.A.'s] condition between the 2010 and 2011 CSE Meetings that would have warranted a significantly different program recommendation."  (Def. Opp. 33).  Defendants further state that the Aaron School Progress Report, which noted that "a self-contained 12 to 1 to 1 center-based program is the most appropriate for the Student," validated this recommendation.  (*Id.* at 33-34 (citing Y2 Tr. 206; Y2 Def. Ex. 12 at 8)).

Z.A. testified during the IHO hearing that, after hearing the 12:1:1 recommendation from the CSE, Plaintiffs "raised an objection on that, saying [they] didn't think that that would be an appropriate level of support, but that [they] would certainly visit it and any other recommended placement that they had."  (Y2 Tr. 291).  When asked why a 12:1:1 would not provide appropriate support, Z.A. elaborated:

> I mean, [D.A.] is a delightful, very well meaning kid, who wants to learn, but he's got some big difficulties.  And if they're addressed, he has a shot at improving and doing well at learning.  And if it's not the right level of support, he stumbles badly and it affects his self-worth, his ability to learn.  And the difference is not that much, I

> mean, if he's motivated and he's open, he's like, a
> different kid than when he doesn't have that kind of
> level of support.   And it permeates like, all of his
> academic subjects, [ ] just his whole persona.  When he
> does get that level of support, a lot of the time, he'll
> respond positively.   He'll be motivated to do what
> doesn't come naturally to him and what's a little bit
> difficult for him.

(*Id.* at 292).  Z.A. later reiterated that Plaintiffs objected "that with that kind of

support, that [D.A.] wasn't getting two teachers, [ ] we didn't feel that that was

the right level of support for [D.A.], but that we would certainly go and see a

school and keep a totally open mind."  (*Id.* at 313).  In contrast, the Aaron

School Progress Report indicates that "[d]ue to [D.A.'s] difficulties with self

regulation, executive functioning and social/emotional flexibility, a self

contained 12:1:1 center-based structured program is most appropriate for

him."  (Y2 Def. Ex. 12 at 8).

As Plaintiffs acknowledge on reply, a finding that the 12:1:1 program

was appropriate for 2011-2012 "depends upon a finding that a 12:1:1 class

was an appropriate recommendation for D.A. for the 2010-2011 [year]."  (Pl.

Reply 13).  This Court has upheld the SRO's finding to this effect.  In light of

the determination that a 12:1:1 program was substantively appropriate for the

2010-2011 year, Plaintiffs must present a compelling argument that a change

was necessary for the subsequent year; they have not done so.

In light of the CSE's reliance on the Aaron School Progress Report,

Plaintiffs' failure to present evidence — apart from Z.A.'s expressed

belief — that a different class setting was warranted, and the fact that neither

the IHO nor the SRO deemed the 12:1:1 recommendation inappropriate, this

Court will not second-guess the appropriateness of that class structure.  While Plaintiffs desired a second teacher to aid D.A.'s instruction, "questions of class size, teaching methodologies and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies."  *N.Y.C. Dep't of Educ.* v. *V.S.*, No. 10 Civ. 5120 (JG) (JO), 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011).

Moreover, in light of the SRO's determination that the 12:1:1 class structure was appropriate for the 2010-2011 school year, and his finding that the additional classroom paraprofessional could meet D.A.'s needs, including the student's needs for explanation, redirection, and individual support, the Court finds that the same classroom structure remained appropriate for the following year.  Accordingly, this component of the SRO's decision is affirmed.

Further, Plaintiffs argue that the IEP was substantively inadequate because it failed to "contain[] sufficient or appropriate management needs to address D.A.'s needs during the 2011-12 [school year]."  (Pl. Br. 36).  Plaintiffs cite a laundry list of "management needs" allegedly discussed during the CSE meeting but not reflected in the IEP, including:

> extra time, wait time, frequent breaks, redirection, deep pressure, repetition and rephrasing of directions, clear expectations, and specific sensory tools such as balls, putty, a visual timer, and chewing sugar free gum, teacher support to problem solve conflicts with peers, checklists, provision of a separate workspace for math computation, previewing information, additional time to organize his materials before transitions, teacher assistance to locate and correct his errors, and asking "wh" questions to help D.A. formulate his thoughts to complete tasks.

(*Id.*).  Certain of these purported requirements — for instance, extra time and wait time, balls and putty, and repetition and rephrasing — were handwritten on the draft IEP, but allegedly were not incorporated into the final version. (*Compare* Y2 Def. Ex. 8, *with* Y2 Pl. Ex. W).

As Defendant argues in opposition, Plaintiffs proffer no legal support for their contention that the IEP was substantively inadequate due to its omission of alleged needs and tools.  (Def. Opp. 34).  Moreover, Defendant states, "the gravamen of [Plaintiffs'] complaint seems to be that handwritten notes taken on the DOE's version of [the] 2011 IEP were not reflected in the 2011 IEP presented to Parents."  (*Id.* (internal citations omitted)).  Indeed, on reply, Plaintiffs voice this concern, stating that "Defendant argues that the management needs in the IEP were read aloud such that the parents or Aaron [staff] could suggest modifications, but simultaneously admits that the CSE unilaterally determined that it was unnecessary to include the modifications that were suggested."  (Pl. Reply 13).

While the IHO did not specifically address the instant claim, after dispelling a number of Plaintiffs' other substantive challenges to the IEP, the IHO did state, "[l]astly, I have considered all of the other claims raised by the parent[s] against the DOE and I find that they do not support any additional findings with respect to a denial of [a] FAPE."  (Y2 IHO Op. 9).  On appeal, the SRO evaluated this contention in the context of the procedural adequacy discussed above, but then explicitly concluded that "the handwritten notes were not substantive or material modifications to the student's needs, but

61

rather explanations of certain of the student's management needs already addressed in the IEP specifying particular strategies to be used for the student."  (Y2 SRO Op. 6-7).

At the outset, the Court agrees with Defendant that Plaintiffs do not proffer a legal basis under which these alleged omissions would rise to the denial of a FAPE.  Moreover, the law is clear that "[e]very aspect of a student's specific educational issues does not need to be detailed in the IEP, as long as the IEP [is] designed to specifically address those issues."  *G.B.* v. *N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 250 (S.D.N.Y. 2015); *cf. Bryant* v. *N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) ("The IDEA guarantees only that students with disabilities are provided an appropriate education, not one that provides everything that might be thought desirable by loving parents." (internal quotation marks omitted)).

Here, the IEP mandated a number of categories of D.A.'s academic management needs into which the omissions alleged by Plaintiffs would appear to fall: (i) a multisensory approach involving, *inter alia*, manipulatives, frequent check-ins, repetition, and teacher proximity; (ii) use of "basic line[s] of questioning" with "chunking of information"; (iii) verbal and visual cues and reminders; (iv) positive reinforcement; (v) sensory tools and breaks; and (vi) leading questions, reminders, and teacher prompts.  (*See generally* Y2 IEP). The Court finds that, while the IEP did not enumerate each precise tool or method desired by Plaintiffs, it sufficiently addressed in the categories it set

forth D.A.'s attentional, executive functioning, auditory processing, sensory integration, and other difficulties.

Moreover, the SRO determined that the tools and methods cited did not constitute "substantive or material modifications to the IEP," but rather, only explications of the provisions of D.A.'s IEP suggested by Plaintiffs and Aaron School staff. (Y2 SRO Op. 6-7). In light of the Second Circuit's determination that "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers," *Grim*, 346 F.3d at 382, the Court will not second-guess the SRO's determination that the failure to incorporate these notes into the finalized IEP was not an omission resulting in an inappropriate IEP. Accordingly, the Court agrees with the SRO's determination that the IEP was substantively adequate and reasonably calculated to allow D.A. to make progress, rather than regress, during the 2011-2012 school year.

### c.   Plaintiffs' Challenges to the Placement Fail

Plaintiffs next claim that the IHO "properly concluded that Defendant had failed to meet its burden to show that J.H.S. 104 could have implemented D.A.'s IEP as written"; they state that the testimony of Jenessa Polsinelli, the teacher of the class recommended to D.A., confirmed their understanding from their school visit that the offered class did not operate as a 12:1:1 class for the entire school day, and thus, "the school would not have been able to provide D.A. with the full-time 12:1:1 program for 35 periods weekly mandated by his IEP. (Pl. Br. 38). Plaintiffs press the IHO's conclusion that "not providing

[D.A.] with approximately 10 periods per week of instruction in the 12:1:1 was more than a *de minimis* failure in the DOE's ability to implement [D.A.'s] IEP." (*Id.* at 38-39 (citing Y2 IHO Op. 7)).

Defendant, in turn, contends that "the record contains absolutely no evidence that D.A. would have been assigned to Polsinelli's classroom for the 2011-2012 school year," and suggests, based on the testimony of Dr. Abramowitz, that the placement would not have modified the IEP (for example, by "mainstreaming" D.A.) without conducting an evaluation and formally amending the IEP. (Def. Opp. 38-39).[8]  Defendant also asserts that Plaintiffs "seek to speculate regarding issues about which the record is silent," and they "ask the Court to find a deprivation of [a] FAPE based on what might have happened had numerous contingent circumstances occurred." (*Id.* at 39).

This Court deems Plaintiffs' challenge to the placement impermissibly speculative, albeit not on the precise grounds raised by Defendant.  After R.A. visited the placement, Plaintiffs sent a letter to Idalia Ocasio of the DOE indicating that J.H.S. 104 would not be an appropriate placement.  (Y2 Pl. Ex. E at 1).  More specifically, Plaintiffs wrote that "[w]hen [R.A.] visited the school, the 12x1x1 class was watching a movie with a large amount of 6th graders.  There were so many kids in the classroom.  That would be overwhelming for [D.A.]." (*Id.*).  Plaintiffs' Due Process Complaint for the 2011-2012 school year stated similarly that

---

[8]     The Court notes that it is perplexed by Defendant's contention that the record fails to demonstrate that D.A. would be placed in Polsinelli's class, as Polsinelli testified that hers was the only 12:1:1 sixth grade class.  (Y2 Tr. 72).

> [d]uring the parent's visit, she was shown a 12:1:1 6th grade class that was watching a movie with a large number of other 6th grade students. The classroom was very crowded. This setting would have been overwhelming for [D.A.] and too overstimulating. Upon information and belief, the school would not have been able to provide the level of support and supervision that [D.A.] would have required to function appropriately in integrated activities such as what the parent observed. Furthermore, the CSE did not discuss during the June 2011 IEP meeting the support that [D.A.] would require for participation in mainstream activities, nor did the CSE recommend any supports in the IEP itself for these activities.

(Y2 Pl. Ex. A at 3-4). While Plaintiffs now contend that Polsinelli's testimony "confirmed [their] understanding from their visit to the school that the offered class did not operate as a 12:1:1 class for the entire school day" (Pl. Br. 38), the record does not reflect that Plaintiffs previously held or expressed this concern prior to hearing Polsinelli's testimony. While the Due Process Complaint and Plaintiffs' letter both express a certain amount of concern about D.A. participating in an "integrated activit[y]" at some point — specifically, watching a movie — their suggestion of a concern about potential mainstreaming for classes or electives did not arise until the IHO hearing.

Contrary to Plaintiffs' current arguments, their pre-hearing challenge — which focused on R.A.'s observation of a large group of students, including the 12:1:1 class, watching a movie together — simply cannot be read as a substantive challenge to the placement's ability to implement the IEP. Like the 2010-2011 IEP, the 2011-2012 IEP also provided that D.A. was to have "full participation" in "lunch, assemblies, trips and/or other school activities with non-disabled students," a category into which the movie-watching activity

observed by R.A. presumably would fit; indeed, Plaintiffs referred in the Due Process Complaint only to a concern with D.A.'s "participation in mainstream *activities*."  (Y2 Pl. Ex. A at 3-4 (emphasis added)).  Accordingly, the complaints about this in Plaintiffs' letter to the DOE and in the Due Process Complaint sounded in a challenge to the very terms of the IEP, rather than an expectation that the placement would not adhere to the 12:1:1 program for D.A.'s classes, as designated.

More to the point, this ground — on which Plaintiffs now rely heavily and which underscored the IHO's opinion — was not known or expressed at the time Plaintiffs rejected the placement, and Plaintiffs cannot now recast their rejection in light of the later-learned information.  Accordingly, the information learned from Polisinelli at the IHO hearing is not a permissible capacity-based ground for rejection of the proposed placement.  *See M.T.*, 2016 WL 1072491, at *9 ("Th[e] test of a school's capacity of implement a student's IEP, however, is limited to facts uncovered by a parent *prior to* rejecting the placement option. It does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO hearing." (emphasis in original)); *see also Scott ex rel. C.S.* v. *N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 445 (S.D.N.Y. 2014) ("The proper inquiry for the Court, therefore, is whether the alleged defects of the placement were reasonably apparent to Plaintiff[s] or the DOE when Plaintiff[s] rejected [the placement].").  In this regard, "the appropriate forum for such a claim is a later proceeding to show that the child was denied a [FAPE] because necessary services included in the IEP were not provided in

practice." *F.L. ex rel. F.L.* v. *N.Y.C. Dep't of Educ.*, 553 F. App'x 2, 9 (2d Cir. 2014) (summary order) (citing *R.E.*, 694 F.3d at 187 n.3).

Plaintiffs further argue that the DOE "failed to demonstrate that the placement and offered class would have provided D.A. with appropriate and similarly-functioning peers or with appropriate peer models," based on Polsinelli's testimony that D.A. "would have been one of the highest functioning students academically in her class" and that D.A. had differing speech-language needs and sensory requirements from the other students in the class. (Pl. Br. 39). Along the same lines, Plaintiffs contend that the DOE "failed to establish that JHS 104 would have provided D.A. with the safe, structured environment with appropriate peers and peer models that he required to make measurable progress and avoid regression." (*Id.* at 40). Plaintiffs base this on the size of the school (approximately 1,100 students) and the claim that "the entire sixth grade (365 students) ate lunch together supervised by less than 10 teachers and administrators." (*Id.*). Plaintiffs state that the size and activity of the placement, in addition to alleged bullying and fighting issues, would have overwhelmed D.A., made him less "available for learning," and posed a safety concern. (*Id.*).

In response, Defendant contends that, as evidenced by D.A.'s IEP and Polsinelli's comments, D.A. would fall "squarely in the range of Ms. Polsinelli's students for the 2011-2012 school year," were he to attend J.H.S. 104 and be placed in Polsinelli's class. (Def. Br. 39). Polsinelli testified that her students' abilities (i) ranged from kindergarten- to fifth-grade level for decoding and

reading; (ii) ranged from first- to fifth-grade level for math computation and first- to fourth-grade for math problem-solving; and (iii) were at approximately fourth-grade level for writing skills.  (Y2 Tr. 92-93).  D.A., by comparison, performed at (i) approximately a fourth-grade level in decoding, reading comprehension, and writing; (ii) a fourth- or fifth-grade level in listening comprehension; and (iii) a third-grade level for math computation and problem-solving.  (Y2 Def. Ex. 8 at 3).  Accordingly, the Court agrees that placement among Polsinelli's students would have been appropriate given D.A.'s assessed levels of performance.

Finally, with regard to the size and safety of the school, "[t]hese concerns, while understandable, do not relate to whether the school could implement the IEP."  *M.T.*, 2016 WL 1267794, at *13 (internal quotation marks omitted); *see also J.M.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 353 (VEC), 2016 WL 1092688, at *10 (S.D.N.Y. Mar. 21, 2016) ("Plaintiffs' complaint that the school is too large is an impermissible challenge because it does not relate to whether the school could implement the IEP."); *Y.F.*, 2015 WL 4622500, at *7 (finding challenges to proposed placement based on "size," "curriculum," or "environment" unavailing where they did not contradict specific provisions of IEP).  A review of D.A.'s IEP demonstrates that Plaintiffs' expressed concerns do not contradict its terms.  (*See generally* Y2 IEP).  While the IEP notes that D.A. "continues to require the structure and support of a small classroom setting (*id.* at 18), it does not dictate general parameters or requirements for the school as a whole.  Thus, Plaintiffs' concerns about the size and safety of the school do not speak to the

placement's ability to implement the IEP and are insufficient to find D.A. was denied a FAPE.

## CONCLUSION

For the foregoing reasons, Plaintiffs' procedural, substantive, and placement-based challenges to the 2010-2011 and 2011-2012 CSE meetings and resultant IEPs are unavailing, and their motion for summary judgment is DENIED.  The Clerk of Court is directed to terminate the motion at docket entry 17.  Because Defendant did not cross-move for summary judgment, the Court will not dispose of this case in its entirety.  Accordingly, the parties are ORDERED to appear at a conference with the Court on **October 7, 2016, at 3:00 p.m.** in Courtroom 618 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York, to discuss next steps.

SO ORDERED.

Dated:     September 13, 2016
           New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge